1   MICHAEL J. FINNEGAN #137409
    NATHAN M. SPATZ #204769
2   PILLSBURY WINTHROP SHAW
        PITTMAN LLP
3   725 South Figueroa Street, Suite 2800
    Los Angeles, CA  90017-5406
4   Telephone:  (213) 488-7100
    Facsimile:  (213) 629-1033
5   nathan.spatz@pillsburylaw.com

6   Attorneys for Plaintiff
    AUTOZONE DEVELOPMENT CORPORATION
7

**ORIGINAL**

FILED
CLERK, U.S. DISTRICT COURT

AUG 23 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                   SOUTHERN DIVISION

11

12   AUTOZONE DEVELOPMENT            Case No. CV05-6157 R(CWx)
13   CORPORATION, a Nevada          COMPLAINT FOR:
14   corporation,
                                    1.  Breach of Contract
15                       Plaintiff,  2.  Injunctive Relief
16        vs.
                                    Demand for Jury Trial
17   STANTON PLAZA GROUP II, LLC,
18   a California limited liability company;
     BRANDYWINE DEVELOPMENT
19   CORPORATION, a California
     corporation,
20
21                       Defendants.
22
23
24
25
26
27
28

20555319v1                    - 1 -              COMPLAINT



1    Plaintiff AUTOZONE DEVELOPMENT CORPORATION, a Nevada

2  corporation ("Plaintiff" or "AutoZone"), does hereby allege as follows:

3                                    PARTIES

4        1.      AutoZone is, and at all times relevant hereto has been, a

5  corporation duly organized and existing by virtue of the laws of the State of

6  Nevada and is authorized to do business and is doing business in the County of

7  Orange, State of California.

8        2.      AutoZone's principal place of business is, and at all times

9  relevant hereto has been, Memphis Tennessee.

10        3.      AutoZone is informed and believes, and on that basis alleges, that

11  Defendant STANTON PLAZA GROUP II, LLC ("Stanton Plaza Group") is

12  and at all times herein mentioned has been, a limited liability corporation duly

13  organized and existing by virtue of the laws of the State of California and

14  doing business in the County of Orange, State of California.  Stanton Plaza

15  Group is in the business of building and developing residential homes and

16  commercial properties.

17        4.      AutoZone is informed and believes, and on that basis alleges, that

18  Defendant BRANDYWINE DEVELOPMENT CORPORATION

19  ("Brandywine") is and at all times herein mentioned has been, a corporation

20  duly organized and existing by virtue of the laws of the State of California and

21  doing business in the County of Orange, State of California.  Brandywine is in

22  the business of building and developing residential homes and commercial

23  properties.

24        5.      AutoZone is informed and believes, and on that basis alleges, that

25  there exists, and at all times herein mentioned there existed, a unity of interest

26  and ownership between defendant Stanton Plaza Group, on one hand, and

27  defendant Brandywine, on the other, such that any individuality and

28  separateness between Stanton Plaza Group and Brandywine have ceased, and

1   Stanton Plaza Group is the alter ego of Brandywine. Adherence to the fiction
2   of the separate existence of Stanton Plaza Group as an entity distinct from
3   Brandywine would permit an abuse of the limited liability privilege and would
4   promote fraud and injustice.

5       6.   AutoZone is informed and believes, and on that basis alleges, that
6   at all times mentioned herein, Defendants, and some of them, were the agents,
7   servants and employees of some or all of the other Defendants, and were
8   acting within the scope of said agency, authority and employment.

9       7.   AutoZone is informed and believes, and on that basis alleges, that
10  Defendants agreed to perform the acts hereinafter described, and that
11  Defendants performed and continue to perform such acts pursuant to said
12  agreement or agreements.

13                    <u>JURISDICTION AND VENUE</u>

14      8.   This Court has jurisdiction over this action under 28 U.S.C. §§
15  1332(a) in that diversity of citizenship exists between the parties and the
16  amount in controversy exceeds $75,000.00, exclusive of interest and costs.
17  Venue is proper within this district pursuant to 28 U.S.C. §§ 1391 because the
18  claims set forth in this Complaint arose within this district and one or more of
19  the defendants reside in this judicial district.

20      9.   AutoZone is a Nevada corporation with its principal place of
21  business in Memphis, Tennessee.

22      10.  AutoZone is informed and believes, and on that basis alleges, that
23  Stanton Plaza Group is and at all times herein mentioned has been, a limited
24  liability corporation duly organized and existing by virtue of the laws of the
25  State of California and doing business in the County of Orange, State of
26  California.

27      11.  AutoZone is informed and believes, and on that basis alleges, that
28  Brandywine is and at all times herein mentioned has been, a corporation duly

1   organized and existing by virtue of the laws of the State of California and
2   doing business in the County of Orange, State of California.

3       12.     AutoZone is informed and believes, and on that basis alleges,
4   that Brandywine is the sole member of Stanton Plaza Group.

5                           GENERAL ALLEGATIONS

6       13.     On or about April 20, 1998, AutoZone's predecessor-in-interest,
7   AutoZone, Inc., a Nevada corporation, and James A. Besaw, an individual,
8   executed a written lease entitled "Lease Agreement" ("Lease") for certain real
9   property located at 11320 Beach Boulevard, City of Stanton, California
10  (hereinafter referred to as the "Premises").  A true and correct copy of the
11  Lease is attached hereto as Exhibit "A" and incorporated herein by reference.

12      14.     The Premises is a 9100 sq. ft. retail unit located in the Stanton
13  Plaza Shopping Center in the City of Stanton.

14      15.     The Premises is a portion of a 133,063 sq. ft. general shopping
15  center ("General Shopping Center") which is currently improved with retail
16  shops and related asphalt parking spaces.

17      16.     Pursuant to the terms of the Lease, AutoZone's predecessor-in-
18  interest, AutoZone, Inc., entered into possession and continued possessing the
19  Premises.

20      17.     In or about April of 1998, AutoZone's predecessor-in-interest,
21  AutoZone, Inc., a Nevada corporation, and James A. Besaw, an individual,
22  executed a "First Amendment to Lease Agreement" ("First Amendment"),
23  wherein the parties to the Lease agreed to have the Lease re-executed so that
24  the landlord was "James A. Besaw and Lana D. Besaw, Husband and Wife as
25  community property."  A true and correct copy of the First Amendment is
26  attached hereto as Exhibit "B" and incorporated herein by reference.

27      18.     On or about February 20, 2001, AutoZone's predecessor-in-
28  interest, AutoZone, Inc., a Nevada corporation, and James Besaw executed an

"EFT Payment Addendum" ("Second Amendment"), wherein the landlord agreed to be paid sums due from AutoZone via an electronic funds transfer. A true and correct copy of the Second Amendment is attached hereto as Exhibit "C" and incorporated herein by reference.

19.     Pursuant to the terms of the Lease and amendments thereto, the initial term of the Lease was for five (5) years, commencing May 1, 1998.

20.     The monthly rent for the first five (5) year term was $8,000.00 per month.

21.     Pursuant to Section 5 of the Lease, AutoZone was granted four (4) separate options to extend the term of the Lease for four (4) separate consecutive additional periods of five (5) years each.

22.     The extension periods and corresponding rent pursuant to Section 5 of the Lease are as follows:

| Extension Period | Monthly Rent |
| --- | --- |
| May 1, 2003 to April 30, 2008 | $ 9,000.00 |
| May 1, 2008 to April 30, 2013 | $10,350.00 |
| May 1, 2013 to April 30, 2018 | $12,000.00 |
| May 1, 2018 to April 30, 2023 | $13,500.00 |

23.     On or about April 18, 2001, the parties to the Lease executed a "Third Amendment to Lease Agreement" ("Third Amendment"), wherein AutoZone exercised its first option to extend the terms of the Lease for an additional five (5) year period, and the parties to the Lease agreed to reduce the monthly rent from $9,000.00 as specified in Section 5 of the Lease to $8,500.00. A true and correct copy of the Third Amendment is attached hereto as Exhibit "D" and incorporated herein by reference.

24.     On or about October 7, 2004, the Besaws sold all of their rights, title and interest in the General Shopping Center and the Premises to Defendant Stanton Plaza Group, a wholly-owned entity of Brandywine, via

1   Grant Deed No. 902728 as recorded in Orange County for the amount of

2   $6,000,000.00.

3   ### DEFENDANTS INTEND TO REDEVELOP THE GENERAL SHOPPING

4   ### CENTER AND BREACH AUTOZONE'S LEASE

5        25.    AutoZone is informed and believes, and on that basis alleges, that

6   Defendants acquired the General Shopping Center and the Premises from the

7   Besaws in order to redevelop the area into a mixed-use residential and

8   commercial project.

9        26.    Several properties located within the General Shopping Center,

10  however, are or were under long-term leases with the landlord, including the

11  subject Premises.

12       27.    On or about February 8, 2005, approximately four months after

13  acquiring the Premises, Defendants and the Stanton Redevelopment Agency

14  ("SRA") entered into an "Owner Participation and Disposition and

15  Development Agreement" ("DDA"). A true and correct copy of the DDA is

16  attached hereto as Exhibit "E" and incorporated herein by reference.

17       28.    The specific purpose of the DDA was to facilitate the

18  development of a mixed-use residential and commercial project by Defendants

19  on a series of currently separate parcels which are owned, or under offer to

20  acquire, by Defendants.

21       29.    AutoZone is informed and believes, and on that basis alleges, that

22  Defendants intend to rely upon the SRA's purported power of eminent domain

23  to acquire AutoZone's leasehold interest, thereby forcing AutoZone to

24  abandon the Premises.

25       30.    Pursuant to the terms of the DDA, Defendants were required to

26  exercise their best efforts to acquire AutoZone's leasehold interest through

27  negotiations with AutoZone so that Defendants could redevelop the Premises.

28       31.    Rather than make any attempt to acquire AutoZone's leasehold

1    interest through negotiation and agreement, Defendants have utilized the SRA

2    to institute an eminent domain action against AutoZone in order to acquire

3    AutoZone's leasehold interest.

4        32.    Pursuant to Section 7(D) of the Lease, Defendants are not

5    permitted to redevelop the Premises into a mixed-use residential and

6    commercial project.

7        33.    Section 7(D) of the Lease requires Defendants to maintain the

8    Premises as a "General Shopping Center," such that Section 7(D) provides as

9    follows: "Landlord represents, warrants and agrees and this Lease is made and

10   entered into upon the express condition that Landlord shall at all times during

11   the Term of this Lease and any extension or renewal thereof maintain a

12   General Shopping Center upon the Entire Premises, which Shopping Center

13   shall always have as a part thereof a Parking Area as shown on Exhibit "B"

14   annexed hereto, to furnish parking space without charge to all customers of the

15   Entire Premises seeking same."

16       34.    Based upon the actions of Defendants, it is clear that Defendants

17   have no intention of maintaining the Premises in its current form as a General

18   Shopping Center.

19       35.    When Defendants acquired the General Shopping Center in

20   October of 2004, Defendants began terminating the leases of other tenants and

21   haphazardly boarding up the General Shopping Center, which has resulted in a

22   high vacancy rate and made the General Shopping Center look dilapidated.

23       36.    Defendants' intention of redeveloping the Premises is in direct

24   violation of the terms of the Lease.

25       37.    Pursuant to Section 20 of the Lease, Defendants were required to

26   provide AutoZone with written notice within ten (10) days after knowledge of

27   any intended or actual taking of the Premises by eminent domain.

28       38.    Section 20 of the lease provides as follows: "Landlord agrees to

1   immediately within ten (10) days after any notice of intended or actual taking

2   or appropriation to give Tenant written notice thereof, providing to Tenant full

3   details of such taking or appropriation, including, without limitation, copies of

4   all condemnation plans or surveys submitted by the condemning authority, a

5   statement of the nature of the project to be conducted by the condemning

6   authority, and such other information as might be necessary to enable Tenant

7   to determine its future course of conduct."

8       39.   Defendants failed to provide AutoZone with the notice required

9   pursuant to Section 20 of the Lease, despite the fact that Defendants knew

10   since October of 2004 that Defendants and the SRA intended on taking

11   AutoZone's leasehold interest by eminent domain.

12       40.   The failure by Defendants to provide AutoZone with the requisite

13   notice pursuant to the terms of the Lease has significantly hindered

14   AutoZone's ability to determine its future course of conduct.

15   <u>DEFENDANTS HAVE INTENTIONALLY NEGLECTED THE GENERAL</u>

16   <u>SHOPPING CENTER AND THE PREMISES</u>

17       41.   Under California law, in order for the SRA to justify taking the

18   Premises for a public use under its purported power of eminent domain, the

19   SRA must make a determination that the General Shopping Center is blighted.

20       42.   AutoZone is informed and believes, and on that basis alleges, that

21   when Defendants acquired the General Shopping Center from AutoZone's

22   former landlord for $6,000,000.00, the General Shopping Center was fully

23   occupied by businesses paying rent to the landlord and tax revenues to the

24   City of Stanton, and was generally well-maintained.

25       43.   AutoZone alone invested hundreds of thousands of dollars in

26   leasehold improvements when it entered into the Lease for the Premises.

27       44.   In order to attempt to justify any purported taking of the Premises

28   by the SRA, Defendants began neglecting the General Shopping Center in

1  order to create symptoms of blight.

2       45.    Since Defendants acquired the General Shopping Center in

3  October of 2004, rather than fulfilling their obligations under the terms of the

4  Lease for the Premises, Defendants have made a concerted effort to allow the

5  General Shopping Center to substantially deteriorate.

6       46.    In particular, since Defendants acquired the General Shopping

7  Center in October of 2004, Defendants began terminating the leases of other

8  tenants and haphazardly boarding up various stores in the General Shopping

9  Center, which has resulted in the General Shopping Center looking

10  abandoned.

11       47.    In addition, Defendants failed to maintain the General Shopping

12  Center in good working order, such that the parking lot lights either do not

13  work or had not worked for a considerable amount of time, the parking lot has

14  dangerous holes and needs to be striped, the landscaping is not being

15  maintained, and no effort is being made to clean the trash or dirt in the parking

16  area.

17       48.    Pursuant to Section 24 of the Lease, the landlord is required to

18  maintain the common facilities.  Section 24 of the Lease provides as follows:

19  "Landlord agrees at its own expense to maintain throughout the Term all

20  Common Facilities in good repair, clean and clear of snow, ice, rubbish and

21  debris, properly drained, striped (restriping shall be performed by Landlord at

22  least biannually) and adequately lighted and safe-guarded at all times when the

23  Demised Premises is open for business and for one-half hour after closing

24  thereof."

25       49.    AutoZone is informed and believes, and on that basis alleges, that

26  Defendants are intentionally neglecting their duties under the terms of the

27  Lease in order to create blight and justify a taking of AutoZone's leasehold

28  interest through eminent domain.

1    50.    In addition, as a result of Defendants' aforementioned actions,

2  sales and profits at AutoZone's store have significantly declined over the

3  course of the past year, resulting in significant damages to AutoZone.

4                      **FIRST CAUSE OF ACTION**

5                         (For Breach of Contract)

6    51.    Plaintiff hereby refers to, re-alleges and incorporates by reference

7  paragraphs 1 through 50, inclusive, above as though fully set forth herein.

8    52.    Plaintiff has performed all obligations, covenants and conditions

9  on its part to be performed under the terms of the Lease.

10    53.    Defendants have breached the Lease by, among other things, (1)

11  failing to maintain a General Shopping Center; (2) attempting to redevelop the

12  General Shopping Center into a mixed-use residential and commercial project;

13  (3) failing to provide notice to AutoZone of the intended eminent domain

14  action; and (4) failing to maintain the common facilities.

15    54.    As a direct and proximate result of Defendant's breach of the

16  Lease, Plaintiff has been damaged and will incur additional damages in an

17  amount to be proven at trial, but in excess of $75,000.00.

18    55.    In addition, Plaintiff has been compelled to commence this

19  litigation to recover damages as a result of Defendant's breaches as

20  hereinabove alleged.  Plaintiff, therefore, is entitled to an award of a

21  reasonable sum to compensate it for its attorneys' fees and costs of suit

22  incurred herein pursuant to paragraph 34 of the Lease.

23                      SECOND CLAIM FOR RELIEF

24                (For Injunctive Relief Against All Defendants)

25    56.    Plaintiff hereby refers to, re-alleges and incorporates by reference

26  paragraphs 1 through 55, inclusive, above as though fully set forth herein.

27    57.    As set forth in the First Claim for Relief, Defendants have

28  engaged in a course of conduct in breach of the Lease.  By their conduct,

1  Defendants intend to deprive, and will deprive, AutoZone of all of its rights
2  under the Lease.

3      58.   If Defendants are not enjoined from engaging in certain conduct,
4  as described below, AutoZone will suffer irreparable injury for which there is
5  no adequate remedy at law.  Pursuant to Federal Rule of Civil Procedure 65,
6  injunctive relief is warranted.

7      59.   Accordingly, AutoZone requests that this Court enter the
8  following injunctive relief:

9          (a)   Order Defendants and its officers, directors, shareholders,
10         agents, managers, employees, attorneys, accountants, and all other
11         persons with actual or constructive knowledge of the injunctive relief,
12         and each of them to fully perform their obligations under the terms of
13         the Lease;

14         (b)   Order the Defendants and its officers, directors,
15         shareholders, agents, managers, employees, attorneys, accountants, and
16         all other persons with actual or constructive knowledge of the injunctive
17         relief, and each of them cease their efforts to redevelop the Premises
18         into a mixed-use residential and commercial project and perform their
19         obligations under the terms of the Lease by maintaining the property as
20         a General Shopping Center.

21  WHEREFORE, AutoZone prays for judgment as follows:

22     1.   On its First Claim For Relief against Defendants, for damages
23  against for breach of lease in an amount to be determined at trial but in excess
24  of $75,000.00 exclusive of costs and interest; together with interest until the
25  amounts owed by Defendants to AutoZone are paid in full; together with all
26  costs and reasonable attorneys' fees incurred or to be incurred to enforce the
27  Lease.

28     2.   On its Second Claim For Relief against Defendants, that this

1   Court grant the following injunctive relief:

2         (a)   Order Defendants and its officers, directors, shareholders,

3   agents, managers, employees, attorneys, accountants, and all other

4   persons with actual or constructive knowledge of the injunctive relief,

5   and each of them to fully perform their obligations under the terms of

6   the Lease;

7         (b)   Order the Defendants and its officers, directors,

8   shareholders, agents, managers, employees, attorneys, accountants, and

9   all other persons with actual or constructive knowledge of the injunctive

10  relief, and each of them cease their efforts to redevelop the Premises

11  into a mixed-use residential and commercial project and perform their

12  obligations under the terms of the Lease by maintaining the property as

13  a General Shopping Center.

14  3.    On all Claims For Relief against all Defendants:

15        (a)   For costs of suit incurred herein;

16        (b)   For reasonable attorneys' fees; and

17        (c)   For such other relief as the Court deems just and equitable.

18  Dated:  August 22, 2005.

19

20        MICHAEL J. FINNEGAN
      NATHAN M. SPATZ

21        PILLSBURY WINTHROP SHAW
         PITTMAN LLP

22        725 South Figueroa Street, Suite 2800
      Los Angeles, CA  90017-5406

23

24        By _____

25             Nathan M. Spatz
      Attorneys for Defendant

26        AUTOZONE DEVELOPMENT
      CORPORATION

27

28

1

## DEMAND FOR JURY TRIAL

2        Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the

3   Federal Rules of Civil Procedure.

4

5   Dated:  August 22, 2005.

6                                        MICHAEL J. FINNEGAN
                                         NATHAN M. SPATZ
7                                        PILLSBURY WINTHROP SHAW
                                              PITTMAN LLP
8                                        725 South Figueroa Street, Suite 2800
                                         Los Angeles, CA  90017-5406
9

10                                       By _____
11                                               Nathan M. Spatz
                                         Attorneys for Defendant
12                                       AUTOZONE DEVELOPMENT
                                         CORPORATION
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Stanton, CA

# LEASE AGREEMENT

**THIS LEASE** made as of _APRIL 20_ , 1998, between **James A. Besaw, an individual** (hereinafter called "Landlord") and **AutoZone, Inc., a Nevada corporation** (hereinafter called "Tenant").

1. **ACCEPTANCE:**   In the event this Lease is not accepted by Landlord and returned to Tenant on or before April 30, 1998, this offer to lease shall be void.

1.1 **EFFECTIVE DATE:** This Lease shall be effective upon the date that Tenant receives a fully executed original of this Lease (hereinafter the "Effective Date").

2. **WITNESSETH:**  The parties hereto agree that this Lease sets forth all agreements, covenants and conditions express or implied between the parties, and supersedes any prior oral or written agreements between the parties with respect to the premises hereinafter described.  The following exhibits are attached to this Lease and made a part hereof:

        Exhibit "A" - Legal Description
        Exhibit "B" - Plot Plan
        Exhibit "C" - Title Exceptions
        Exhibit "D" - Non-Disturbance and Attornment Agreement
        Exhibit "E" - Subordination, Non-Disturbance, and Attornment Agreement

3. **PREMISES:**  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the approximately 9,100 square foot premises to be located in the Stanton Plaza in the City of Stanton, County of Orange, State of California, and more particularly described as the Demised Premises in Exhibit "A" and shown outlined on Exhibit "B", together with all improvements now or hereafter erected thereon and all rights and appurtenances thereunto belonging.  Demised Premises is part of the Landlord's other property hereinafter referred to as Entire Premises and described in Exhibit "A" and shown outlined on Exhibit "B".

3.1 **TENANT'S PRO RATA SHARE:**  Whenever in this Lease reference is made to Tenant's pro rata share same will be calculated as follows:

        Size (Street Level Floor Area) of Demised Premises          9,100

                                                                                    ÷          = 20.8590%

        Size (Floor Area) of all structures in Entire Premises          43,628

unless and until either the size (floor area) of the Demised Premises or size (floor area) of the structures in the Entire Premises are changed in which event the above percentage shall be adjusted accordingly.

4. **COMMENCEMENT OF TERM:** The term of this Lease ("the Term") shall commence on the same date as is provided in Section 6 (**RENT**) for the commencement of payment of monthly rent and shall end upon the last day of the month  following the expiration of five (5) years after such commencement date unless

_—14—_

sooner terminated or extended as herein provided. Upon the commencement of the Term, the parties will execute a memorandum setting forth the commencement and termination dates.

5. **EXTENSION PERIODS:** Landlord grants to Tenant four (4) separate options to extend the Term for four (4) separate consecutive additional periods (hereinafter called "Extension Periods") of five (5) years each on the same terms and conditions as set forth in this Lease for the Term other than Rent, which is outlined in Section 6 below. Each option shall be automatically exercised by Tenant unless Tenant shall give notice to Landlord at least six (6) months before the expiration of the Term or Extension Period then in effect of Tenant's desire to terminate this Lease, and upon such automatic renewal, the Extension Period shall become part of the Term.

6. **RENT:** Tenant agrees to pay to Landlord throughout the Term the monthly sum Eight Thousand Dollars ($8,000.00) (unless such rent shall be abated or diminished as in this Lease elsewhere provided) (hereinafter called "Rent") in advance, on the first day of each calendar month, commencing with the first day of the month next following the earlier of (a) the opening by Tenant of its store in the Demised Premises for business with the public, or (b) Acceptance and Delivery of the Demised Premises (as provided in Section 22 herein), and continuing throughout the duration of the Term EXCEPT that Landlord and Tenant agree that for the thirteenth (13th) , twenty-sixty(26th) and thirty-ninth (39th) months of the Term, Tenant shall be exempt from the eight thousand dollars ($8,000.00) payment of Rent without being in default under the terms of this Lease. If either (a) or (b) in the preceeding sentence occurs on a day other than the first day of a month, then the first monthly rental payment shall include, in addition to Rent as defined herein, a prorated amount of Rent determined according to the following formula:

$$\frac{Rent}{number\ of\ days\ in\ month} \times (Number\ of\ days\ in\ month-day\ of\ month) = prorated\ amount\ of\ Rent$$

Notwithstanding the foregoing, if Landlord has not completed Landlord's obligations under Section 22 of this Lease before the occurrence of (a) or (b) of this Section, then Rent shall not commence until the first day of the month following the date that Landlord has completed Landlord's obligations set forth in Section 22 of this Lease.

All payments of Rent shall be made to Jim Besaw, P.O. Box 3928, Dana Point, CA 92629, whose Social Security Number is 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 or to such other person or corporation or at such other place as shall be designated by Landlord, in writing, delivered to Tenant at least ten (10) days prior to the next ensuing rent payment date. Landlord and Tenant agree that the monthly Rent for any Extension Period, if exercised by Tenant, shall be as follows:

First five year Extension Period          $9,000 per month          $108,000 Annually

| | | |
|---|---|---|
| Second five year Extension Period | $10,350 per month | $124,200 Annually |
| Third five year Extension Period | $12,000 per month | $144,000 Annually |
| Fourth five year Extension Period | $13,500 per month | $162,000 Annually |

7. **LANDLORD'S TITLE:**    (A) Landlord covenants that Landlord has fee simple title to The Entire Premises and the Demised Premises described on Exhibit "A" hereof and full right and authority to make this Lease; that said premises are free and clear of and from all liens, restrictions, leases and encumbrances (except as set forth in Exhibit "C") and that there are no laws, ordinances, governmental rules or regulations or title restrictions or zoning or other matters which will restrict, limit or prevent Tenant's operation of an automobile parts, supply and accessories store or any department thereof in the Demised Premises.  Landlord covenants that so long as Tenant is not in default hereunder, Tenant shall have quiet and peaceful possession and enjoyment of the Demised Premises, the Common Facilities portions of Entire Premises and of all rights and appurtenances thereunto belonging.

(B)  Concurrently with the execution of this Lease, Landlord and Tenant have executed a Short Form Lease.  Immediately after commencement of the Term, Landlord and Tenant shall execute an Amended Short Form Lease which sets forth the actual commencement date of this Lease (if different from the previously recorded Short Form Lease).  Either Landlord or Tenant may record the Short Form Lease and the Amended Short Form Lease.

(C) Landlord agrees (at its own cost and expense) to furnish to Tenant proof satisfactory to Tenant that Landlord's title at the time of recording said Short Form Lease was in accordance with the foregoing covenants, that the Demised Premises and Entire Premises as described in Exhibit "A" are the same as shown outlined on Exhibit "B".  Landlord shall also furnish an agreement in form satisfactory to Tenant executed by any mortgagee or holder of any lien prior to this Lease subordinating each such mortgage or lien affecting the premises described on Exhibit "A" of this Lease, unless Landlord and such mortgagee or the holder of such lien executes and delivers to Tenant duly acknowledged triplicate counterparts of a "Non-Disturbance and Attornment Agreement" in the form attached as Exhibit "D".  If Landlord fails to furnish the proof of title above required, or if Landlord fails to furnish the subordination agreement(s) or Non-Disturbance and Attornment Agreement(s) above required, then Tenant may terminate this Lease at any time prior to the date when the same are furnished upon thirty (30) days written notice to Landlord. Wherever reference is made to a mortgage or mortgagee in this Lease, such reference shall be deemed to include a deed of trust or the holder of a deed of trust.

(D) Landlord represents, warrants and agrees and this Lease is made and entered into upon the express condition that Landlord shall at all times during the Term of this Lease or any extension or renewal thereof maintain a General Shopping Center upon the Entire Premises, which Shopping Center shall

— 16 —

always have as a part thereof a Parking Area as shown on Exhibit "B" annexed hereto, to furnish parking space without charge to all customers of the Entire Premises seeking same.

8.   **SUBORDINATION AND NON-DISTURBANCE:**   If any future Mortgagee so requests, this Lease shall be subject and subordinate to a Mortgage or Deed of Trust covering the Demised Premises or Entire Premises and to all renewals, modifications, consolidations, replacements and extensions thereof, provided Landlord and such Mortgagee execute and deliver to Tenant duly acknowledged triplicate counterparts of a "Subordination, Non-Disturbance and Attornment Agreement" in the form attached as Exhibit "E".

9.   **POSSESSION UPON COMMENCEMENT OF TERM:**   Upon commencement of the Term, the covenant of Landlord set forth in Subsection (A) of Section 7 of this Lease (LANDLORD'S TITLE) shall be in force except for matters junior to this Lease and the Demised Premises shall be unoccupied.  At such time, the building and any other improvements erected upon the Demised Premises and Entire Premises shall be in full compliance with all laws, ordinances and regulations relating to the use, occupation and construction thereof.

9.1 **DELIVERY OF POSSESSION UPON TERMINATION OR EXPIRATION OF TERM:** Tenant agrees to deliver to Landlord physical possession of the Demised Premises upon the termination of the Term in good condition excepting, however, ordinary wear and tear, damage by fire, or any other casualty insured against under policies maintained or required to be maintained by Landlord, or damage from any other cause unless such other cause is solely attributable to the negligence of Tenant.  Tenant may be required to make incidental repairs to the Demised Premises before delivering physical possession of the Demised Premises to Landlord.  In the event that the total cost of said incidental repairs is less than Five Thousand Dollars ($5,000.00), then Tenant shall have no obligation to make said incidental repairs.

10.   **ASSIGNMENT AND SUBLETTING:**   Tenant may not assign this Lease or sublet the Demised Premises or any part thereof without the prior written consent of Landlord, such consent not to be unreasonably withheld. Notwithstanding the foregoing, Tenant may assign or sublet this Lease without the consent of Landlord if such assignment or subletting is to facilitate the sale by Tenant of all or a portion of Tenant's chain of stores, or if such assignment or subletting is for the continued use of the Demised Premises as an auto parts store. Notwithstanding any subletting or assignment, Tenant shall remain primarily liable for the performance of all the terms and conditions of this Lease.

11. **PROTECTIVE COVENANT**: In order to induce Tenant to enter into this Lease, Landlord agrees for itself, its successors and assigns, its officers, directors and shareholders (holding more than ten percent (10%) of its stock), its parent, affiliated and subsidiary corporations and any partner or other party affiliated with it, that none of the foregoing shall use, suffer, permit or consent to the use or occupancy of any part of the Entire Premises except for the Demised Premises as an auto parts store or for the sale of automobile parts, supplies and/or accessories.



Landlord further grants Tenant the right to merchandise any products normally sold in Tenant's other auto parts, supply and accessories stores without restriction.

Landlord shall not use, lease, sell or otherwise convey all or any part of the Entire Premises to any entity which requires, or may require in the future, a denser parking use than Tenant. Denser parking use as used herein means a use the classification of which under local law requires a higher number of parking spaces per square foot of occupancy than that of Tenant. If Landlord shall violate the restriction set out above then Tenant's Rent under this Lease shall be reduced to an amount calculated by multiplying the Minimum Rent under this Lease by a fraction the numerator of which is the number of parking spaces per square foot required for Tenant's use under local law and the denominator of which is the number of parking spaces per square foot required by the denser user's use under the law. Such reduction in Rent shall continue in effect for as long as Landlord allows the violation of this section to continue.

Excluding Naka Restaurant at 11354 Beach Blvd., which has twenty four hundred (2,400) square feet of floor area, prohibited uses of the Entire Premises (whether or not prohibited by the next preceding paragraph) include but are not limited to the following: Manufacturing or industrial uses, offices, either private or government (including but not limited to any type of medical office, clinic or facility); flea markets or similar businesses; adult entertainment; commercial indoor amusements that exceed two thousand (2000) square feet of floor area; schools of any type; churches; car rentals or sales parking vehicles offered for lease or sale in the parking areas of Entire Premises; restaurants, nightclubs, cocktail lounges, taverns and entertainment facilities that exceed two thousand (2000) square feet of floor area.; undertaking establishments; bingo games or off-track betting agencies; post offices or postal facilities; gymnasiums, spas, tanning facilities, dance studios or health clubs; theaters, either motion picture or live; bowling alleys; skating rinks of any type; call centers or any other similar uses which require excessive use of the Parking Area in terms of number of parking spaces or length of time of the use of the parking spaces.

12. **LANDLORD'S REPAIRS:** (A) Landlord shall maintain the following in good working order and repair throughout the Term: the exterior portions and structural elements of the Demised Premises or the building of which the Demised Premises is a part and the appurtenances thereto and any improvements outside of the Demised Premises erected by Landlord for Tenant, including but not limited to the roof, roof structures and supports, foundations and structural supports, exterior walls termite protection, floors (excepting floor covering) and mechanical equipment and conduits embedded in the floors, gutters, downspouts, streets, parking lot, curbs and sidewalks. Landlord shall also maintain in good order and repair throughout the Term the utility lines servicing the Demised Premises to the extent not maintained by public utility companies and the electrical, sprinkler, plumbing and sewer systems and other mechanical installations and facilities that are installed in the building by or for Landlord or that are installed in other parts of Entire Premises by or for Landlord to service the building. Landlord shall also make and pay for all other repairs to the interior and exterior of the Demised Premises necessitated by (i) Landlord's failure to make any repairs

— 18 —

required of it hereunder, or (ii) defective workmanship or materials in the original construction of the Demised Premises or of any other improvements outside of the Demised Premises erected by Landlord for Tenant.   Landlord specifically agrees to repair any and all damage caused by settling, expansion or contraction of the building and/or the land underneath the building, parking or common areas.   Landlord shall not alter or remodel the exterior of the Demised Premises without Tenant's prior written consent, and any request for such consent shall be accompanied by plans and specifications for such work approved by applicable governmental authorities, together with Landlord's proposal for removing, storing and replacing Tenant's sign and furnishing temporary signs for Tenant while the work is being performed.

(B) During the first year of the Term, Landlord shall make and pay for all necessary repairs and replacements to the heating and air conditioning system installed in the building by or for Landlord or installed in other parts of Entire Premises by or for Landlord and servicing the building.   Thereafter, Tenant shall make and pay for all necessary repairs and replacements.

(C) Anything in this Lease to the contrary notwithstanding, Landlord agrees that if, in an emergency, it shall become necessary to make any repairs hereby required to be made by Landlord, Tenant may without notice otherwise required by the Section of this Lease entitled RESPONSIBILITY OF LANDLORD hereof, proceed forthwith to have such repairs made and pay the cost thereof.   Landlord agrees to pay Tenant the cost of such repairs on demand, and Landlord further agrees that if it fails so to pay to Tenant, Tenant may deduct the amount so expended by it from Rent or any other payment due or to become due.

(D) If Tenant is deprived of the use of any portion of the Demised Premises for a period of more than three (3) days during the making of any repairs, improvements or alterations by Landlord under any provisions of this Lease, then so long as Landlord does not proceed diligently to remedy such condition all Rent and other sums payable hereunder shall abate for such period as Tenant is deprived of such use. Furthermore, if Landlord fails within three (3) days following Landlord's receipt of written notice of the need therefor from Tenant to commence any repairs required to be made by Landlord to stop any leaks of water into the Demised Premises or any repairs or replacements required by this Lease to be performed to the HVAC system by Landlord within the first year of the Lease, or if Landlord thereafter fails to complete any such repairs or replacements with diligence, then, in either event, the Rent and all other sums due hereunder shall abate until such time as such repairs and/or replacements are completed.

(E) Landlord agrees to indemnify and save Tenant harmless from and against all loss to merchandise, fixtures and equipment occasioned by Landlord's failure within ten (10) days {or three (3) days in the case of roof leaks or HVAC repairs within the first year of the Lease} after receipt of notice of necessity therefor, to commence and thereafter proceed diligently with any repairs required of Landlord hereunder.

13.   **TENANT'S REPAIRS AND ALTERATIONS**:   Subject to Landlord's obligations under the Section of this Lease entitled LANDLORD'S REPAIRS, Tenant shall make and pay for all ordinary non-structural repairs to the interior of the Demised Premises arising from Tenant's operation of business therein not

— *19* —

occasioned by ordinary wear and tear, fire or other casualty.  Tenant may make and shall pay for any alterations and improvements to the Demised Premises as Tenant deems desirable and Tenant agrees that all such alterations and improvements shall be made in a good and workmanlike manner and in such fashion as not to diminish the value of the Demised Premises.  Tenant shall submit plans, (hereinafter "Plans") to Landlord for written approval prior to making initial alterations and improvements to the Demised Premises (both exterior and interior), which approval by Landlord will not be reasonably withheld  The plans shall be deemed accepted if Landlord does not notify Tenant of Landlord's approval/disapproval of plans within twenty (20) days of Tenant's submittal of Plans to Landlord.  On surrendering possession of the Demised Premises to Landlord at the expiration or sooner termination of this Lease, Tenant shall not be required to restore the same to the condition existing at the commencement of the Term and Landlord agrees to accept the Demised Premises with all alterations and improvements made by Tenant.  Tenant may paint the exterior of the Demised Premises and may also paint, erect or authorize the installation of signs (which Tenant deems necessary to the operation of its business) on the exterior of the building, and inside of the Demised Premises identifying same as Tenant's store.  Tenant may also erect a pylon sign at the adjacent street or streets at its expense.  Tenant may at any time or from time to time remove such signs or change them to reflect new designs. Tenant may use its standard colors and logo in all signage. Landlord shall not and may not install or maintain, or permit anyone other than Tenant to install or maintain, any signs on the exterior or roof of the Demised Premises or within the air space above the Demised Premises during the Term of this Lease or any extensions or renewals thereof.  Tenant is responsible for installation and maintenance of all interior improvements, exterior plate glass, maintenance of the HVAC after one (1) year warrantee period, the maintenance and monitoring of the fire sprinkler system, water, heater, plumbing, electrical and sewer (not embedded in floors or exterior walls) within the Demised Premises, during the entire term of this Lease.

13.1 **TENANT'S RENOVATIONS:**  Subject to Landlord's approval of Tenant's Plans, pursuant to Section 13 (TENANT'S REPAIRS AND ALTERATIONS) of this Lease, Tenant may make and shall pay for any and all alterations as Tenant deems necessary to renovate the Demised Premises.  These alterations may include, but are not limited to, alterations of the existing walls to provide for loading areas; removal and/or relocation of interior demising walls; alteration of the exterior of the Demised Premises to allow for placement of Tenant's storefront on the Demised Premises.  Tenant agrees that all such alterations and improvements shall be made in a good and workmanlike manner and in such fashion as not to diminish the value of the Demised premises. Tenant further agrees that no such alterations or improvements shall compromise the structural integrity of the Demised Premises.

13.2  **INTENTIONALLY OMITTED**

14.  **COMPLIANCE WITH LAWS**:  Tenant shall make and pay for non-structural improvements and alterations to comply with all laws, rules or regulations of any governmental authority promulgated after the

commencement of the Term applying to the physical condition of the Demised Premises and arising from Tenant's conduct of business in the Demised Premises.  Landlord agrees to make and pay for all other repairs, improvements or alterations to the Demised Premises required by any such authority.

15.  **TENANT'S FIXTURES**:  Tenant may install in the Demised Premises such fixtures (trade or otherwise) and equipment as Tenant deems desirable, and all of said items shall remain Tenant's property whether or not affixed or attached to the Demised Premises.  Tenant may remove said fixtures and equipment from the Demised Premises at any time and from time to time during the Term.  Landlord shall not mortgage, pledge or encumber said fixtures, equipment or improvements.  Tenant shall, within thirty (30) days after expiration of the Term, repair any damage to the Demised Premises caused by Tenant's removal of any such fixtures or equipment.  Tenant shall be allowed access, either underground or aerial as required by the telecommunications supplier, to all telecommunications lines and facilities, including the right to install at tenant's expense on an exterior wall or roof area a digital communications reflector no larger than two meters in diameter, complete with attached cable to leased premises, and Tenant may offer access to telecommunications services to other tenants.

16.  **UTILITIES**:  The Landlord shall provide to the Demised Premises throughout the Term such sanitary and storm sewer facilities and such utilities (including, without limitation, water, electric power and gas) as the Tenant may require.  Tenant agrees to pay for all such utilities for which the Landlord provides separate metering that are consumed by Tenant in the Demised Premises, during the Term. Landlord shall pay for all such utilities consumed by Tenant in the Demised Premises that are not separately metered.

16.1  **TRASH REMOVAL**:  Tenant shall store all Tenant's trash in dumpsters or other covered trash receptacles customary in shopping centers.  Tenant's trash receptacle shall be located near Tenant's loading areas and Tenant shall have Tenant's trash removed from the Entire Premises regularly, all at Tenant's cost.  Tenant may also maintain garbage cans customary to Tenant's business on the sidewalk located in front of the Demised Premises, provided Tenant shall empty the garbage cans regularly, and the garbage cans shall not be located so as to block or materially impair access across the sidewalk.

17.  **PUBLIC LIABILITY INSURANCE**:  (A) Throughout the Term, or any extensions thereof, Tenant shall maintain insurance against public liability for injury to person (including death) or damage to property occurring within the building and the Demised Premises arising out of the use and occupancy thereof by Tenant.  Such insurance shall be with minimum single limits of One Million Dollars ($1,000,000.00) for personal injury, death or property damage, and Landlord shall be named as additional insured under the policy.  Tenant shall deliver to Landlord a certificate of such insurance naming Landlord as an additional insured and an agreement by the insurer that said policy may not be canceled without ten (10) days prior written notice delivered to Landlord.

(B)  Throughout the Term or any extensions thereof, Landlord shall maintain insurance against public liability for injury to person (including death) or damage to property arising out of the acts or omissions of

Landlord or arising out of the use of Common Facilities as defined in this Lease by Tenant or its licensees, employees, invitees, or customers.  Such insurance shall be with minimum single limits of One Million Dollars ($1,000,000.00) for personal injury, death or property damage, and Tenant shall be named as additional insured under the policy.  Landlord shall deliver to Tenant a certificate of such insurance naming Tenant as an additional insured and an agreement by the insurer that said policy of insurance may not be canceled without ten (10) days prior written notice delivered to Tenant.

18.  **DAMAGE BY CASUALTY**:  (A) If the Demised Premises is damaged or destroyed by fire, the elements, subsidence of sublateral or subjacent support or other casualty, Landlord shall within thirty (30) days begin repairs and shall restore the Demised Premises or any such other store to its condition just prior to the damage, within ninety (90) days, or Tenant may cancel this Lease.

(B)  If Tenant is not actually open for business during all or any part of the period ("Restoration Period") from the date of such damage or destruction as aforesaid until the date the Demised Premises is redelivered to Tenant in accordance with the terms of this Lease, all Rent or other sums payable hereunder shall abate for such period as Tenant is not open for business without causing default by Tenant.  If Tenant is open for business during the Restoration Period, the Rent and other sums payable hereunder shall abate in proportion to the usable space; provided, however, that if Landlord does not proceed diligently with restoration of the Demised Premises, all Rent and other sums payable hereunder shall abate without causing default by Tenant.

(C)  If any other building erected on Entire Premises is damaged or destroyed by fire, the elements, subsidence of sublateral or subjacent support or other casualty, Landlord shall within ninety (90) days promptly and diligently either (i) repair and restore such other building to its condition just prior to the damage, or (ii) level such other building to the ground and clear up all debris therefrom, or (iii) put such other buildings in a clean and safe condition.

(D)  Landlord agrees to keep in effect on the Demised Premises and on all other buildings erected on Entire Premises and to provide Tenant proof of fire insurance with extended coverage endorsement in an amount not less than eighty percent (80%) of the full replacement value of the buildings and improvements thereon.

(E)  If any such damage or destruction shall occur within the last three (3) years of the Term, or of any Extension Period, affecting more than fifty percent (50%) of the replacement value of the Demised Premises, either party may terminate this Lease by notice to the other party within thirty (30) days after the date of such damage or destruction.  If Landlord shall terminate this Lease as above provided, Tenant may, within thirty (30) days after receipt of notice thereof, extend the Term or Extension Period to run for five (5) years from the date of restoration and redelivery of the Demised Premises to Tenant, whereupon Landlord's termination shall be void, and Landlord shall restore the Demised Premises in accordance with the terms of this Section.  Tenant shall not have the right to void a termination by Landlord during the last



Extension Period.  If this lease is terminated as provided in this Section, both parties shall be relieved of any further liabilities hereunder except for obligations accrued at the date of such damage or destruction, and any sums prepaid by Tenant shall be apportioned and appropriately refunded to Tenant.

18.1  **INSURANCE REIMBURSEMENT**:  Tenant shall within thirty (30) days after receipt of an annual billing from Landlord, supported by Landlord's invoices, reimburse Landlord, as Additional Rent, for Tenant's pro rata share of the cost of fire insurance premiums.  Tenant's pro rata share shall be determined on the ratio that the street level floor area of the building bears to the total floor area of all structures erected within the Entire Premises.

19.  **WAIVER OF SUBROGATION AND HOLD HARMLESS**:  Landlord and Tenant shall obtain from their respective insurers endorsements whereby the insurers agree to waive any right of subrogation against Landlord or Tenant, as the case may be, in connection with liability, fire or other risks or casualties covered by said insurance. Landlord agrees that it shall make no claim nor authorize any claim to be made against Tenant, its employees, servants or agents in connection with or as a result of fire, explosion or other casualty damaging the Demised Premises or other buildings in Entire Premises. Tenant agrees that it shall make no claim nor authorize any claim to be made against Landlord, its employees, servants or agents in connection with or as a result of fire, explosion, or other casualty damaging the contents or fixtures installed in the Demised Premises, excepting, however, such claims as may be permitted pursuant to the terms of the Section of this Lease entitled LANDLORD'S REPAIRS hereof by reason of Landlord's failure to make repairs to the Demised Premises.

20.  **EMINENT DOMAIN**:  (A)  If (i) all or part of the Demised Premises or any rights in the Demised Premises, or (ii) so much of any rights in Entire Premises shall be taken or appropriated under any right of eminent domain or under any other legal right whereby the taking authority is obligated to compensate Landlord therefor so that there does not remain (a) parking area as shown on plot plan Exhibit "B", or (b) premises suitable in the opinion of Tenant for the operation of its business, or (c) direct access at grade level to all abutting streets, then Tenant may terminate and cancel this Lease as of the date on which the condemning authority takes physical possession upon giving to Landlord written notice of such election. Landlord agrees immediately within ten (10) days after any notice of intended or actual taking or appropriation to give Tenant written notice thereof, providing to Tenant full details of such taking or appropriation, including, without limitation, copies of all condemnation plans or surveys submitted by the condemning authority, a statement of the nature of the project to be conducted by the condemning authority, and such other information as might be necessary to enable Tenant to determine its future course of conduct.

(B) If this Lease shall be terminated and canceled as a result of any taking or appropriation, Tenant shall be released from any further liability, the Rent and other sums for the last month of Tenant's occupancy shall be prorated, and Landlord shall refund to Tenant any sums paid in advance.  If at the time

— 23 —

of such taking or appropriation Tenant shall not have fully amortized expenditures which it might have made on account of any improvements or alterations made or erected on the Demised Premises, the amount thereof shall be payable to Tenant out of any award, subject and subordinate to the right of any Mortgagee permitted under the terms of the Section of this Lease entitled <u>SUBORDINATION AND NON-DISTURBANCE</u>.

(C) Tenant may file such claims as are permitted by law for the loss of its leasehold interest, business dislocation damages, moving expense, or other damages caused by such taking or appropriation. The Tenant's right to receive compensation or damages for its fixtures or its personal property shall not be affected in any manner by this Lease.

(D) If this Lease is not terminated and canceled because of any such taking or appropriation, Landlord shall within thirty (30) days begin to restore the Demised Premises to a condition as nearly comparable as practicable to the condition existing just before such taking or appropriation. Restoration shall be completed within ninety (90) days. If Tenant is not actually open for business during all or any part of the period from the date of such taking or appropriation until the date the Demised Premises is redelivered to Tenant in accordance with the terms of this Lease ("Rebuilding Period"), all Rent or other sums payable hereunder shall abate for such period that Tenant is not open for business. If Tenant is actually open for business during the Rebuilding Period, the Rent shall abate proportionately for the unusable area; provided, however, that if Landlord does not proceed diligently with restoration of the Demised Premises, all Rent and other sums payable hereunder shall abate. After restoration of the Demised Premises, the Rent shall be reduced in the ratio that the total floor area of the Demised Premises taken or appropriated bears to the total floor area of the Demised Premises before such taking or appropriation.

21.  <u>**PERMITS AND LICENSES**</u>:  Landlord agrees upon request of Tenant to execute or join in the execution of any application for permits and licenses which may be necessary in connection with any construction, alterations, improvements and/or repairs permitted under this Lease.

22. <u>ACCEPTANCE AND DELIVERY</u>  The Demised Premises shall be deemed Accepted and Delivered (hereinafter "Accepted and Delivered"), as provided in Section 6 (<u>RENT</u>) and in Section 25 (<u>USE OF THE PREMISES BEFORE TERM COMMENCES</u>) when each of the following actions have been completed:

    1.    Landlord has satisfied the following conditions:

        a) Landlord has delivered to Tenant fully executed Non-Disturbance and Attornment Agreement(s) as provided in Section 7 (C) of this Lease;

        b) The Demised Premises complies with Section 9 of this Lease;

        c) Landlord has delivered to Tenant all keys to the Demised Premises;

        d) Landlord has delivered to Tenant a written and sealed certification regarding asbestos as provided for in Section 30 (E) of this Lease; and

e) The HVAC equipment is in good order and repair, as evidenced by a letter from a licensed HVAC company.

f) The roof is in good order and repair, as evidenced by a letter from a licensed roofer.

g) Landlord has delivered to Tenant a fully executed Short Form Lease as provided for in Section 7(B) of this Lease.

h) Landlord has delivered to Tenant a completed W-9 form reflecting Landlord's federal tax ID number.

2.      Upon completion of the eight (8) conditions set forth in subsection (1) above, Landlord shall within ten (10) days, submit written notice to Tenant that the Demised Premises is ready to be Delivered to Tenant and that all eight (8) of the conditions set forth in subsection (1) above have been satisfied.

3.      Upon receipt of said notice from Landlord, Tenant shall *WITHIN TEN(10) days* submit written acknowledgment to Landlord that Tenant agrees that the eight (8) conditions set forth in subsection (1) above have been satisfied and that Tenant is accepting the Demised Premises.

4.      When Landlord receives Tenant's written acknowledgment, the Demised Premises shall be deemed Accepted and Delivered.

## 23. <u>INTENTIONALLY OMITTED</u>

24. <u>COMMON FACILITIES</u>: (A) All those portions of Entire Premises shown on Exhibit "B" which are not presently occupied by buildings shall be Common Facilities for the exclusive joint use of all tenants of Entire Premises, their employees, customers and invitees, and Landlord hereby grants to Tenant, its employees, customers and invitees, the right to use, in common with all other tenants of the buildings on the Entire Premises, all of said Common Facilities (except that Tenant's Loading Area shall be reserved for Tenant's exclusive use) and any enlargement thereof for ingress and egress to and from the Demised Premises and the public streets and highways shown on Exhibit "B" and for the parking of motor vehicles in the areas designated as "Parking Area".  Landlord agrees at its own expense to maintain throughout the Term all Common Facilities in good repair, clean and clear of snow, ice, rubbish and debris, properly drained, striped (restriping shall be performed by Landlord at least biannually)and adequately lighted and safe-guarded at all times when the Demised Premises is open for business and for one-half hour after closing thereof.

(B)  Throughout the Term, the Common Facilities shall contain a Parking Area as shown on Exhibit "B", and Landlord shall not use or permit the Common Facilities to be used for carnivals or other businesses, temporarily or permanently.  If at any time during the Term, such Parking Area shall be reduced below the minimum area above set forth by reason of taking or appropriation under any power of eminent domain, and if Tenant does not terminate this Lease as permitted in the Section of this Lease entitled <u>EMINENT DOMAIN</u>, the Rent payable pursuant to the Section of this Lease entitled <u>RENT</u> of this Lease shall abate in the same proportion that the Parking Area so taken bears to the minimum Parking



Area set forth above.  If, at any time during the Term, Landlord by its acts or omissions reduces or permits a reduction of the Parking Area of Common Facilities below the above minimum or if the Landlord changes the location or arrangement of the Parking Area, the Rent payable pursuant to the terms of the Section of this Lease entitled <u>RENT</u> of this Lease and all other charges payable under the terms of this Lease shall abate.

24.1  **COMMON FACILITIES MAINTENANCE**:  Tenant shall within thirty (30) days after receipt of any annual billing from Landlord supported by copies of the vendors' invoices for performing the work included in the billing, reimburse Landlord, as <u>Additional Rent</u> for Tenant's pro rata share of the cost of maintaining the Common Facilities.  Tenant's proportionate share shall be determined according to the ratio set forth in Section 3.1 (TENANT'S PRO-RATA SHARE) of this Lease.  Common Facilities Maintenance charges shall include only the following items:  lighting of the parking areas, patching of potholes in the Parking Area, sweeping, snow removal and striping of the Parking Area, and repairs of the parking lights, light standards and , entrance and exit signs.

25.  **USE OF PREMISES BEFORE TERM COMMENCES**:  Tenant may enter the Demised Premises at any time prior to the commencement of the Term and make improvements permitted by this Lease and install therein fixtures and equipment and receive and store therein merchandise and other property at Tenant's own risk, free from Rent, provided that such entry does not interfere unreasonably with the work being done in or to the building by Landlord.  Such entry into the Demised Premises shall not be construed as Acceptance and Delivery thereof (as provided in Section 22 herein) under the terms and provisions of this Lease.

26.  **TRANSFER OF TITLE**:  If there shall be any change in or transfer of title of Landlord in or to the Demised Premises or any part thereof, Tenant may withhold payments thereafter accruing until notified in writing by Landlord of such change in title and until given satisfactory proof, whereupon Tenant shall submit such payment to the party properly entitled to receive it.

27.  **TENANT'S DEFAULT IN RENT**:    If Tenant shall default in payment of rent herein reserved, when due, Landlord shall forward written notice of such default, by certified mail, return receipt requested, and the failure of Tenant to cure such default within thirty (30) days after the date of receipt of such notice shall at the option of the Landlord cause the termination of this Lease, and Landlord shall be entitled to all remedies available under California law.  If the failure to pay Rent continues to twenty (20) days after Landlord has given Tenant notice of Tenant failure to pay Rent, the Tenant agrees to pay a late charge in the amount of ten percent (10%) of the monthly Rent , which amount shall be deemed Additional Rent. Tenant shall be exempt from the late charges, if any, for the first late payment of Rent per year.

28.  **OTHER DEFAULTS BY TENANT**:  If Tenant shall default in the performance of any of the terms or provisions of this Lease other than the payment of the rent, and if Landlord shall give to the Tenant written notice by certified mail, return receipt requested, of such default, and if Tenant shall fail to cure such default

within ninety (90) days after receipt of such notice, or if the default is of such a character as to require more than ninety (90) days to cure, then, if Tenant shall fail to use reasonable diligence in curing such default, Landlord may cure such default for the account of and at the cost and expense of Tenant, and the reasonable sums so expended by Landlord shall be deemed to be Rent and on demand shall be paid by Tenant on the day when Rent shall next become due and payable.  In no event, however, shall any default under the terms of this Section be the basis of a forfeiture of this Lease or otherwise result in the eviction of the Tenant or the termination of this Lease.

29. **RESPONSIBILITY OF LANDLORD**:  If Landlord fails to pay any installment of taxes or assessments affecting the Demised Premises or Entire Premises when any of the same become due, or if Landlord fails to make any repairs or do or complete any work required of it under any of the provisions of this Lease, or if Landlord fails to perform any covenant or agreement in this Lease contained on the part of Landlord to be performed, Tenant, after the continuance of any such failure or default for thirty (30) days after written notice thereof is given by Tenant to Landlord, may elect to pay said taxes or  assessments, or cure such defaults on behalf of and at the expense of Landlord and do all necessary work and make all necessary payments in connection therewith.  This shall include, without limitation, the payment of any counsel fees, costs and charges of or in connection with any legal or equitable action which may be brought, and Tenant may further take such other proceedings at law or in equity as Tenant deems necessary, notwithstanding any other remedy herein provided.  In the event of such election by Tenant, Landlord agrees to pay to Tenant any amount so paid by Tenant, and agrees that Tenant may withhold any and all rental payments and other sums due and becoming due after the expiration of the aforesaid notice period to the Landlord pursuant to the provisions of this Lease and may apply the same to the payment of such indebtedness of the Landlord until such indebtedness is fully paid.  In addition to the foregoing, Tenant may proceed in equity to enjoin any breach by Landlord or by any other party of any provision of this Lease.  Nothing herein contained shall preclude the Tenant from proceeding to collect the amount so paid by it, as aforesaid, without waiting for rental offsets to accrue.  If at the expiration of the Term of this Lease there shall be any sums owing by Landlord to Tenant, this Lease may at the election of Tenant be extended and continued in full force and effect until the last day of the month following the date when the indebtedness of Landlord to Tenant shall have been fully paid.  If any alleged default is of such a nature that it cannot be completely remedied or cured within the thirty (30) day period above provided, then notwithstanding the provisions of this Section to the contrary, Tenant shall not have a right to enforce any of the remedies herein set forth if Landlord shall commence curing such default within such thirty (30) day period and shall proceed with reasonable diligence in good faith to complete the curing thereof.  This section not to be unreasonably enforced.

30. **HAZARDOUS SUBSTANCES**:  (A) As used in this Lease, "HAZARDOUS SUBSTANCES" shall be defined as any substance that is biologically or chemically active or is a hazardous, toxic, or dangerous

waste, substance (including, but not limited to, petroleum derivative substances), or material defined as such in (or for purposes of) any state, federal or local environmental laws, regulations, decrees or ordinances or in the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or in any of the so called state or local "Super Fund", "Super Lien" or "Cleanup Lien" laws or any other federal, state or local regulation, order or decree relating to or imposing liability or standards of conduct concerning any such substances or materials or any amendments or successor statutes thereto.

(B)  Tenant represents and warrants that, except for items commonly sold or utilized in auto parts and supply stores, no HAZARDOUS SUBSTANCES will be stored on the Demised Premises and that during the Term of this Lease or any Extension Period thereof, no HAZARDOUS SUBSTANCES will be discharged on the Entire Premises by Tenant or anyone under its direction or control.  Tenant agrees that such representations and warranties shall survive any termination of this Lease, and Tenant agrees to indemnify and hold harmless the Landlord from any and all costs, expenses, claims and damages, including but not limited to attorneys' fees and costs of remediation, arising from Tenant's breach of any of the foregoing representations and warranties.

(C)  Landlord shall indemnify and hold Tenant harmless from and against all costs, expenses, and damages, including, but not limited to:  attorneys' fees and costs of remediation arising out of any claim for loss or damage to property, injuries to or death of persons, any contamination of or adverse effects on the environment or any violation of any environmental or other law caused by or resulting from any hazardous waste or HAZARDOUS SUBSTANCE or any leakage or contamination from underground tanks on or under the Entire Premises and not resulting from Tenant's operations in the Demised Premises.  This indemnification precedes, is concurrent with, and survives this Lease.

(D)  Furthermore, Landlord represents and warrants to Tenant that Landlord has no actual or constructive knowledge of:  (1) the presence of any HAZARDOUS SUBSTANCES on, under or within the Entire Premises; (2) any spills, releases, discharges or disposals of HAZARDOUS SUBSTANCES that have occurred or are presently occurring on or onto the Entire Premises; (3) any spills or disposal of HAZARDOUS SUBSTANCES that have occurred or are occurring adjacent to the Entire Premises as a result of any construction on or operation and use of the Entire Premises or adjacent property; (4) any failure to comply with all applicable local, state and federal environmental laws, regulations, ordinances, and administrative and judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport and disposal of any HAZARDOUS SUBSTANCES on the Entire Premises or adjacent property; or (5) the presence of any underground storage tanks now or in the past on the Entire Premises.

(E)  It is a condition of Tenant's obligations under this Lease that within fifteen (15) days following the date hereof Landlord shall furnish to Tenant, at Landlord's cost, a written and sealed certification (certified to Landlord and Tenant) by an engineer licensed in the State where the Demised Premises is located stating that the engineer has inspected the Demised Premises for the presence of asbestos and

— 2ν —

asbestos-containing materials and that there is no asbestos and no asbestos-containing materials on or within the Demised Premises.  If Landlord fails to furnish said certificate to Tenant within the stated time period, then Tenant may terminate this Lease by sending written notice of termination to Landlord.  Any and all asbestos and asbestos-containing materials on or within the Demised Premises at the time of delivery of the Demised Premises to Tenant shall at all times be and remain the Property of Landlord, and upon request by Tenant at any time after this Lease is executed when such materials are discovered Landlord shall promptly and with diligence remove all such asbestos and asbestos-containing material from the Demised Premises and restore any and all damage thereby caused at Landlord's cost, in compliance with all requirements of applicable governmental authorities, including but not limited to such requirements pertaining to the removal and disposal thereof.  All rents and other sums payable hereunder shall abate during any periods when Landlord is removing asbestos or asbestos-containing materials from the Demised Premises and until the Landlord has repaired and restored any and all damage caused by the removal and redelivered the Demised Premises to Tenant.

If any investigations or tests for HAZARDOUS SUBSTANCES or asbestos or asbestos-containing materials disclose results that are unacceptable to Tenant, then Tenant may terminate this Lease by furnishing written notice of termination to Landlord.

31.  **NOTICE:**  All notices or demands required or permitted to be given or served pursuant to this Lease shall be deemed to have been given or served only if in writing, postage pre-paid and shall be sent by U.S. Certified Mail with Return Receipt Requested or by Federal Express to:

**If by Certified Mail:**

| **LANDLORD:** | **TENANT:** |
|---|---|
| **James Besaw**<br>34382 Starboard Lantern<br>Dana Point, CA  92629 | **AutoZone, Inc.**<br>Property Management 8700<br>P.O. Box 2198<br>Memphis, Tennessee  38101-2198 |

**If by Federal Express:**

**AutoZone, Inc.**
Property Management 8700
60 Madison Avenue, 9th Floor
Memphis, Tennessee  38103

Such addresses may be changed from time to time by either party by serving notice as above provided.

32.  **REAL ESTATE TAXES**:  Landlord shall pay all Real Property Taxes (hereinafter defined as "Taxes") upon the Entire Premises and shall within six months thereafter provide Tenant with a copy of the paid Tax receipt and a request for reimbursement.  Upon receipt from Landlord of: (1) a request for reimbursement, (2) a copy of the paid Tax receipt, (3) a copy of the tax map which shall identify the area covered by the

— 29 —

paid Tax receipt, and (4) a computation of Tenant's pro rata share of said Taxes for which Landlord is seeking reimbursement, then Tenant shall reimburse Landlord, as <u>Additional Rent</u>, for Tenant's pro rata share of said Taxes. Tenant's pro rata share shall be determined according to the ratio set forth in Section 3.1 (TENANT'S PRO-RATA SHARE) of this Lease.

33. <u>USE</u>: Tenant may use the Demised Premises for any lawful purpose. Tenant shall indemnify and hold Landlord harmless of and from all fines or penalties imposed by law arising by reason of the violation by Tenant of any laws, rules, ordinances or regulations relating to the conduct of business in the Demised Premises issued by any governmental authority having jurisdiction over the Demised Premises.

Tenant may operate its business on the Demised Premises, subject to the terms of this Lease, as Tenant deems best, and there shall be no restrictions upon Tenant or upon the operation of its business. Tenant may discontinue the operation of its business at any time or from time to time during the Term but shall remain liable for the performance of the terms and conditions of this Lease.

34. <u>GENERAL PROVISIONS</u>:

(A) Landlord shall pay all fees and commissions for bringing about the execution and delivery of this Lease and shall indemnify and hold Tenant harmless of and from any and all claims for such fees and commissions by any broker or agent with whom Landlord has dealt.

(B) The captions and numbered Sections of this Lease are inserted for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

(C) If more than one person or corporation is named as Landlord in this Lease and executed the same as Landlord, then the word "Landlord" wherever used in this Lease shall refer to all such persons or corporations, and the liability of such persons or corporations for compliance with or for the performance of all the terms, covenants and provisions of this Lease shall be joint and several.

(D) All the provisions of this Lease shall be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate Section hereof, and all the provisions hereof shall bind and enure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns.

(E) No amendment or modification of this Lease shall be effective unless in writing executed by two duly authorized representatives of the Tenant.

(F) The Sections of this Lease are intended to be severable. If any Section or provision of this Lease shall be held to be unenforceable by any court of competent jurisdiction, this Lease shall be construed as though such Section had not been included in it. If any Section or provision of this Lease shall be subject to two constructions, one of which would render such Section or provision invalid, then such Section or provision shall be given that construction which would render it valid.

(G)  Upon request of Tenant, Landlord shall promptly furnish to Tenant Landlord's tax identification number(s) so that Tenant may report the payments made by Tenant to Landlord under this Lease as required by applicable governmental authorities.

In the event of any litigation between Tenant and Landlord to enforce any provision of this Lease or any right of either party hereto, the unsuccessful party to such litigation shall pay the successful party all costs and expenses, including reasonable attorneys' fees, incurred therein.  Moreover, if either party hereto without fault is made a party to any litigation instituted by or against any other party to this Lease, such other party shall indemnify Landlord or Tenant, as the case may be, against and save it harmless from all costs and expenses, including reasonable attorneys' fees, incurred by it in connection therewith.

(H)  This Lease shall not be strictly construed against Tenant as the draft or writing of Tenant or because of any presumption in connection with terms favorable to, or dictated by, Tenant.

35.  **NO OPTION**:  The submission of this Lease for examination does not constitute a reservation of or option for the Demised Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

LANDLORD:
James A. Besaw, an individual

By: _____
    James A. Besaw

TENANT:
AutoZone, Inc., a Nevada corporation

By: _____
                **Vice President**
Title: _____

By: _____
                **Vice President**
Title: _____

_ 31 _

## EXHIBIT "A"

**Demised Premises:**

The Parcel of land shown outlined as "Demised Premises", Exhibit "B", annexed hereto upon which is located a store building having a frontage of 65 feet and a depth of 140 feet, and an overall area of 9,100 sq. ft., all being a part of Entire Premises hereinafter described.

**Entire Premises:**

Parcel 1, in the City of Stanton, County of Orange, State of California, as shown on a parcel map filed in Book 66 Page 10 of parcel maps, in the office of the County Recorder of said County.

— 32 —

13:26   2462525   JIM BESAW

**DEMISED PREMISES**

EXISTING BUILDING

ALLEY

PLAZA WAY

**ENTIRE PREMISES**



BEACH BOULEVARD

SITE PLAN

N

EXHIBIT "B"

— 33 —

**EXHIBIT "C"**

**Title Exceptions**

Mortgages:

Landlord covenants that prior to commencement of the Term of this Lease, the mortgages described below shall either be discharged of record or the mortgagees shall execute an agreement in accordance with Section 7(C) of this Lease:

**People's Bank**

Landlord warrants that there are no easements, restrictions, or other matters that will affect or limit the use of the Demised Premises or Common Facilities by Tenant in accordance with the terms of this Lease, except as follows:

**NONE**

# FILE COPY

# NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**THIS AGREEMENT** is made by and between **People's Bank** (hereinafter called "Lender"), the holder of a promissory note secured by a Deed of Trust or Mortgage recorded March 7, 1989 in the Official Records of Orange County, California, Reception No. 89-116667, in the hereinafter described property, and **AutoZone, Inc., a Nevada corporation**, (hereinafter called "Tenant"), which is the Tenant under a Lease (the "Lease") from **James A. Besaw and Lana D. Besaw, Husband and Wife as community property**, (hereinafter called "Landlord"), dated April 20, 1998, pertaining to certain store premises and real property more fully described in Exhibit "A" attached hereto (hereinafter called the "premises").

1.    Tenant's agreement is upon and subject to the express conditions that:

a.   So long as Tenant continues to pay the Rent as provided for in the Lease and otherwise complies with all the terms and provisions thereof, Lender shall not disturb the rights of possession of Tenant in and to the premises as set forth in the Lease, notwithstanding any foreclosure or proceedings in lieu thereof affecting the premises and whether or not Tenant is made a party thereto; and

b.   If all or any part of the premises is damaged or destroyed by casualty or by the exercise of any right of eminent domain, the proceeds of any insurance or condemnation award relating thereto shall be made available for the purpose of repair or restoration thereof as provided for in the Lease; and

c.   Upon passing of title to the premises or any part thereof to the Lender or to any other party in any foreclosure or proceedings in lieu thereof, the party acquiring such title shall thereupon during the period of such party's ownership, by virtue of such acquisition of title and continued ownership and without the execution of any further instruments or documents, be deemed to be the Landlord for all purposes of the Lease during the period of such ownership and be deemed to have assumed the full and complete performance of all the obligations of Landlord as set forth in the Lease which accrue during the period of such ownership; and

d.   If Lender shall take possession to the premises, without acquiring title thereto, but in such a manner as to be entitled to receive rents therefrom, Lender

shall, in addition, be deemed to have assumed all the obligations of Landlord set forth in the Lease accruing during such period of possession.

2.      Lender, by its acceptance of this Agreement, agrees that in the event Lender or any other party takes possession of the premises as note-holder-in-possession, by foreclosure of the Deed of Trust or Mortgage, or by acquisition of title in lieu of foreclosure, Lender or such other party shall not affect or disturb Tenant's right to possession of the premises or Tenant's other rights under the Lease in the exercise of Lender's or such other party's rights so long as Tenant is not then in default under any of the terms, covenants, or conditions of the Lease beyond the curative periods applicable thereto as provided in the Lease.  In the event that Lender or any other party succeeds to the interest of Landlord under the Lease by foreclosure or by acquisition of title to the premises in lieu of foreclosure, or any other action taken under the Deed of Trust or Mortgage by Lender, or in the event that Lender or any other party exercises the rights granted to it by any assignment, Tenant hereby agrees to be bound to Lender or such other party under all of the terms, covenants and conditions of the Lease; and, Tenant agrees that it shall attorn to, and be liable to and recognize Lender or such other party as Tenant's new landlord for the balance of the term of the Lease upon and subject to all the terms and conditions thereof, and the Lease and the rights of Tenant thereunder shall continue in full force and effect as a direct lease between Tenant and Lender or such other party upon all the terms, covenants, and agreements set out in the Lease, and Tenant shall thereafter make the rental payments set out in the Lease as instructed by written notice of Lender or such other party, forwarded to Tenant by certified mail, return receipt requested or registered mail, postage prepaid, at least ten (10) days prior to the date when the next payment of Rent or other sum payable under the Lease is due.  Such attornment shall be effective and self-operative without the execution of any further instrument by Lender or such other party and Tenant immediately upon the succession by Lender or such other party to the interest of the Landlord under the Lease, and the respective rights and obligations of Tenant and Lender or such other party upon such attornment, to the extent of the then remaining balance of the term of the Lease and any extension of renewal permitted thereby, shall be and are the same as are now set forth in the Lease or as it may have been modified with Lender's consent.

3.  This Agreement shall be binding on and inure to the benefit of the Tenant, the Lender and their respective successors and assigns.

4. Landlord joins in this Agreement for the purpose of consenting to the provisions hereof and agrees to be bound hereby.

**IN WITNESS WHEREOF**, Tenant, Landlord and Lender have caused this Agreement to be executed as of the 24th day of April, 1998.

**LANDLORD:**

**James A. Besaw and Lana D. Besaw, Husband and Wife as community property**

By:_____
        **James A. Besaw**

By: _____
        **Lana D. Besaw**

**TENANT:**

**AutoZone, Inc., a  Nevada corporation**

By:_____
Title:_____
                    **Vice President**

By:_____
Title:_____
                **Executive Vice President**

**LENDER:**

**People's Bank**

_____
                **Name**

_____
                **Name**

STATE OF TENNESSEE          )
                           )
COUNTY OF SHELBY           )

       On this 18th day of May in the year 1998, before me, Michelle E. Mann, a Notary Public of said State duly commissioned and sworn, personally appeared Wm. David Gilmore and Lawrence E. Evans, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument as Vice President and Executive Vice President and acknowledged to me that they executed the same in their authorized capacities and that by their signatures on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

       In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public in and for said State.

My Commission Expires: 9/25/2001

_— 3 —_

STATE OF CALIFORNIA )
) 
COUNTY OF _____ )

          On _____, 1998, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

          WITNESS my hand and official seal.

My Commission Expires:

                              _____
                              Notary Public in and for said State

STATE OF CALIFORNIA )
)
COUNTY OF _____ )

          On _____, 1998, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

          WITNESS my hand and official seal.

My Commission Expires:

                              _____
                              Notary Public in and for said State

# EXHIBIT "A"

**Demised Premises:**

The Parcel of land shown outlined as "Demised Premises", Exhibit "B", annexed hereto upon which is located a store building having a frontage of 65 feet and a depth of 140 feet, and an overall area of 9,100 sq. ft., all being a part of Entire Premises hereinafter described.

**Entire Premises:**

Parcel 1, in the City of Stanton, County of Orange, State of California, as shown on a parcel map filed in Book 66 Page 10 of parcel maps, in the office of the County Recorder of said County.



DEMISED PREMISES

ENTIRE PREMISES

BEACH BOULEVARD

SITE PLAN

# EXHIBIT "B"

# SHORT FORM LEASE

**THIS INDENTURE OF LEASE,** made this ___20th___ day of ___April___, 1998, between **James A. Besaw Lana D. Besaw, Husband and Wife as community property,** hereinafter collectively referred to as "Landlord"; and **AutoZone, Inc., a Nevada corporation,** with its principal offices in the City of Memphis, County of Shelby, State of Tennessee; hereinafter called "Tenant".

## WITNESSETH:

**FOR AND IN CONSIDERATION** of One Dollar ($1.00) and other valuable consideration paid and to be paid by Tenant to Landlord, Landlord does demise and lease unto Tenant and Tenant does lease and take from Landlord upon the terms and conditions and subject to the limitations more particularly set forth in a certain Lease Agreement between Landlord and Tenant, bearing even date herewith, to which Lease Agreement reference is hereby made for all the terms and conditions thereof, which terms and conditions are made a part hereof as fully and particularly as if set out verbatim herein, the premises, hereinafter the Demised Premises, situated in the City of Stanton, County of Orange, State of California, consisting of land, together with improvements placed and/or to be placed thereon, The Demised Premises is a part of the "Entire Premises" each of which are more particularly described in Exhibit "A" and outlined on Exhibit "B" attached hereto and made a part hereof.

**TO HAVE AND TO HOLD** the above described premises unto Tenant for a term of five (5) years, commencing on May 1, 1998, ending upon the last day of the month after the expiration of five (5) years after such Commencement Date, unless sooner terminated, extended or modified as provided in said Lease Agreement.

**LANDLORD** in said Lease Agreement has granted to Tenant four (4) separate options to extend the term for four (4) separate consecutive additional periods of five (5) years each, which are exerciseable by Tenant as provided in said Lease Agreement.

**SAID LEASE AGREEMENT** contains, among other things, the following provisions:

Landlord agrees for itself, its successors and assigns, its officers, directors and shareholders (holding more than ten percent (10%) of its stock), its parent, affiliated and subsidiary corporations and any partner or other party affiliated with it, that none of the foregoing shall use, suffer, permit or consent to the use or occupancy of any part of the Entire Premises except for the Demised Premises as an auto parts store or for the sale of automobile parts, supplies and/or accessories.

Landlord further grants Tenant the right to merchandise any products normally sold in Tenant's other auto parts, supply and accessories stores without restriction.

Landlord shall not use, lease, sell or otherwise convey all or any part of the Entire Premises to any entity which requires, or may require in the future, a denser parking use than Tenant. Denser parking use as used herein means a use the classification of which under local law requires a higher number of parking spaces per square foot of occupancy than that of Tenant. If Landlord shall violate the restriction set out above then Tenant's Rent under this Lease shall be reduced to an amount calculated by multiplying the Minimum Rent under this Lease by a fraction the numerator of which is the number of parking spaces per square foot required for Tenant's use under local law and the denominator of which is the number of parking spaces per square foot

required by the denser user's use under the law.  Such reduction in Rent shall continue in effect for as long as Landlord allows the violation of this section to continue.

Excluding Naka Restaurant at 11354 Beach Blvd., which has twenty four hundred (2,400) square feet of floor area, prohibited uses of the Entire Premises (whether or not prohibited by the next preceding paragraph) include but are not limited to the following: Manufacturing or industrial uses, offices, either private or government (including but not limited to any type of medical office, clinic or facility); flea markets or similar businesses; adult entertainment; commercial indoor amusements that exceed two thousand (2000) square feet of floor area; schools of any type; churches; car rentals or sales parking vehicles offered for lease or sale in the parking areas of Entire Premises; restaurants, nightclubs, cocktail lounges, tavernsand entertainment facilities that exceed two thousand (2000) square feet of floor area.; undertaking establishments; bingo games or off-track betting agencies; post offices or postal facilities; gymnasiums, spas, tanning facilities, dance studios or health clubs; theaters, either motion picture or live; bowling alleys; skating rinks of any type; call centers or any other similar uses which require excessive use of the Parking Area in terms of number of parking spaces or length of time of the use of the parking spaces

**LANDLORD** has agreed with Tenant that any mortgage placed on the Demised Premises or to be placed on the Demised Premises shall provide for non-disturbance of Tenant in the event of foreclosure, provided Tenant shall not default in the performance of its obligations under said Lease Agreement.  Tenant has agreed that it will attorn to the Mortgagee in possession or the purchaser at or in lieu of foreclosure provided its possession shall not be disturbed.

**IN TESTIMONY WHEREOF**, the above named Landlord and the above named Tenant have caused this instrument to be executed on the day and year set forth in said Lease Agreement.

LANDLORD:
**James A. Besaw and Lana D. Besaw,**
**Husband and Wife as community property**

By: _____
       James A. Besaw

By: _____
       Lana D. Besaw

TENANT:
**AutoZone, Inc.,**
**a Nevada corporation**

By: _____
                    Vice President

Title: _____

By: _____
             Executive Vice President

Title: _____

Prepared by:
M. Lenore Warr, Attorney
AutoZone, Inc.
60 Madison Avenue, 9th Floor (38103)
P. O. Box 2198
Memphis, TN  38101-9842

# EXHIBIT B

# FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (the "Amendment") made and entered into this 2 day of _____, 1998, by and between James A. Besaw and Lana D. Besaw, Husband and Wife as community property (hereinafter "Landlord") and AutoZone, Inc., a Nevada corporation, (hereinafter "Tenant").

## WITNESSETH

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated April 20, 1998 for the lease of certain real property located in the City of Stanton, County of Orange, State of California; and

WHEREAS, Landlord executed the Lease Agreement as James A. Besaw, an individual, and Landlord and Tenant hereby acknowledge that Landlord should have executed said Ground Lease as James A. Besaw and Lana D. Besaw, Husband and Wife as community property; and

WHEREAS, Landlord and Tenant desire to have Landlord re-execute the Lease Agreement as James A. Besaw and Lana D. Besaw, Husband and Wife as community property.

NOW THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which Landlord and Tenant do hereby acknowledge, Landlord and Tenant hereby agree as follows:

1.      Landlord's execution of this Amendment as James A. Besaw and Lana D. Besaw, Husband and Wife as community property shall constitute a confirmation and ratification of said Lease Agreement.

2.      The Lease Agreement, as hereby amended, remains in full force and effect, and except as expressly stated herein, remains unchanged, and Landlord and Tenant hereby confirm and ratify said Lease Agreement as hereby amended.

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment to Lease Agreement as of the date and year first stated above:

LANDLORD:                                           TENANT:

James A. Besaw and Lana D. Besaw,        AutoZone, Inc., a Nevada corporation
Husband and Wife as community
property

By: _____            By: _____
James A. Besaw                                   Title:   Vice President

By: _____            By: _____
Lana D. Besaw                                     Title:   Executive Vice President

Prepared by and return to:
Lenore Warr, Attorney
AutoZone, Inc.
60 Madison Ave., Dept. 8340
Memphis, TN 38103

Stanton, CA
...dment to Ground Lease

-44-

STATE OF TENNESSEE   )
                             )
COUNTY OF SHELBY     )

On this 18th day of May in the year 1998, before me, Michelle E. Mann, a Notary Public of said State duly commissioned and sworn, personally appeared Wm. David Gilmore and Lawrence E. Evans, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument as Vice President and Executive Vice President and acknowledged to me that they executed the same in their authorized capacities and that by their signatures on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public in and for said State.

My Commission Expires: 9/25/2001

*Michelle E. Mann*

MICHELLE E. MANN
NOTARY
PUBLIC
AT
LARGE
SHELBY CO., TN.

— 45 —

STATE OF CALIFORNIA      )
                         )
COUNTY OF _ORANGE_       )

On _6/23_ , 1998, before me, _C. Dennis Soderin_ , personally
appeared _James A. Besaw & Lana D. Besaw_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have
executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires: _Dec. 9, 1998_

Notary Public in and for said State

> C. Dennis Soderin
> Comm. #1032606
> NOTARY PUBLIC - CALIFORNIA
> ORANGE COUNTY
> Comm. Expires Dec. 9, 1998

---

STATE OF CALIFORNIA      )
                         )
COUNTY OF _____        )

On _____ , 1998, before me, _____ , personally
appeared _____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have
executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires: _____

Notary Public in and for said State

— 46 —

# EXHIBIT "A"

**Demised Premises:**

The Parcel of land shown outlined as "Demised Premises", Exhibit "B", annexed hereto upon which is located a store building having a frontage of 65 feet and a depth of 140 feet, and an overall area of 9,100 sq. ft., all being a part of Entire Premises hereinafter described.


**Entire Premises:**

Parcel 1, in the City of Stanton, County of Orange, State of California, as shown on a parcel map filed in Book 66 Page 10 of parcel maps, in the office of the County Recorder of said County.



**DEMISED PREMISES**

**ENTIRE PREMISES**

ALLEY

EXISTING BUILDING

PLAZA WAY

BEACH BOULEVARD

N

SITE PLAN

**EXHIBIT "B"**

# EXHIBIT C

Store # 2806A

# EFT PAYMENT ADDENDUM

· ᴄᴅ 1 9 RECD

THIS ADDENDUM supplements and amends the Lease Agreement between AutoZone, Inc. ("Tenant") and James Besaw ("Landlord") for premises located at 11320 Beach Blvd. in the city of Stanton, state of California.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties are agreed as follows:

1. Landlord agrees to be paid sums due from Tenant via electronic funds transfer ("EFT") to the institution and account number which Landlord may inform Tenant of from time to time. Landlord may change any such institution or account number upon not less than thirty (30) days written notice to Tenant. Landlord shall complete and execute the attached EFT Exhibit "A" which is incorporated herein, designating the initial institution and account number.

2. Tenant will make payments available to Landlord's bank as of the date of payment stated in the Lease Agreement and upon any other terms that the parties may agree in writing from time to time. If such payment date falls on a non-banking day, then such payment shall be due on the next banking day. Payment shall be deemed conclusively made when Landlord's financial institution has control of the payment.

3. All payments shall be in accordance with and governed by the National Automated Clearing House Association's Corporation Trade Payment Rules, as amended from time to time ("ACH Rules") and Article 4A of the Uniform Commercial Code as adopted in Tennessee and amended from time to time ("UCC"). Both ACH Rules and UCC are incorporated herein by reference.

4. Landlord shall indemnify, defend and hold Tenant harmless for any loss of Tenant or Landlord arising from reason of error, mistake or fraud related to any incorrect payment information furnished to Tenant by Landlord.

5. Landlord may terminate EFT transactions by at least thirty (30) days written notice to Tenant at any time.

6. Nothing in this Agreement shall obligate Tenant to make any payments to Landlord via EFT and Tenant may cease to make EFT payments to Landlord without notice at any time. Should Tenant elect to cease making EFT payments to Landlord, Tenant shall forward any payments which become due to Landlord to the address listed in the Lease, or to the last address designated in writing by Landlord for remittal of such payments.

7. Payments to Landlord shall be made by Tenant through a bank so designated by Tenant from time to time ("Originating Bank"). All payment information shall be sent by Tenant to Originating Bank in CTX format on EDI Document 820. If Landlord's financial institution is incapable of receiving CTX formatted documents, then Landlord must contact Originating Bank to make arrangements to receive remittance information. **Tenant will not make**

*remittance information available to Landlord in any other manner for payments made via EFT.*

8.  Should Landlord fail to (i) execute this Addendum and (ii) complete and execute the attached Exhibit "A" and (iii) return this Addendum and Exhibit "A" to Tenant by July 22, ~~2000~~, Tenant's herein offer shall be null and void and of no further effect.
    2001

     IN WITNESS WHEREOF, each party hereto warrants and represents that this Agreement has been duly authorized by all necessary corporate action and that this agreement has been duly executed by and constitutes a valid and binding agreement of that party.

AutoZone, Inc.
TENANT

By: _____

Title: **Vice President**

Date: _____2-20-01_____

By: _____

Title: **Vice President**

Date: _____2-20-01_____


LANDLORD dbA STANTON PLAZA

JAMES A. BESAW

By: _____

Title: _____OWNER_____

Date: _____2/5/01_____


APPROVED, VERIFIED AND
PASSED FOR SIGNING

_____

— 56 —

STATE OF TENNESSEE    )
                              )

COUNTY OF SHELBY     )

        On this 18th day of May in the year 1998, before me, Michelle E. Mann, a Notary Public of said State duly commissioned and sworn, personally appeared Wm. David Gilmore and Lawrence E. Evans, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument as Vice President and Executive Vice President and acknowledged to me that they executed the same in their authorized capacities and that by their signatures on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

        In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public in and for said State.

My Commission Expires: 9/25/2001

_—51—_

STATE OF CALIFORNIA      )
                          )
COUNTY OF _ORANGE_        )

On _6/23_, 1998 before me, _C. Dennis Soderin_, personally
appeared _JAMES A. BESAW + LANA D. BESAW_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have
executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires: _Dec 9, 1998_

Notary Public in and for said State

```
C. Dennis Soderin
Comm. #1032806
NOTARY PUBLIC · CALIFORNIA
ORANGE COUNTY
Comm. Expires Dec. 9, 1998
```

STATE OF CALIFORNIA      )
                          )
COUNTY OF _____   )

On _____, 1998, before me, _____, personally
appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they have
executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires: _____        _____
                                              Notary Public in and for said State

—52—

# EXHIBIT D

AZ#2806
11320 Beach Blvd.
Stanton, CA

# THIRD AMENDMENT TO LEASE AGREEMENT

**THIS THIRD AMENDMENT TO LEASE AGREEMENT** ("Third Amendment") is made and entered into between **James A. Besaw and Lana D. Besaw, Husband and Wife as community property** (hereinafter "**Landlord**"), and **AutoZone Development Corporation, a Nevada corporation** (hereinafter "**Tenant**"), assignee of AutoZone, Inc., a Nevada corporation, by virtue of Assignment and Assumption of Lease dated as of February 16, 1999.

### WITNESSETH:

**WHEREAS,** Landlord and Tenant (by its predecessor in interest) entered into that certain Lease Agreement made as of April 20, 1998, amended by that certain First Amendment to Lease Agreement executed by Tenant on May 18, 1998 and by Landlord on June 23, 1998, and amended by that certain EFT Payment Addendum signed by Landlord on February 5, 2001 and by Tenant on February 20, 2001 (collectively hereinafter "Lease"), whereby Tenant leased from Landlord the approximately 9,100 square foot premises located in the Stanton Plaza in the City of Stanton, County of Orange, State of California, being more particularly described in the Lease (the "Demised Premises") and more commonly known as 11320 Beach Boulevard, Stanton, California; and

**WHEREAS,** the Term of the Lease currently expires on April 30, 2003, and there are available to Tenant four (4) separate options to extend the Term for four (4) separate consecutive additional Extension Periods of five (5) years each; and

**WHEREAS,** Landlord and Tenant now desire to amend the Lease as herein provided.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Lease as follows:

1.  The recitals set forth above are incorporated herein as true and correct.

2.  Landlord and Tenant hereby agree that AutoZone, Inc., a Nevada corporation, was mistakenly named as Tenant in the EFT Payment Addendum referred to in the above recitals, and that the proper Tenant in said document should be, and is hereby changed to, AutoZone Development Corporation, a Nevada corporation. The officers who signed on behalf of AutoZone, Inc. are also authorized to sign on behalf of AutoZone Development Corporation, and are hereby deemed to have signed in such capacity.

3.  Tenant hereby exercises the First five year Extension Period under the Lease, commencing on May 1, 2003 and ending on April 30, 2008 (unless the Lease is sooner terminated or extended as provided for in the Lease), with the Rent during such period being Eight Thousand Five Hundred Dollars ($8,500.00) per month, which amount is a reduction of Five Hundred Dollars ($500.00) per month from the amount originally set out in the Lease for such period.

_ ♏3-

4. The three (3) remaining separate options to extend the Term for three (3) separate consecutive additional Extension Periods of five (5) years each shall remain exercisable by Tenant to extend the Term beyond expiration of the Term as herein extended, at the monthly Rent amounts set out in Section 6 of the Lease for said Extension Periods.

5. The addresses for Tenant as set out in Section 31 of the Lease are hereby amended to read as follows:

**If via U.S. Certified Mail:**

**TENANT:**

AutoZone Development Corp.
c/o AutoZone Property Management
Dept. 8700
P.O. Box 2198
Memphis, TN 38101-2198

**If via Federal Express:**

**TENANT:**

AutoZone Development Corp.
c/o AutoZone Property Management
Dept. 8700
60 Madison Avenue
Memphis, TN 38103-2107

6. Landlord warrants to Tenant that the Landlord holds fee simple title to the Demised Premises, and has full right and authority to enter into this Third Amendment.

7. All of the other terms and conditions of the Lease are hereby reaffirmed and remain in full force and effect. If there is a conflict between the terms and conditions of this Third Amendment and the terms and conditions of the Lease, the terms and conditions of this Third Amendment shall control.

**IN WITNESS WHEREOF**, the parties hereto have fully executed this Third Amendment as of this 18th day of April, 2001.

**LANDLORD:**

**James A. Besaw and Lana D. Besaw**

By: _____
James A. Besaw

By: _____
Lana D. Besaw

**TENANT:**

**AutoZone Development Corporation, a Nevada corporation**

By: _____

Printed Name: Wm. David Gilmore

Title: Vice President

By: _____

Printed Name: James Dobbs

Title: Vice President

2
—5-4—

STATE OF TENNESSEE     )
                               )SS
COUNTY OF SHELBY     )

On this 18th day of April in the year 2001, before me, Deana Barber, a Notary Public of said State duly commissioned and sworn, personally appeared James Dobbs and Wm. David Gilmore, personally known to me to be the persons whose names are subscribed to the within instrument as Vice Presidents of AutoZone Development Corporation, a Nevada corporation and acknowledged to me that they executed the same in their authorized capacities and that by their signatures on the instrument the persons or the entity upon behalf of which the persons acted, executed the instrument.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public in and for said State.

My Commission Expires: 4/3/2004

*Deana Barber*

DEANA BARBER
NOTARY
PUBLIC
AT LARGE
SHELBY CO., TN

STATE OF CALIFORNIA     )
                                )
COUNTY OF Orange     )

On May 11, 2001, before me, C. Dennis Soderin, a Notary Public, personally appeared James A. Besaw and Lana D. Besaw personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same and that by their signatures on the instrument.

WITNESS my hand and official seal.

Signature _____

My Commission Expires: _Dec 9 2002_

C. DENNIS SODERIN
Commission # 1203690
Notary Public - California
Orange County
My Comm. Expires Dec 9, 2002

—55—

# EXHIBIT E



# OWNER PARTICIPATION AND DISPOSITION AND DEVELOPMENT AGREEMENT

## [*Stanton Plaza Project*]

## by and between

## the

## STANTON REDEVELOPMENT AGENCY

## and

## STANTON PLAZA GROUP, LLC

## and

## STANTON PLAZA GROUP II, LLC

## Dated February 8, 2005

112/016136-0001
574286.04 a02/02/05

## IT IS A PLEASURE TO SEND THE ENCLOSED
## MATERIAL WHICH YOU REQUESTED



Contact: _____

Department:_____

*City of Stanton*

7800 Katella Avenue
Stanton, California 90680
(714) 379-9222



**Jake Wager**
*City Manager*

7800 Katella Avenue
Stanton, CA 90680-3162
www.ci.stanton.ca.us

(714) 379-9222 Ext. 241
Fax (714) 890-1443
j_wager@ci.stanton.ca.us

— 57 —

# OWNER PARTICIPATION AND DISPOSITION AND DEVELOPMENT AGREEMENT

This Owner Participation and Disposition and Development Agreement ("Agreement"), dated for reference as indicated on the cover page, is hereby entered into by and between the STANTON REDEVELOPMENT AGENCY a public body, corporate and politic ("Agency"), and STANTON PLAZA GROUP, LLC, a California limited liability corporation, and STANTON PLAZA GROUP II, LLC, a California limited liability corporation (collectively the "Developer") as follows:

## RECITALS

**A.    General Purpose.**  This Agreement provides a mechanism whereby Developer may participate in the redevelopment of the Project Area.  Its general purpose is to implement the Redevelopment Plan, to decrease blight, and to enhance the economic feasibility of development within the Project Area in a manner consistent with the goals, objectives, policies and standards of the Redevelopment Plan and those of Agency and the City.  As such, this Agreement is in accord with the applicable state and federal laws.  In approving this Agreement, Agency has determined that conditions existing within the Project Area are perpetuating the existence of blight, serving to retard private development, and currently render development of the Project infeasible without the cooperation of Agency.  This Agreement is, therefore, intended to set forth the obligations of Developer to develop the Project and the manner in which and the extent to which Agency will cooperate with Developer in that endeavor.  Agency also determines, by approving this Agreement, that completion of the Project is in the vital and best interests of the community, will serve the health, safety, and general welfare of the City and its citizens, will serve to strengthen the City's land use and social structure, and will assist in the alleviation of economic and physical blight within the Project Area.

**B.    Specific Purpose.**  The specific purpose of this Agreement is to facilitate the development of a mixed-use residential and commercial project by Developer (the "Project") on a series of currently separate parcels which are owned, or under offer to acquire, by Developer.  As further described in this Agreement, Developer may require the cooperation of Agency to acquire certain property interests in the Site, including existing leasehold interests.  The Project and Site are more particularly described in the Definitions section following hereafter. If such Agency Site assembly cooperation is required, this Agreement provides for the sale of such property to Developer and for Developer's undertaking and completion of the Project on the Site subject to the terms and conditions herein provided. This Agreement also provides that such sale will be a price that is not less than "fair market value," within the meaning of Health and Safety Code § 33433, at its "highest and best use" as established by independent appraiser or real estate economist.

112/016136-0001
574288.04 a02/02/05

-1-

**C.    Speculation not Permitted**.  Developer understands and acknowledges that the purpose of this Agreement is <u>not</u> to facilitate speculation or excess profit taking in the Site within the meaning of Health and Safety Code § 33437.5 as that section exists on the date of this Agreement, and in this regard Agency and Developer agree that the provisions of this Agreement are consistent with that section.

## DEFINITIONS

*"Acquisition Costs"* shall mean the full amount of costs incurred by Agency to acquire the land and improvements (including leasehold interests) and fixtures and equipment for the Acquisition Parcels, including Agency's legal, appraisal, and consulting fees relating thereto.   Except as may be expressly set forth herein, Acquisition Costs shall not include relocation costs, payments for loss of goodwill, payments for moveable fixtures and equipment that are removed from such acquired property, or in-house Agency administrative or overhead costs.

*"Acquisition Parcel"* shall mean, singularly and/or collectively, any parcel of real property, or any interest in real property, including without limitation any leasehold interest, required to be acquired by Agency pursuant to the Site Assembly provisions referenced in this Agreement.  The four (4) Acquisition Parcels that are known to the parties as of the Effective Date of this Agreement are identified in Section 1.1 [Status of Site Assembly as of Effective Date].

*"Action"* shall mean any suit (whether legal, equitable, or declaratory in nature), proceeding or hearing (whether administrative or judicial), arbitration or mediation (whether voluntary, court-ordered, binding, or non-binding), or other alternative dispute resolution process, and the filing, recording, or service of any process, notice, claim, demand, lien, or other instrument.

*"Actual Knowledge"* shall mean the actual subjective knowledge of the person in question, without any duty on the part of such person to make any inquiry or conduct any investigation, and excluding the concept of "constructive notice."

*"Agency"* shall mean the Stanton Redevelopment Agency, a public body organized and existing and exercising those governmental functions and powers, as authorized under the Community Redevelopment Law (Health and Safety Code § 33000, et seq.) of the State of California.

*"City"* shall mean the City of Stanton, a municipal corporation formed and existing under the laws of the State of California.

*"Close of Escrow"* or *"Closing"* shall mean the closing of the Escrow for the Kwon Parcel or the Ronnenberg Parcel, as applicable, by the Escrow Agent's distributing the funds and documents received through such Escrow to the party entitled thereto and conveyance of fee title from Agency to Developer, all as provided in this Agreement.  The "Closing" as to any Acquisition Parcel consisting of less than a fee interest shall mean the termination of the property interest being acquired by the Agency and the delivery of physical possession of said parcel by the Agency to

Developer free of the right of possession held by the prior holder of such property interest.

**"Closing Date"** shall mean the date by which the applicable Closing or Close of Escrow is required to occur, unless extended by mutual agreement of the parties in writing, as provided in this Agreement.

**"Commercial Phase"** shall mean the commercial phase of the Project, as referred to in Section 3.3 [Project Phasing] and depicted in the phasing plan set forth in Attachment No. 2A to this Agreement.

**"Default"** shall mean the failure of a party to perform any material action or covenant required by and within the time periods provided herein following notice and expiration of the applicable period to cure said failure, as set forth in Section 8.1 [Default] of this Agreement.

**"Developer"** shall mean, collectively, Stanton Plaza Group, LLC, a California limited liability company, and Stanton Plaza Group II, LLC, a California limited liability company, whose principal places of business are 16580 Aston, Irvine, CA 92606. Stanton Plaza Group will own and develop the portion of the Site south of Plaza Way and Stanton Plaza Group II will own and develop the portion of the Site north of Plaza Way, as depicted in the Site Map set forth in Attachment No. 2 to this Agreement. The term "Developer" shall, to the extent such is permitted under this Agreement, include any assignee of or successor to, the rights and responsibilities of Developer under this Agreement.

**"Development Cost"** shall mean all the costs and expenses which must necessarily be incurred in the design, development, financing, construction and completion of the Project, including but not limited to: predevelopment costs; Developer's overhead and related costs; costs of acquiring the Site; design and engineering costs; development costs; construction costs, including without limitation costs for labor and materials; fees payable to accountants, appraisers, architects, attorneys, biologists, construction managers, engineers, geologists, hydrologists, inspectors, planners, testing facilities, and other consultants; impact, development, park, school and other fees and charges imposed by governmental entities as a condition approval on the Project; costs related to applying for and obtaining permits and approvals; taxes; assessments; costs and expenses related to testing for, and remediation of, Hazardous Substances; utility connection fees and other utility related charges; costs relating to financing, including without limitation, principal, interest, points, fees and other lender charges and costs; escrow fees and closing costs; recording fees; court costs; costs relating to insurance; costs relating to title insurance; costs relating to bonds; and all other costs and expenses of Developer related to the performance of this Agreement; excluding, however, any costs that are the responsibility of Agency pursuant to the express provisions set forth herein.

**"Development Fees"** shall mean those fees, charges, and exactions imposed by the City and any other governmental agencies with jurisdiction upon the development of

the Project on the Site, including, but not limited to, application fees, processing fees, development fees, impact fees, mitigation fees, park fees, storm drain fees, sewer fees, and other related charges.

*"Due Diligence Deadline"* shall mean the date that is seventy-five (75) days after the Right-of-Entry Date for the Kwon Parcel, as set forth in Section 1.11.2 [Physical Condition of the Kwon Parcel].

*"Effective Date"* shall mean the date on which this Agreement is formally approved by Agency's governing board at a public meeting, provided that this Agreement shall not be binding unless and until it is executed by the appropriate authorities of the Agency and Developer.

*"Environmental Laws"* shall mean those laws and implementing regulations referred to in the federal and state statutes set forth in subparagraph (i) of the definition of "Hazardous Substances" hereinbelow.

*"Environmental Review"* shall mean the investigation and analysis of the Project's impacts on the environment as may be required under the California Environmental Quality Act ("CEQA"), Public Resources Code §21000, et seq., or of the Project's impacts on any species of plant or animal listed as a species of concern, a threatened species, or an endangered species as may be required by the California Endangered Species Act ("CESA"), Fish and Game Code §2050, et seq., and/or the U.S. Endangered Species Act ("USESA"), 16 U.S.C. §1531, et seq., or other applicable California or federal law or regulation to the extent that Agency and/or City is the lead agency for such review or is otherwise required to complete such review prior to or concurrently with issuing Project Approvals.

*"Escrow"* shall mean an escrow opened with Escrow Agent by the parties to facilitate a sale or transfer of fee title to the Acquisition Parcels that are to be acquired by the Agency and conveyed to Developer in fee as contemplated in this Agreement.

*"Escrow Agent"* shall mean Stewart Title of California located at 2010 Main Street, Suite 250, Irvine, CA 92614 (Grace Kim, Escrow Officer), or such other escrow company that may be mutually approved in writing by the Agency and Developer.

*"Executive Director"* shall mean the Executive Director of Agency and/or any person designated and authorized by the Executive Director to act in his/her capacity with regard to this Agreement.

*"Hazardous Substances"* shall mean any and all of the following:

(i)      any substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated, or for which liability arises for misuse, pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq.; the Toxic Substances Control Act, 15 U.S.C.S. § 2601, et seq.;

the Clean Water Act, 33 U.S.C. §1251, et seq.; the Insecticide, Fungicide, Rodenticide Act, 7 U.S.C. § 136, et seq.; the Superfund Amendments and Reauthorization Act, 42 U.S.C. § 6901, et seq.; the Clean Air Act, 42 U.S.C. § 7401, et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f, et seq.; the Solid Waste Disposal Act, 42 U.S.C. §6901, et seq.; the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001, et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 655 and 657; the Hazardous Waste Control Act, California Health and Safety Code ("H.&S.C.") § 25100, et seq.; the Hazardous Substance Account Act, H.&S.C. § 25330, et seq.; the California Safe Drinking Water and Toxic Enforcement Act, H.&S.C. § 25249.5, et seq.; the Underground Storage of Hazardous Substances, H.&S.C. § 25280, et seq.; the Carpenter-Presley-Tanner Hazardous Substance Account Act, H.&S.C. § 25300, et seq.; the Hazardous Waste Management Act, H.&S.C. §25170.1, et seq.; the Hazardous Materials Response Plans and Inventory, H.&S.C. § 25001, et seq.; the Porter-Cologne Water Quality Control Act, Water Code § 13000, et seq., all as they may from time to time be amended;

(ii)   any substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated, or for which liability for misuse arises pursuant to any other federal, state or local statute, law, ordinance, resolution, code, rule, regulation, order or decree due to its hazardous, toxic or dangerous nature;

(iii)   any petroleum, crude oil or any substance, product, waste, or other material of any nature whatsoever which contains gasoline, diesel fuel or other petroleum hydrocarbons other than petroleum and petroleum products contained within regularly operated motor vehicles; and

(iv)   polychlorinated biphenyls (PCB), radon gas, urea formaldehyde, asbestos and lead.

*"Holder"* shall mean the holder, including its successors, grantees or assigns of record of any mortgage, deed of trust, or other security interest affecting the Site or any legal parcel(s) that exist within the Site from time to time that is permitted in accordance with Article 7.0 [Assignments, Transfers and Rights of Holders] of this Agreement.

*"Litigation Expenses"* shall mean all costs and expenses, to the extent reasonable in amount, actually and necessarily incurred by a party in good faith in the investigation, prosecution or defense of an Action or to cure a Default of another party, including, but not limited to, court costs, filing, recording, and service fees, copying costs, exhibit production costs, special media rental costs, attorneys fees, consultant fees, fees for investigators, witness fees (both lay and expert), travel expenses, deposition and transcript costs, and any other costs or expenses, the award of which a court of competent jurisdiction may determine to be just and reasonable.

*"Local Regulations"* shall mean all applicable provisions of the Redevelopment Plan, the City's General Plan, the Stanton Plaza Specific Plan, the City's Municipal Code (including but not limited to, all zoning, development and building standards,

regulations, policies, guidelines, and procedures, and all uniform codes incorporated therein), any applicable specific plan, the conditions of any applicable map approved under the Subdivision Map Act (Government Code § 66410, et seq.), and any mitigation measures imposed as a result of Environmental Review for the Project.

*"Physical Condition of the Site"* shall mean all of the existing physical, environmental, and economic conditions affecting the Site and its use, including, but not limited to, the physical configuration of the Site, any trees, stumps, brush, or other vegetation on the Site, the condition of its soils, the presence or impact of any geologic or hydrologic features and faults, the nature of its lateral and subjacent support, the presence of Hazardous Substances, waste, garbage, rubbish, or refuse on, in, under, or adjacent to the Site, the Site's compliance with applicable Environmental Laws, the location of the Site within any flood plain or high risk fire area, the location of public utilities and public improvements on, in, under, or over the Site, the presence, soundness, and habitability of any structures, fixtures, or improvements on or in the Site, the existence of any faults or defects (whether known or unknown, patent or latent), the economic and legal suitability of the Site for the intended use, all market conditions that may affect development and use of the Site, and all actions, orders, and judgments affecting the Site.

*"Prevailing Party"* shall mean "prevailing party" as defined in Code of Civil Procedure § 1032(a)(4).

*"Project"* shall mean the phased design, construction, and use by Developer of a mixed use residential/commercial project on the Site. Developer is proposing that the Project will consist of 10,000-30,000 square feet of retail and restaurant space, 170-300 attached "for sale" residential units, and between 20-35 "live/work" for sale units. As of the Effective Date of this Agreement, the parties contemplate that the Project may consist of as many as four (4) identified components or phases, as more particularly described in Section 3.3 [Project Phasing] and as depicted in the phasing plan set forth in Attachment No. 2A: Residential Phases 1 and 2, Residential/Live-Work Phase 3, and the Commercial Phase.

*"Project Approvals"* shall mean any land use, development and building permits, approvals and entitlements required by the City for the design, development, construction, and completion of the Project, and/or any phase thereof, including, but not limited to: General Plan amendments, Stanton Plaza Specific Plan amendments, variances, conditional use permits, site plan review, grading permits, building permits, actions under the Subdivision Map Act, encroachment permits, and other development and building approvals as may be required under the Stanton Municipal Code, but not including a certificate of occupancy.

*"Project Area"* shall mean that portion of the City that is subject to, and the boundaries of which are specifically described in, the Redevelopment Plan.

*"Project Plans"* shall mean all plans for grading, drainage, traffic, parking, construction and/or building, landscaping and other plans related to the Project, and/or

any phase thereof, and all designs, diagrams, drawings, specifications and other representations of or documents associated with the Project or such phase of the Project.

"**Public Improvements**" shall mean those public improvements, including but not limited to, streets, street lights, traffic signals, curbs, gutters, sidewalks, parkway landscaping, irrigation systems, storm drains, sewers, and other public facilities related to the Project and required to be constructed and installed in the existing public rights-of-way and/or on areas of the Site to be dedicated to the City by Developer as a condition of obtaining the Project Approvals for the Project or any phase thereof, consistent with the terms and conditions set forth in this Agreement.

"**Redevelopment Plan**" shall mean that plan of redevelopment for the Stanton Consolidated Redevelopment Project that was enacted by Agency pursuant to the Community Redevelopment Law, Health and Safety Code § 33000, et seq., on November 23, 2004 by Ordinance 903.

"**Related Entity**" shall mean a person or entity that meets the following requirements: (i) the entity is a validly organized and existing business entity which is an affiliate or subsidiary of either of the two entities comprising Developer, or an entity in which either of the two entities comprising Developer is a general partner, managing member, or trustee, or an entity in which Developer or James L. Barisic, individually or collectively, is the majority shareholder (meaning owning at least 51% of the outstanding stock entitled to voting rights in the business entity) or otherwise directly or indirectly holds at least 51% of the ownership interest and management control; (ii) the entity expressly assumes any obligations of Developer that are assigned to such entity under this Agreement in a writing reasonably satisfactory as to form to Agency's attorney; and (iii) the entity is financially capable of performing the duties and discharging the obligations it is assuming.

"**Residential Phase 1**," **Residential Phase 2**," and "**Residential/Live-Work Phase 3**" shall mean those respective components or phases of the Project, as referred to in Section 3.3 [Project Phasing] and depicted in the phasing plan set forth in Attachment No. 2A to this Agreement.

"**Restrictive Covenant**" shall mean that Declaration of Restrictive Covenants to be recorded against the Site as required under this Agreement.

"**Right-of-Entry Date for the Kwon Parcel**" shall mean the date Developer secures the legal right to enter onto the Kwon Parcel to perform a Phase 2 subsurface environmental investigation, as set forth in Section 1.11.2 [Physical Condition of the Kwon Parcel].

"**Security Deposit**" shall mean the security to be delivered by Developer to Agency pursuant to and in accordance with Section 8.9 of this Agreement.

"**Site**" shall mean that approximately 11.25 acres of real property, located generally at the northeast corner of Beach Boulevard and Orangewood Avenue in the

Project Area, consisting of all or a portion of Assessor's Parcel Nos. 131-141-05, 06, 07, 08, 11, 12, 15 and 16, and more particularly described in Attachment Nos. 1 and 2 to this Agreement.

*"Title Company"* shall mean Stewart Title of California, located at 180 N. Riverview Drive, #100, Anaheim CA 92808 (Nancy J. Noonan, Senior Title Officer), or such other title insurance company that may be mutually agreed to in writing by the Agency and Developer.

## OPERATIVE PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises and covenants made by the parties and contained herein and other consideration, the value and adequacy of which are hereby acknowledged, the parties promise, agree, and covenant as follows:

## ARTICLE 1 .0 - SITE ASSEMBLY

1.1    **Status of Site Assembly as of Effective Date**.    Developer and the Agency acknowledge that, as of the Effective Date, most of the separate parcels comprising the Site are currently owned by Developer and, accordingly, that Developer qualifies as an "owner participant" within the meaning of applicable provisions of the Community Redevelopment Law (Health & Safety Code § 33000 et seq.), the Redevelopment Plan, and the Agency's adopted rules governing owner participation. However, those potential Acquisition Parcels including, but not limited to, the parcel known as Assessor's Parcel No. 131-141-06 (the "Kwon Parcel"), a portion of the property known as Assessor's Parcel No. 131-141-12 (the "Ronnenberg Parcel"), the leasehold interest held by Auto Zone, Inc., or its successor, in a portion of Assessor's Parcel No. 131-141-16 (the "Auto Zone Lease"), and the leasehold interest held by Gutierrez/Flores in a portion of Assessor's Parcel No. 131-141-16 (the "Beauty Shop Lease") are owned by third parties who have declined to participate in the redevelopment of the Site as proposed by the Agency following the Agency's completion of the owner participation process required by the Community Redevelopment Law and as provided for in the Redevelopment Plan.

1.2    **Developer's Efforts to Acquire the Acquisition Parcels**.    The parties acknowledge that prior to the Effective Date Developer has exercised its best efforts to acquire the Acquisition Parcels, but that it has been unsuccessful in doing so and that completion of said acquisitions will require Agency's Site assembly services as provided in Section 1.3 [Site Assembly Services].

1.3    **Agency's Site Assembly Services**.    The Agency shall provide Developer with site assembly and acquisition services as provided herein.    Additionally, Agency shall use its best efforts to work with the City to vacate, or cause to be vacated, any and all unnecessary public service easements (including streets) on the Site that are inconsistent with the Project Approvals.    It is understood and agreed by the parties that any such services provided by the Agency are for the purpose of ameliorating the

existence of subdivided lots of irregular shape and/or inadequate size for proper utilization within the Project Area and for the reduction of fragmented and multiple parcel ownership, all of which contribute to the existence of blight within the Project Area. In this regard, it is expressly understood by the parties that:

1.3.1 **Agency Acquisition.** Within the times set forth in the Schedule of Performance, the Agency shall use reasonable efforts in good faith to acquire the Acquisition Parcels through a voluntary negotiated purchase and sale of the parcels. The Agency shall commence its efforts by first preparing and tendering upon the owners of record and/or the holders of the property interests to be acquired, as applicable, a written offer to purchase each Acquisition Parcel complying with Government Code § 7267.2, for an amount not less than the fair market value of the parcel or property interest as established by an Agency certified fair market value appraisal. If for any reason any of the owners of the Acquisition Parcels fails or refuses to enter into a contract with the Agency for the purchase and sale of the parcel or property interest within the time set forth in the Schedule of Performance on terms consistent with this Agreement, the matter shall be referred to the governing board of the Agency to consider, in its sole discretion, whether the Agency should, in compliance with the Eminent Domain Law and all applicable state laws, exercise its power of eminent domain to acquire said parcel or property interest. Developer acknowledges that nothing in this Agreement shall be deemed a prejudgment or commitment with respect to condemnation, or a guarantee that such condemnation will be undertaken.

Notwithstanding the foregoing, Agency acknowledges that it shall consult with and obtain the consent of Developer prior to making any final decisions concerning payment of any Acquisition Costs for an Acquisition Parcel above the amount of the applicable Agency certified fair market value appraisal therefor or concerning any other aspect of the acquisition of any of the Acquisition Parcels that materially affects Developer's rights or obligations hereunder or with respect to the Project, including without limitation with respect to the strategy and/ or the settlement terms relating to the timing, price and associated terms for any such acquisition.

If the Agency's governing board adopts a resolution or resolutions of necessity authorizing the acquisition of any of the Acquisition Parcels by exercise of the Agency's power of eminent domain, the Agency shall file the eminent domain action(s) within ten (10) business days after the date of adopting said resolution(s), and thereafter the Agency shall exercise reasonable diligence to prosecute the eminent domain action(s) to completion as soon as reasonably practicable. In this regard, the Agency further covenants that upon Developer's written request, and subject to Developer's payment/advance of the applicable portion of the Security Deposit, as provided for in Section 8.9 [Security Deposit], the Agency shall exercise reasonable efforts to (i) obtain possession of the Acquisition Parcel(s) pursuant to an order or orders for prejudgment possession and with the effective date of such order(s) being as soon as reasonably practicable and in accordance with applicable law, and (ii) cause any tenants and occupants to be expeditiously relocated from the Acquisition Parcel(s) consistent with the effective date of the order(s). In addition, the Agency shall grant to Developer consent, by appropriate instrument, for Developer to occupy the premises and proceed

with development of the Project on the Site (or the applicable portion(s) thereof) pending completion of the eminent domain action(s) and transfer of title to Developer or termination of the property interest(s) being acquired by the Agency, as applicable. Upon the request of Developer and/or the Title Company, the Agency shall execute an indemnification agreement in form and content satisfactory to the Title Company by which the Agency shall agree to indemnify, defend, and hold harmless the Title Company from and against any claims, liabilities, losses, damages, and expenses incurred by the Title Company in the event of the Agency's abandonment of the eminent domain proceedings or failure to obtain title to the Acquisition Parcel(s) in question and thereafter to promptly convey said title to Developer or terminate the property interest being acquired by the Agency, as applicable, in accordance with this Agreement. Developer agrees in turn to indemnify, defend, and hold harmless the Agency if the Agency's abandonment of the eminent domain proceedings or failure or refusal to convey title to Developer or to acquire and terminate said property interest, as applicable, is justified because of a material uncured Default by Developer hereunder.

Upon the request of any party to this Agreement, the other party or parties shall provide full information regarding the status of its/their negotiations to acquire the Acquisition Parcels, whether by negotiated purchase or (as to the Agency) by eminent domain, and to relocate the occupants therefrom.

1.3.2 **Acquisition Costs.** All Acquisition Costs required to purchase the Acquisition Parcels shall be paid for, and advanced by, Developer by way of deposit and draw as provided in Section 1.4.3 [Acquisition Deposit] of this Agreement. The Agency agrees to act reasonably to minimize the amount of Acquisition Costs required to be paid by Developer, consistent with applicable provisions of law and the parties' mutual objective to assemble the Acquisition Parcels on an expeditious basis. Not by way of limitation of the foregoing, the Agency agrees that the terms of all consultant contracts entered into by the Agency shall be fair and reasonable and shall not require payments in excess of the reasonable range of rates and charges that would be typical for the consultants in question contracting with the Agency in the absence of any obligation by Developer or other third party to advance or pay for such services.

1.3.3 **Limitations.** Nothing in this Agreement shall be construed to be a commitment of any of the Agency funds, revenues, or monies to pay any of the Acquisition Costs for acquisition of the Acquisition Parcels. Nothing in this Agreement shall be construed to be a binding commitment by the governing board of the Agency to exercise its power of eminent domain with regard to any particular parcel or parcels comprising the Site. In no event shall the Agency exercise its power of eminent domain unless and until the governing board of the Agency has duly considered the evidence before it and determined, in its sole discretion, that as to each subject parcel, each of the findings required under Code of Civil Procedure § 1240.030 and § 1245.230 can be made and, that based on these findings, the governing board has determined to adopt a resolution of necessity after a duly noticed public hearing, and compliance with the provisions of the California Eminent Domain Law (Code of Civil Procedure §1230.010 *et seq.*). In the event that the parties have been unsuccessful in their efforts to acquire any of the Acquisition Parcels by negotiated purchase and the Agency elects not to

exercise its power of eminent domain to acquire the remaining unacquired Acquisition Parcels, Developer has the right to terminate this Agreement.

1.3.4 **Relocation and Loss of Business Goodwill Expenses**. The parties acknowledge that the displacement of any person or business from the Site as a result of this Agreement, the Project, or related actions of the City and/or the Agency may require the City or Agency to provide relocation services and assistance under the Relocation Assistance Act (Government Code § 7260 et seq.) and/or to provide compensation for loss of business goodwill pursuant to Government Code Section 1263.510. Subject to Developer's rights under Section 3.8 of this Agreement, the Agency shall be responsible at no cost to Developer for providing all relocation services that are required and for paying all relocation benefits and compensation for loss of business goodwill, including all payments for fixtures and equipment that are removed from the Site (if any) as a result of the Agency's entering into this Agreement or its acquisition of any of the Acquisition Parcels or the Project. The Agency shall hire consultants to monitor and perform the Agency's obligations at Agency's sole cost and expense up to any amount required or supportable under the Relocation Assistance Act or Government Code Section 1263.510, as applicable. So long as the Agency is responsible for such payments, the Agency shall at all times have complete authority and control over any and all negotiations and settlements with displaced persons and business owners and shall determine, in its sole discretion, the amount which is required to be paid or which it deems reasonably necessary to be paid to any displaced person or business owner.

1.3.5 **Conveyance of Acquisition Parcels**. The Agency shall convey to Developer and Developer shall accept from the Agency fee title to those Acquisition Parcels to be acquired by the Agency in fee (i.e., the Ronnenberg Parcel and the Kwon Parcel), as provided for in this Agreement. Agency shall terminate the leasehold or other possessory interest in the remaining Acquisition Parcels (i.e., the Auto Zone Lease and the Beauty Shop Lease) as soon as the Agency is able to acquire possession of the applicable premises and relocate the occupants therefrom. In the event that an order of prejudgment possession is obtained for any Acquisition Parcel, Agency agrees to convey the possessory interest in such parcel to Developer as soon as reasonably possible in conjunction with any relocation services provided by Agency in order to allow Developer to expeditiously commence construction of the Project. The Agency shall not have any obligation to acquire title to any Acquisition Parcel or to convey fee title or the possessory interest in any such Acquisition Parcel to Developer until Developer has paid and fully discharged the Acquisition Costs for such Acquisition Parcel. The parties acknowledge that the Community Redevelopment Law requires that any Acquisition Parcel(s) conveyed by the Agency to Developer shall be conveyed subject to certain covenants and restrictions required and/or permitted under Health & Safety Code § 33435, § 33436, § 33437, § 33437.5, and § 33439, and that the form of the Grant Deed and Declaration of Redevelopment Covenants contain such covenants and restrictions.

1.4 **Developer's Deposits**. Developer shall make the following deposits with the Agency.



1.4.1 **Deposits Generally**. From time to time, Developer shall be required to deposit with the Agency certain amounts described below which the Agency shall place into one or more interest bearing accounts (collectively the "Deposit Accounts"). The Deposit Accounts shall each be subject to the general rules set forth in this Section. At any time after the City approves the discretionary Project Approvals for the Project (which Project Approvals include the tentative tract map and site plan but which for purposes of this Section 1.4.1 exclude any conditional use permits, signage plans, variances, or similar permits that may be required for specific proposed businesses or uses within the Commercial Phase of the Project that are not processed concurrently with the tentative tract map and site plan application(s)) on terms consistent with the Stanton Plaza Specific Plan (as amended) and this Agreement and otherwise as reasonably approved by Developer, the Agency may make written demand upon Developer for specified funds to be placed into a Deposit Account when the Agency determines that, in its reasonable discretion, the account balance is insufficient to cover the sum of the Acquisition Costs previously advanced or paid by the Agency, current Acquisition Costs to be paid from the account, and Acquisition Costs that the Agency reasonably anticipates will be incurred within thirty (30) days after the date of the Agency's demand. The Agency may withdraw funds from the Deposit Accounts, without prior notice to or approval of Developer, only as necessary to pay past or current Acquisition Costs. Any unexpended and uncommitted balance in the Deposit Accounts remaining after this Agreement is terminated or expires shall be returned to Developer after all of Developer's obligations hereunder have been satisfied. The Agency shall furnish to Developer, within thirty (30) days after written request by Developer, an accounting of all deposits and withdrawals from the Deposit Accounts, including a description (in reasonable detail) of the costs and expenses paid by the Agency, during the applicable reporting period. Developer shall have the right to review all City and Agency records relating to the Deposit Accounts and expenditure of funds placed in such accounts during the Agency's normal business hours. Developer shall also have the right to make copies of such records, at Developer's expense, for off-site review.

1.4.2 **Administrative Deposit**. Within five (5) days of the Effective Date of this Agreement, Developer shall deposit with the Agency Fifteen Thousand Dollars and No Cents ($15,000.00), (the "Administrative Deposit"). Developer agrees that the Agency may withdraw and use funds from the Administrative Deposit to pay legal, appraisal and other reasonable Acquisition Costs incurred by the Agency in preparing to acquire the Acquisition Parcels.

1.4.3 **Acquisition Deposit**. Developer shall be responsible for paying One Hundred Percent (100%) of the Acquisition Costs for the Acquisition Parcels. If the Agency enters into a Purchase and Sale Agreement to acquire any Acquisition Parcel and upon the Agency's written demand, Developer shall deposit funds with the Agency, in the manner provided in Section 1.4.1 [Deposits Generally], at such times and in such amounts as may be required by the Agency to enable it to timely comply with its payment obligations under such agreement; provided, however, that no payments shall be due from Developer until after the date the City approves Developer's discretionary Project Approvals for the Project (and Developer approves the same), as set forth and subject to the same terms and conditions stated in Section 1.4.1. If the governing board

of the Agency has negotiated a purchase price for an Acquisition Parcel and makes a timely demand for payment to Developer hereunder, the Agency shall not be obligated to conclude the Purchase and Sale Agreement with the seller of the Acquisition Parcel until Developer deposits the full amount of compensation for such property.  If the governing board of the Agency adopts a resolution of necessity for such property, the Agency shall not be obligated to apply to the court for issuance of an order for prejudgment possession unless and until Developer has deposited the amount established by the Agency to be the probable amount of compensation for such property.  Developer shall make such subsequent deposits with the Agency as the Agency reasonably determines are necessary for Acquisition Costs, including without limitation amounts required to settle or pay the judgment in an eminent domain case, any award of just compensation, interest, litigation expenses, and other Acquisition Costs, excluding relocation expenses and payments for loss of business goodwill that are the Agency's responsibility in accordance with Section 1.3.4 above, within fifteen (15) days of the Agency's written demand therefor.

      **1.4.4  Agency Conditions to Close.**  In addition to any other conditions set forth herein in favor of Agency, Agency's obligation to sell and convey any Acquisition Parcel that is to be conveyed to Developer in fee shall be conditioned upon Developer having paid all of the Acquisition Costs attributable thereto.

      **1.4.5  Developer's Conditions for Closing.**  Developer's obligation to purchase each Acquisition Parcel and to close the Escrow therefor and, as to each Acquisition Parcel consisting of less than a fee interest, Developer's obligation to pay the Acquisition Costs for said parcel in order to enable the Agency to acquire and terminate the applicable property interest shall, in addition to any other conditions set forth herein in favor of Developer, be conditional and contingent upon the satisfaction, or waiver by Developer, of each and all of the following conditions (collectively "Developer's Conditions of Closing") within the times provided:

      **1.4.5.1**  <u>Deposit by Agency.</u>  Not later than three (3) business days before the Close of Escrow as to any Acquisition Parcel to be conveyed by the Agency to Developer in fee, Agency shall have deposited the Grant Deed into Escrow for conveyance of title to the Acquisition Parcel along with any sums necessary to satisfy the Conditions of Closing and Escrow Instructions for which Agency is responsible under this Agreement.

      **1.4.5.2**  <u>Title Insurance.</u>  Not later than three (3) business days prior to the Close of Escrow as to any Acquisition Parcel to be conveyed by the Agency to Developer in fee, as provided in Section 1.9 [Title Insurance] of this Agreement, Agency shall have deposited into Escrow a commitment by the Title Company to issue a CLTA Owner's Title Insurance Policy to Developer at the Closing, showing title vested in Developer subject only to the approved Condition of Title and with coverage in the amount of the payment made by the Agency to the owner(s) thereof for land and improvements or such other amount as may be reasonably approved by Developer.

1.4.5.3 <u>Site Conditions / Due Diligence Date</u>.  As to the Kwon Parcel only, on or before the Due Diligence Deadline Developer shall have investigated and accepted the physical condition of the Kwon Parcel as provided in Section 1.11.2 [Physical Condition of the Kwon Parcel].

1.4.5.4 <u>Other Actions</u>.  Prior to Close of Escrow as to any Acquisition Parcel to be conveyed by the Agency to Developer in fee, the Agency shall have performed and completed all other actions reasonably necessary to achieve the closure of escrow in accordance with this Agreement and the escrow instructions issued or entered into pursuant to this Agreement.

1.4.5.5 <u>Waiver of Conditions</u>.  Developer, in its sole discretion, may waive the satisfaction of any of Developer's Conditions of Closing.

1.5  **Possession of the Acquisition Parcels**.  Agency shall deliver possession of the Acquisition Parcels to Developer at the Close of Escrow or, as to each Acquisition Parcel consisting of less than a fee interest, at the time Agency acquires and terminates the applicable property interest and relocates the occupant(s) from said parcel. However, prior to said time(s), Agency shall deliver possession of the Acquisition Parcels to Developer in accordance with any order(s) of prejudgment possession obtained by Agency, as provided for in Sections 1.3.1 and 1.3.5, and otherwise in Agency's sole discretion, on such terms as Agency deems appropriate.  In such event, Developer shall provide reasonable advance notice of its entry to Agency. Developer agrees to defend, release, indemnify and hold Agency and the City harmless against any and all Actions, liability, loss, lien, encumbrance, damage, injury and/or costs and expenses, including Litigation Expenses, suffered by Agency or the City, as the case may be, as a result of any acts or omissions of Developer, or its agents, employees or contractors while exercising such rights of entry and access.

1.6  **Grant Deeds**.  Agency shall convey title to each Acquisition Parcel to be conveyed in fee to Developer through a Grant Deed.  The Grant Deed shall be in a form substantially similar in all material respects to the form of grant deed attached to this Agreement as Attachment "<u>3</u>".

1.7  **Preliminary Title Reports**.  Prior to the Effective Date, Developer has reviewed Preliminary Title Reports reflecting the current status of title to the various parcels comprising the Site, together with a copy of all recorded documents, and a plot of all easements of record, referenced therein and Developer has approved the condition of title to the Site, excepting only with respect to the property interests within the Acquisition Parcels that must be acquired, conveyed, and/or terminated as provided for herein.

1.8  **Condition of Title**.  Agency shall convey to Developer insurable fee simple title to those Acquisition Parcels to be conveyed in fee free and clear of all monetary liens and encumbrances (excepting only any lien for current taxes and assessments not yet due and payable for taxes and assessments accruing subsequent to recordation of the Deed) and all non-monetary liens and encumbrances except:

1.8.1 **Local Regulations.** The effect of the Local Regulations to which the Site may be subject, including the Redevelopment Plan;

1.8.2 **The Agreement**. The effect of this Agreement;

1.8.3 **Restrictive Covenants**. The effect of the Restrictive Covenants provided for in this Agreement; and

1.8.4 **Public Easements**. Any easements or rights-of-way of record granted to or held by a public entity or private utility provider for streets, sidewalks, storm drains, drainage, utilities, slopes, landscaping, or other public use, facility, or improvement consistent with the Project; with the exception of those public service easements that are to be vacated as a result of the Project and/or Project Approvals.

1.9     **Title Insurance**. Not later than three (3) business days prior to the Close of Escrow for each Acquisition Parcel to be conveyed by the Agency to Developer in fee the Agency shall deposit into Escrow a commitment by the Title Company to issue a CLTA Owner's Title Insurance Policy showing title to the Acquisition Parcel vested in Developer and showing Developer as the proposed insured party in the amount provided for in Section 1.4.5.2. The commitment for a CLTA Owner's Insurance Policy shall show the status of title and be subject only to those exceptions to title referred to in Section 1.8 [Conditions of Title] of this Agreement.   Agency shall pay the Title Company's premium for the CLTA Owner's Title Insurance Policy with coverage in the amount of the Acquisition Costs paid by Developer for said parcel.   However, in the event that Developer desires to obtain an Extended Coverage ALTA Owner's Title Insurance Policy, then Developer shall undertake to obtain and shall pay, at its sole cost, the net additional expense for upgrading from CLTA to ALTA coverage and the cost of any survey prepared in connection therewith, and Developer shall also pay the full cost attributable to obtaining any non-standard endorsements or additional coverage that it may request.

1.10   [Intentionally Omitted]

1.11   **Physical Condition of the Site**.   Developer expressly understands, acknowledges and agrees that it takes possession of, and title to, the Site and the Acquisition Parcels subject to the following:

1.11.1 **Developer's Approval.** Prior to the Effective Date, and with the exception of the Kwon Parcel that is addressed in Section 1.11.2, Developer acknowledges that it has conducted such investigations, performed such tests, and made such inquiries that it believes to be necessary to enable it to approve the Physical Condition of the Site.  Accordingly, with the exception of Developer's reserved rights with respect to the Kwon Parcel, as referred to in Section 1.11.2, and its reserved rights as to third parties, as set forth in Section 1.11.3, Developer hereby approves the Physical Condition of the Site, Developer acknowledges that it is purchasing the Site solely in reliance upon its own investigations and business judgment, that neither the Agency nor the City has made any representations or warranties to Developer with

respect to such matters, and that Developer is assuming all risks and shall incur all costs that may be necessary to remedy any defects in the Physical Condition of the Site and to prepare the Site for development.

      1.11.2 **Physical Condition of the Kwon Parcel.**  From and after the Effective Date, the Agency and Developer shall cooperate in an effort to secure from the owner(s) and occupant(s) of the Kwon Parcel the right for the Agency, Developer, and Developer's environmental consultant to enter onto the Kwon Parcel and perform such invasive testing and investigations that Developer determines in its reasonable discretion are necessary to enable it to evaluate the Physical and Environmental Condition of the Site with respect to the Kwon Parcel. Upon Developer's request, and if the written consent of the owner(s)/occupant(s) cannot be obtained, such cooperation by the Agency shall include the Agency seeking to obtain a court order permitting such entry, testing, and investigation pursuant to Code of Civil Procedure Section 1245.010 et seq.   The date that Developer obtains written authorization from the owner(s)/occupant(s) of the Kwon Parcel or the Agency, as applicable, to enter onto the Kwon Parcel for such purpose is referred to herein as the "Right-of-Entry Date for the Kwon Parcel."

      Developer shall have from the Right-of-Entry Date for the Kwon Parcel through the Due Diligence Deadline to examine, inspect, and investigate the physical condition of the Kwon Parcel and, in Developer's sole and absolute judgment and discretion, to determine whether the Physical Condition of the Site is acceptable to Developer with respect to the Kwon Parcel.  If Developer does not disapprove the Physical Condition of the Site with respect to the Kwon Parcel by delivery of written notice to the Agency on or before the Due Diligence Deadline, Developer shall be conclusively deemed to have approved the same.  If Developer timely disapproves the Physical Condition of the Site with respect to the Kwon Parcel, the parties shall meet and confer for a minimum period of thirty (30) days regarding possible solutions and alternatives, including possible amendments to this Agreement, reserving, however, each party's sole and absolute discretion with respect thereto.  In the event that Developer timely disapproves the Physical Condition of the Site with respect to the Kwon Parcel and the parties do not agree upon an alternative solution, either party may terminate and rescind this Agreement with respect to the phases of development located in whole or in part within the area currently encompassed by the Kwon Parcel by delivery of written notice to the other party.

      Developer shall indemnify, defend, and hold harmless the Agency, the City, and their respective officials, officers, employees, and agents from and against any and all claims, liabilities, and losses arising out of Developer's (or its contractor's or consultant's) entry onto the Kwon Parcel pursuant to this Section 1.11.2, including without limitation pursuant to any court order obtained by the Agency for such purpose.

      1.11.3 **No Waiver or Release By Developer of Claims Against Third Parties**. Notwithstanding any other provision set forth in this Agreement to the contrary, Developer does not waive or release any rights or claims it may have against third parties (i.e., parties other than the Agency and City and their respective officials,

officers, employees, and agents) with respect to the Physical Condition of the Site, including without limitation rights or claims against "responsible parties" with respect to the actual or threatened violation of any Environmental Laws.

1.12 **Escrow**. The following provisions shall apply to the Escrow(s) to be established under this Agreement:

1.12.1 **Escrow Instructions.** Within the time set forth in the Schedule of Performance, the Agency and Developer shall deliver a fully executed original of this Agreement to the Escrow Agent and take all actions consistent with this Agreement to open the Escrow(s) for conveyance by the Agency to Developer of those Acquisition Parcels that are to be conveyed by the Agency in fee (i.e., the Kwon Parcel and the Ronnenberg Parcel). This Agreement shall constitute the joint escrow instructions of Agency and Developer for each Escrow for the conveyance of fee title to such Acquisition Parcels from the Agency to Developer. Agency and Developer shall promptly prepare, execute and deliver to the Escrow Agent such additional escrow instructions consistent with the terms and conditions of this Agreement as shall be reasonably necessary. Should any conflict or discrepancy arise or exist between this Agreement and the escrow instructions, then the terms, conditions, and text of this Agreement shall prevail.

1.12.2 **Closing Date.** Unless the parties mutually agree in writing to extend the Closing Date, the Closing Date for the conveyance of each Acquisition Parcel shall occur as expeditiously as possible and within five (5) business days after the satisfaction (or waiver by the benefited party or parties) of the applicable conditions to closing set forth in Sections 1.4.4 and 1.4.5 of this Agreement. In addition, with respect to any Acquisition Parcel that is acquired by the Agency utilizing its power of eminent domain, the Closing Date for purposes of this Agreement shall be deemed to be such earlier date, if applicable, on which the Agency conveys possession of the Acquisition Parcel to Developer pursuant to an order for prejudgment possession, assuming that Developer is able to secure a title insurance policy from the Title Company at such time consistent with the provisions of Section 1.9 [Title Insurance]. Notwithstanding any other provision set forth in this Agreement to the contrary, in the event that for any reason the Closing Date for any of the Acquisition Parcels does not occur within three (3) years from the Effective Date of this Agreement due to circumstances beyond the Agency's reasonable control (i.e., the Agency is not in Default), (i) Developer shall have the right in its sole discretion to rescind the provisions of this Agreement relating to the acquisition and conveyance of said Acquisition Parcel, (ii) in the event Developer does so rescind such provisions of this Agreement the Agency shall promptly reimburse Developer fifty percent (50%) of any Acquisition Costs previously paid or advanced by Developer to the Agency with respect thereto (and release and indemnify, defend, and hold harmless Developer from and against any and all further claims, liabilities, and losses relating thereto), and (iii) the Agency and Developer shall cooperate in good faith with respect to a reconfiguration and redesign of the Project pursuant to new Project plans to be prepared excluding the Acquisition Parcel in question, but reserving to the City and Agency their legislative discretion with respect thereto. The remedies provided for in the preceding sentence shall not limit or

restrict the rights or remedies of either party if a Closing fails to occur due to a Default by the other party.

1.12.3 **Deposits and Charges.** Subject to any mutually agreed upon extension of time, within the time set forth in the Schedule of Performance the Agency and Developer each shall execute in recordable form and deliver to the Escrow Agent the Grant Deed and the Restrictive Covenant and make all other payments and deposits, perform all acts, and deliver to the Escrow Agent all documents necessary for the conveyance from Agency to Developer of title or possession to each of the Acquisition Parcels that is to be conveyed by the Agency to Developer in fee. The Agency shall pay into the Escrow one-half (½) of the Escrow Agent's escrow fees, the portion of the Title Company's premium and charges payable by the Agency in accordance with Section 1.9 of this Agreement, and such other charges and closing costs that customarily are the responsibility of the seller in a transaction similar to the transaction provided for herein in the county in which the Site is located, all after notification by the Escrow Agent of the amount thereof. Developer shall pay into the Escrow the balance of the Escrow Agent's fees, the balance of the Title Company's premium and charges, if any, and the balance of all other escrow charges and closing costs payable under this Agreement, after notification by the Escrow Agent of the amount thereof.

1.12.4 **Transfer Stamps.** The Escrow Agent shall buy, affix and cancel any transfer stamps required by law, and pay any transfer tax required by law.

1.12.5 **Authority of Escrow Agent.** The Escrow Agent is hereby empowered to act under this Agreement, and upon indicating its acceptance of Section 1.12 [Escrow] in writing, delivered to Agency and Developer, shall carry out its duties as Escrow Agent hereunder. The Escrow Agent is authorized to:

1.12.5.1 Pay and charge Agency and Developer, respectively, for any fees, charges and costs payable under Section 1.12 [Escrow] of this Agreement. Before such payments are made, and within the time set forth in the Schedule of Performance, the Escrow Agent shall notify Agency and Developer of the fees, charges, and costs necessary to clear title and close the escrow;

1.12.5.2 Disburse funds, deliver the Grant Deed(s), and other documents to the parties entitled thereto when the conditions of this escrow have been fulfilled by Agency and Developer; and

1.12.5.3 Record the Grant Deed, Restrictive Covenants, and any other appropriate instruments delivered through this escrow, if necessary or proper to vest title to the applicable Acquisition Parcel in Developer, all in accordance with the terms and provisions of this Agreement.

1.12.6 **Deposit and Disbursement of Funds.** All funds received in the Escrow for each Acquisition Parcel to be conveyed by the Agency to Developer in fee shall be deposited by the Escrow Agent in an interest-bearing escrow account or

accounts for the benefit of Developer unless the parties expressly agree and subsequently instruct Escrow Agent otherwise.  Such funds may be transferred to any other such escrow account or accounts.  All disbursements shall be made on the basis of a 30-day month.

      1.12.7 **Amendment of Escrow Instructions**.  Any amendment of these escrow instructions shall be in writing and signed by both Agency and Developer.  At the time of the amendment, the Escrow Agent shall agree to carry out its duties as Escrow Agent under such amendment.

      1.12.8 **Communication with Escrow Agent**. All communications from the Escrow Agent to Agency or Developer shall be directed to the addresses and in the manner established in Section 9.18 [Notices, Demands and Communications Between the Parties] of this Agreement for notices, demands, and communications between Agency and Developer.

      1.12.9 **Liability of Escrow Agent**.  The liability of the Escrow Agent under this Agreement is limited to performance of the obligations imposed upon it under Section 1.12 [Escrow] of this Agreement.

      1.12.10 **Brokers' Fees**.  Agency shall not be liable for payment of any real estate broker or finder fees with respect to the transaction contemplated in this Agreement; Developer shall pay any such fees.  Agency and Developer each warrants and represents to the other that it has retained no real estate broker or finder with respect to the conveyance contemplated in this Agreement, and Developer agrees to indemnify, defend, and hold Agency harmless from and against any claim for any real estate commissions or brokerage or finder's fees which may arise herefrom in violation of the foregoing warranty and representation by Developer.

## ARTICLE 2 .0 - AGENCY COOPERATION

    2.1    <u>**Limited Agency Cooperation**</u>.  The parties acknowledge that the Agency has not agreed or otherwise committed to provide any cooperation or assistance to Developer relating to the Project except as expressly provided in this Agreement.

## ARTICLE 3 .0 - DEVELOPMENT OF THE PROJECT

    3.1    <u>**Scope of Development**</u>.  Developer shall develop, including but not limited to, design and construct, the Project on the Site in accordance with the terms and conditions of this Agreement and the following provisions:

      3.1.1 **Project Approvals**.  Developer shall be solely responsible for preparing, filing, and processing applications for, and obtaining all approvals, entitlements, and permits, whether ministerial or discretionary, which the Agency, City and/or any other governmental entity having jurisdiction, requires concerning the Project within the times provided in the Schedule of Performance attached to this Agreement. Developer agrees to comply with the City's development procedures and regulations and to submit such applications, site plans, studies, and other documents as may be

required by the City to review and approve the Project.  Developer understands, acknowledges, and agrees that development of the Project is subject to the discretionary review (including architectural and design review) and approval by the City, including, but not limited to, the City Community Development Department, the City Planning Commission, and the City Council, and that nothing in this Agreement is, or shall be interpreted to be, an agreement by Agency or the City to approve or issue any approvals, entitlements, or permits for the Project.

3.1.2 **Project Plans**.  Developer shall promptly prepare and submit the Project Plans to the appropriate department of the City for review and approval within the time provided for in the Schedule of Performance attached to this Agreement.  In the event the Project Plans or any portion thereof are disapproved, Developer shall expeditiously revise and resubmit the Project Plans or applicable portions thereof to the City.

3.1.3 **Environmental Review**.  Prior to the Effective Date of this Agreement, a Final Environmental Impact Report (the "EIR") has been certified by the City with respect to the amendment of the Stanton Plaza Specific Plan area, which includes the Site.  To the extent any subsequent Project Approval requires additional Environmental Review pursuant to the California Environmental Quality Act ("CEQA") or otherwise, Developer shall undertake, commence, and complete any such necessary Environmental Review, if any, required for the Project, or any portion thereof, and shall comply with any additional conditions or mitigation measures imposed by the City that are needed to address additional environmental impacts not previously addressed, but with Developer reserving its rights with respect to any such new conditions or mitigation measures.

3.1.4 **Agency Cooperation**.  In order to facilitate Developer's receipt of approved Project Plans and Project Approvals, the Agency agrees to use its best efforts in good faith to cooperate with Developer in coordinating actions by City departments and agencies necessary for the review, processing and consideration of the Project Plans and Project Approvals, and to encourage City departments and agencies to review, process, and consider Project Plans and Project Approvals expeditiously.

3.1.5 **Development Costs**.  Notwithstanding any Agency cooperation efforts to be provided by Agency under this Agreement, Developer shall be solely responsible for payment of all Development Costs.

3.1.6 **Development Fees**.  Notwithstanding any Agency cooperation efforts to be provided by Agency under this Agreement, Developer shall be solely responsible for payment of all applicable Development Fees; provided, that Developer does not waive any rights it might have in the absence of this Agreement to protest or challenge such Development Fees, either on their face or as applied to the Project.

3.1.7 **Developer Contribution to Stanton Plaza Entitlements**.  Prior to the Effective Date of this Agreement, the City and Agency initiated and processed an amendment to the Stanton Plaza Specific Plan (which encompasses an area that

includes the Site) and an environmental review of that project pursuant to the California Environmental Quality Act. In recognition of the fact that said Specific Plan Amendment and environmental review may provide some benefit to Developer with respect to its processing of the Project Approvals, the Developer shall pay the total sum of seventy-five thousand dollars ($75,000) to the Agency as Developer's fair share portion of such costs within the time set forth in the Schedule of Performance.

3.1.8 **Construction Sign**. Developer shall install and maintain during the construction period of the Site, at its sole cost and expense, one or more construction signs of no greater than a total of three hundred square feet (300 sq. ft.), or such size as may be allowed under the Stanton Municipal Code for such signs, advertising the construction of the Project and that such Project is being undertaken in cooperation with the Agency. Developer shall provide the sign layout, text, and design to Agency for review and approval. Developer shall be responsible for obtaining, at its sole cost and expense, any permit or approval for such sign(s) as may be required by the City under the Stanton Municipal Code.

3.1.9 **Storm Drain**. Prior to the Effective Date of this Agreement, Developer has been advised that the California Department of Transportation ("Caltrans"), which has regulatory authority concerning encroachments into Beach Boulevard, and/or the City may require in conjunction with the approval and development of the Project that a storm drain system, including appurtenant structures (collectively, the "Storm Drain"), be constructed and installed across the Site and from the northerly boundary of the Site approximately 700 linear feet further north to an existing flood control channel owned and operated by the Orange County Flood Control District ("OCFCD"). The purpose of the Storm Drain is to carry and divert surface runoff from an approximately 28.8-acre drainage tributary area, including the Site, to the OCFCD flood control channel in order to improve existing drainage conditions along a portion of Beach Boulevard adjacent to and north of the Site. It is understood and agreed that even without the Storm Drain the Project will not contribute any net additional surface water runoff onto Beach Boulevard.

If Caltrans and/or the City do require construction/installation of the Storm Drain in conjunction with the approval and development of the Project on the Site, Developer agrees not to protest or challenge such requirement, subject to the following:

(i)  Subject to Developer's contribution to a portion of the acquisition costs for right-of-way as provided herein, the Agency and/or the City, not Developer, shall be responsible for acquisition of any easements or other rights-of-way off of the Site that may be required for the Storm Drain, whether the Storm Drain is located within the dedicated Beach Boulevard right-of-way or on and across any portions of the Payless Shoe property (APN 131-131-05) and/or the Ronnenberg property(ies) (APNs 131-131-06 and –07); and

(ii)  The Agency shall cooperate with Developer in an effort to expeditiously secure all required permits for the Storm Drain from the City, Caltrans (if applicable), and any utility company(ies) with jurisdiction; and

(iii)   Developer shall enter into a contract with a licensed contractor to construct/install the Storm Drain in accordance with the City's standard requirements for the construction and installation of offsite public improvements and the plans and specifications for the Storm Drain that are approved by the City and, if applicable, Caltrans, and with the understanding that if for any reason construction/installation of the Storm Drain is delayed due to delays beyond Developer's reasonable control (e.g., delays in procuring necessary rights-of-way or delays in City or Caltrans approval of the plans), Developer's development of the Project on the Site shall not be similarly delayed; and

(iv)   Developer shall comply with the Prevailing Wage Laws referred to in Section 3.8 with respect to the planning, design, construction, and installation of the Storm Drain; and

(v)   Developer's financial contribution to the cost of the Storm Drain shall be limited to (i) dedication to the City, without compensation, of the portion of the right-of-way for the Storm Drain over and across the Site, and payment of Developer's fair share of the total cost for acquiring any right-of-way off of the Site and for the design, engineering, permitting, construction, installation, supervision, and inspection of the Storm Drain (collectively, the "Storm Drain Costs"), which fair share the parties agree, based upon the relative size of the areas of benefit served by the Storm Drain, is thirty-seven and one-half percent (37.5%) of the total cost of the Storm Drain.  A maximum of five percent (5%) of the total "hard" cost of constructing/installing the Storm Drain shall be includable in the total Storm Drain Costs for Developer's construction management services; otherwise, Developer shall not be entitled to include any administrative or overhead or profit, by whatever name called, in the calculation of the total Storm Drain Costs.  Over the period of time that Developer incurs Storm Drain Costs, Developer shall periodically, but not more frequently than monthly, invoice the Agency for the percentage of Storm Drain Costs incurred by Developer since its previous invoice was submitted in excess of Developer's fair share contribution.  Each such invoice shall be accompanied by such information as shall be reasonably required by the Agency to verify the amount thereof.  Invoices shall be paid by the Agency within thirty (30) days after receipt.  The Agency acknowledges and agrees that the amounts to be paid or reimbursed by Agency to Developer pursuant to this Section 3.1.9 are "costs that would normally be borne by the public" within the meaning of Labor Code Section 1720(c)(3).

3.1.10  **Court Street Improvements**.  Prior to the Effective Date of this Agreement, Developer has been advised that in conjunction with Developer's development of the Project the City and/or Agency may undertake certain street work, on-street parking improvements, sidewalk and parkway landscaping improvements, and miscellaneous related work within the public right-of-way for Court Street adjacent to the Site (collectively, the "Court Street Improvements").  If the City or Agency requires any of the Court Street Improvements to be constructed or installed in conjunction with the

approval and development of the Project, the Agency shall perform or cause the City to perform such work at no cost to the Developer and the Agency acknowledges that their costs incurred for such purpose are "costs that would be normally borne by the public" within the meaning of Labor Code Section 1720(c)(3) and that such undertaking is not "in execution of the project" within the meaning of Labor Code Section 1720(b)(2) and does not convert the Project or any portion thereof as one that is "paid for in whole or in part out of public funds" within the meaning of Labor Code Section 1720(a)(1) and (b).

3.1.11 **Affordable Housing**. The Agency acknowledges that, independent of the Project, the Agency is expending its housing set-aside funds generated from the Project Area pursuant to Health & Safety Code Sections 33334.2 and 33334.3 to meet the Agency's obligations under the Community Redevelopment Law to increase, improve, and preserve the community's supply of low- and moderate-income housing available at affordable housing cost and to produce new and substantially rehabilitated affordable housing units of benefit to the Project Area and the community. Accordingly, the Project and the Site shall not be subject to any affordable housing obligations or affordable housing covenants. Notwithstanding the foregoing, if and to the extent that the City imposes any affordable housing obligations on the Project or the Site after the Effective Date of this Agreement, the Agency shall satisfy such obligations off of the Site using the Agency's housing set-aside funds, such that the expenditures do not result in the Project or any portion thereof becoming classified as a "public work," consistent with Labor Code Section 1720(c)(4).

3.2 <u>**Schedule of Performance**</u>. Developer and Agency shall undertake, commence, and thereafter diligently pursue the Project to completion and perform their respective obligations hereunder within the times set forth in the text of this Agreement and in the Schedule of Performance attached hereto and incorporated herein by reference as Attachment "<u>4</u>". The Schedule of Performance is subject to revision from time to time as mutually agreed upon in writing by Developer and the Executive Director. In the event that a party desires a change to the Schedule of Performance, it shall submit a written request to the other party specifying the nature of the change, the reason for the change, that the change is not due to the negligence or Default of the requesting party, and evidence that the change is reasonably necessary to implement this Agreement. The requesting party shall then meet and confer with the other party to discuss the schedule amendment and shall either approve or deny the request within ten (10) days after they have met and conferred. The parties acknowledge and agree that time is of the essence in the performance of this Agreement and that amendments to the Schedule of Performance may be reasonably denied on this basis. Notwithstanding the foregoing, Agency agrees to consider reasonable extensions of time for Developer's performance which are not caused by Developer's default and are not otherwise the fault of Developer or as may be required under Section 9.3 [Forced Delays; Extension of Times] of this Agreement.

3.3 <u>**Project Phasing**</u>. The parties currently contemplate the Project will be undertaken in as many as four separate components or phases, depending to a considerable extent upon how quickly the Agency is able to acquire the various Acquisition Parcels: Residential Phases 1 and 2, Residential/Live-Work Phase 3, and

112/016136-0001
574286.04 a02/02/05

-23-



the Commercial Phase, as depicted in the Site Plan set forth in Attachment No. 2A to this Agreement.   However, Developer acknowledges that development of the Commercial Phase is of vital importance to the City and Agency.   Accordingly, Developer agrees to certain phasing restrictions on development of Residential Phase 2 and Residential/Live-Work Phase 3 as set forth herein.

Developer shall be entitled to develop the entire residential portion of the Project north of existing Plaza Way (i.e., Residential Phase 1) without any phasing restrictions or controls tied to development of the Commercial Phase of the Project.

Subject to the exceptions set forth in the next three sentences of this paragraph, however, Developer shall not be entitled to the issuance of any building permits for the portion of the Project south of existing Plaza Way (i.e., Residential Phase 2 and Residential/Live-Work Phase 3) until Developer first shall have obtained building permits for the in-line shops (but excluding any pad buildings) and commenced construction of building improvements pursuant to such permits (as reflected by commencement of excavation for foundations) in the Commercial Phase of the Project and construction of such commercial building improvements in the Commercial Phase is thereafter diligently continued in good faith to completion.   Notwithstanding the foregoing, once a building permit is issued, the Agency covenants that such permit shall not be suspended or revoked and no certificate of occupancy or final inspection shall be withheld or delayed on account of any subsequent failure by Developer to timely proceed with development of the Commercial Phase of the Project. In addition, and notwithstanding the foregoing, the phasing condition set forth in the first sentence of this paragraph shall be released and shall be of no further force or effect and Developer shall be free to proceed with development of any portion of the Project south of existing Plaza Way that is located off of the Kwon Parcel if for any reason the Closing Date for conveyance of the Kwon Parcel by the Agency to Developer (with title cleared of all leasehold and other possessory interests and the occupants relocated from said parcel, such that Developer is free to proceed with development of the Commercial Phase of the Project) does not occur within one (1) year after the City issues the rough grading permit for Residential Phase 1.  Finally, and notwithstanding the foregoing, the phasing condition set forth in the first sentence of this paragraph shall be released and shall be of no further force or effect and Developer shall be free to proceed with development of Residential/Live-Work Phase 3 of the Project if for any reason the Closing Date for conveyance of the Kwon Parcel has occurred or is in a condition to occur subject only to the remaining short-term occupancy of the portion or portions of the Kwon Parcel within the Commercial Phase, such that Developer would be able to proceed in the meantime with development of Residential/Live-Work Phase 3 pending the termination of the remaining short-term property interests of tenants/occupants within the Commercial Phase and their relocation from the Site.

In addition to the foregoing, Developer shall commence and complete all phases of the Project within the times provided in the Schedule of Performance.  Subject to the specific timing and phasing restrictions expressly set forth in this Section 3.3, the references herein to the various phases of development are for convenience only and nothing in this Agreement is intended to require Developer to develop one "phase"

before proceeding to another or to control the order, timing, or phasing of Developer's development of the Project.

The Schedule of Performance sets out maximum milestone dates for the Project. Developer may complete milestone events and actions prior to the proscribed dates and may undertake and complete events, actions, and phases of the Project concurrently, at the Developer's discretion, provided such action does not result, or is not likely to result in a delay in completion of the Project as a whole or any phase of the Project.

3.3.1 **Release of Construction Covenants**. Upon Developer's written request and Agency's determination that Developer has timely and satisfactorily completed construction of the portion of the Project on a separate legal parcel or parcels in all material respects, Agency shall record with the Orange County Recorder a (partial) Release of Construction Covenants in a form substantially similar as the Release of Construction Covenants attached hereto as Attachment "<u>5</u>" for that parcel or parcels. Completion shall be deemed to have occurred no later than the date upon which City has issued a Certificate of Occupancy or has signed off on the final inspection for the improvements on that parcel. However, in the event that the City has not issued a Certificate of Occupancy or has not signed off on the final inspection for said parcel, the Agency may deem completion to have occurred if Agency determines, in its sole discretion, that the improvements on that parcel have been substantially completed in all material respects in accordance with this Agreement. However, it is understood, acknowledged, and agreed by Developer that Agency's issuance of a (partial) Release of Construction Covenants shall not in any way satisfy or supersede any requirement that Developer obtain a Certificate of Occupancy, or any other permit or approval required by the City or other governmental entity having jurisdiction for occupancy and operation of the Project or any portion thereof. With specific reference to the Commercial Phase of the Project, "completion" for purposes of this Section and the Schedule of Performance shall exclude (and not require completion of) interior and exterior tenant improvements, tenant signage, the pad buildings, or minor non-life safety "pick up" items relating to the commercial improvements. Upon Developer's written request and satisfactory completion of all of the improvements (and related offsite improvements, as and if required) with respect to any of the four phases of the Project as referred to in Section 3.3 and depicted in the Site Plan set forth in Attachment No. 2A, the Agency shall issue a final Release of Construction Covenants for that phase.

A Release of Construction Covenants shall constitute a conclusive determination by the Agency of Developer's satisfactory completion of its development and construction obligations with respect to the applicable parcel(s) or phase(s) of the Project and of full compliance with the terms set forth in this Agreement relating to such development and construction. After the date Developer is entitled to the issuance of a Release of Construction Covenants, and notwithstanding any other provisions set forth in this Agreement to the contrary, any party then owning or thereafter purchasing, leasing, or otherwise acquiring any interest in the portion of the Site to which such Release of Construction Covenants relates shall not (because of such ownership, purchase, lease, or acquisition) incur any obligation or liability under this Agreement, except that such party shall be bound by the covenants contained in the applicable



Grant Deed and the Restrictive Covenant relating thereto that survive issuance of the Release of Construction Covenants in accordance with the terms and conditions set forth therein. The Agency shall not unreasonably withhold issuance of any Release of Construction Covenants. If the Agency fails or refuses to furnish any Release of Construction Covenants after written request from Developer, the Agency shall, within ten (10) days after such written request provide Developer with a written statement of the reasons the Agency failed or refused to issue the Release of Construction Covenants. The statement shall also contain the Agency's opinion of the action Developer must take to obtain the Release of Construction Covenants. If the reason for such failure or refusal is confined to the immediate availability of specific items or materials for landscaping or minor non-life safety "punchlist" items, the Agency agrees to issue its Release of Construction Covenants upon the posting of a cash deposit (or other security reasonably satisfactory to the Agency) by Developer with the Agency in an amount representing the fair value of the work not yet completed.

The Agency's issuance of a Release of Construction Covenants shall not constitute evidence of compliance with or satisfaction of any obligation of Developer to any holder of a mortgage or any insurer of a mortgage on or with respect to the Site or any portion thereof. The Release of Construction Covenants is not a notice of completion as referred to in California Civil Code Section 3093.

3.4 **Dedication of Rights-of-Way for Public Improvements**. Developer shall give and dedicate such rights-of-way, easements, agreements, licenses, and other grants of rights ("Dedications") as may be necessary for the Project or required by the Project Approvals to the Agency and/or City as are reasonably required to accomplish the survey, design, construction, inspection, testing, operation, maintenance and repair of the Public Improvements. It is understood, acknowledged, and agreed by Developer that such Dedications may include, but are not limited to, fee parcels, and permanent or temporary rights-of-way or easements for public purposes (including street and utility use, slope, drainage, maintenance, construction, entry and/or access, and encroachment permits). Developer agrees that the making of such Dedications are part of the consideration provided by Developer for this Agreement, that Developer shall not seek, nor have a right to seek, any compensation from Agency or City for such Dedications, and that Developer shall not pursue any legal action for compensation, including inverse condemnation or eminent domain, with regard to such Dedications.

3.5 **Management of Project**. The unique qualifications and expertise of Developer are of particular significance to the success of the Project. It is in part because of this expertise and experience that Agency has entered into this Agreement with Developer. Subject to the rights of any Holder pursuant to this Agreement, Developer agrees that: (i) Developer or a Related Entity or an assignee permitted under Article 7.0 of this Agreement will manage the Project through and including completion. However, in the event of a sale or conveyance of the Project, as may be permitted under this Agreement, a replacement or substitute manager may assume management of the Project if the substitute manager is reasonably acceptable to the Agency; provided, however, that the Agency shall not unreasonably withhold or deny approval if

the substitute is of equal or superior experience and expertise to Developer, the Related Entity, or the permitted assignee.

3.6  **No Exemption from Taxes**. This Agreement shall not exempt, and shall not be interpreted as exempting, Developer, Holder, or any person claiming through either of them, from the payment of, or from being subject to the levy of: (i) *ad valorem* property taxes imposed on the Site under Article XIII A of the California Constitution; (ii) special taxes imposed on the Site; (iii) special assessments imposed on the Site; (iii) all taxes payable under the California Bradley-Burns Uniform Local Sales & Use Tax Law, Revenue and Taxation Code § 7200, et seq.; and (iv) all other taxes, assessments, fees, exactions, or charges any portion of which are allocated to, or received by, the City or Agency and which are imposed due to the ownership, use, or possession of the Site or interest therein or due to the construction or operation of the Project. In addition, this Agreement shall not exempt, and shall not be interpreted as exempting, Developer, Holder or any person claiming through either of them, from inclusion in any maintenance district, assessment district, Community Facilities District, other special district, or other method of public financing as may be allowed under the laws of the State of California or of the United States. Notwithstanding the foregoing, nothing in this Agreement is intended to or shall be construed as a waiver or release of Developer's, Holder's, or any other person's right to object to or challenge the imposition of any such taxes, assessments, fees, exactions, or charges or their validity or applicability to such person(s) or the Site.

3.7  **Prevailing Wage Laws**. The Agency and Developer acknowledge that the Storm Drain referred to in Section 3.1.9 and the Court Street Improvements referred to in Section 3.1.10 are "public works" and that the party or parties responsible for constructing and installing such improvements shall be required to comply with all applicable provisions of California's prevailing wage laws with respect thereto. (Labor Code Section 1720 et seq. and implementing regulations) (the "Prevailing Wage Laws"). With respect to the balance of the Project, Developer asserts that the Project is not a "public work" within the meaning of the Prevailing Wage Laws and that, accordingly, Developer is not required to ensure that prevailing wages are paid with respect thereto, nor is Developer required to ensure compliance with other provisions of the Prevailing Wage Laws that apply to public works. The Agency does not dispute Developer's assertion in this regard, but is unwilling to make any representation or warranty or assume any risk with respect thereto. Accordingly, Developer covenants to indemnify, defend, and hold harmless the Agency and City from and against any and all claims, liabilities, and losses (including without limitation attorney's fees and statutory or administrative fines and penalties) arising out of any violation or claimed violation of the Prevailing Wage Laws by Developer or any of its contractors or subcontractors in the development of the Project.

In this regard, Developer further asserts that the Project would be financially infeasible if it were to become classified as a "public work" and Developer were required to ensure the payment of prevailing wages and compliance with the Prevailing Wage Laws with respect thereto, and for this reason that Developer would not have entered into this Agreement if it were required to comply with the Prevailing Wage Laws (except

with respect to construction and installation of the Storm Drain).   Accordingly, notwithstanding any other provision set forth in this Agreement to the contrary, in the event that any Action is instituted challenging Developer's failure or alleged failure to ensure compliance with the Prevailing Wage Laws and seeking any legal or equitable remedy with respect thereto, the parties agree that Developer shall have the right, in its reasonable discretion, to either (i) defend said Action (in which event the Agency agrees to cooperate with Developer in such defense) or (ii) rescind nunc pro tunc any provisions set forth in this Agreement that are either finally determined in such Action to trigger an obligation by Developer to ensure compliance with the Prevailing Wage Laws or that Developer reasonably believes may lead to such a determination.  For example, and not by way of limitation of the foregoing, if it is finally determined in any such Action that the Agency's payment of relocation expenses and/or compensation for loss of business goodwill pursuant to Section 1.3.4 makes the Project a "public work" for purposes of the Prevailing Wage Laws, Developer shall have the right at its option and by delivery of written notice to the Agency to rescind said Section of this Agreement nunc pro tunc by immediately paying or reimbursing the Agency for all such costs and expenses previously incurred by the Agency and thereafter treating any additional such items as part of the Acquisition Costs to be paid by Developer in accordance with and subject to the terms and conditions set forth in Sections 1.3.2, 1.4.1, and 1.4.3.  The Agency shall cooperate with the Developer in executing any documents, including any amendments or modifications to this Agreement, as may be appropriate to effectuate such partial rescission provisions.

## ARTICLE 4 .0 - USE AND MAINTENANCE OF THE SITE

4.1   **Term of Covenants**.  The covenants set forth in this Article 4.0 [Use and Maintenance of the Site] shall be operative, effective, valid and shall bind and encumber each legal parcel within the Site until recordation of the Release of Construction Covenants [Attachment 5] with respect to that parcel, and shall terminate and be of no further force or effect at that time, as provided in Article 2.0 of the Restrictive Covenants.   After that date, the covenants set forth in the Grant Deed and the Restrictive Covenant shall survive in accordance with and subject to the terms and conditions set forth therein.

4.2   **Use Covenant**.  Developer covenants and agrees for itself, its successors and assigns, and any successor-in-interest to the Site or part thereof, that during the period set forth in Section 4.1 [Term of Covenants], Developer shall use, occupy, lease, convey or otherwise transfer the parcels within the Commercial Phase of the Site in accordance with the following provisions:

4.2.1 **Limit on Conveyances to Tax Exempt Entities**.  Except for a transfer or conveyance resulting from eminent domain action or an acquisition under threat of an acquisition under threat of eminent domain, Developer, its successors, and assigns shall not sell, convey, transfer, assign, lease, or sublet all or any portion of any legal parcel within the Commercial Phase of the Site, the buildings within the Commercial Phase of the Site, or any part of the gross leaseable square footage of such buildings, to any person or entity that is exempt, or that is seeking exemption, from



payment of *ad valorem* taxes imposed under Article XIII A of the California Constitution ("Tax Exempt Entity"), unless one of the following conditions is met:

4.2.1.1 <u>Convey to Agency or City</u>. Developer may sell, convey, transfer, assign, lease or sublet all or any portion of any legal parcel within the Commercial Phase of the Site and buildings thereon to the Agency, the City of Stanton, any division, department, or affiliated agency of either the Agency or City and any directly controlled and related entity of the Agency or City; or

4.2.1.2 <u>In Lieu Payments</u>. Developer may sell, convey, transfer, assign, lease or sublet all or any portion of any legal parcel within the Commercial Phase of the Site and buildings thereon to any Tax Exempt Entity, except for any publicly funded schools (or any directly controlled and related entity of publicly funded schools), provided that Developer pays to Agency an amount equal to the *ad valorem* taxes the entity would be required to pay in accordance with Article XIII A of the California Constitution and implementing laws and regulations, if it were not a Tax Exempt Entity. In the event of the sale of all or any portion of any legal parcel within the Commercial Phase of the Site or any parcel or building thereon, to a Tax Exempt Entity (excluding publicly funded schools as provided herein), Developer shall pay to Agency, prior to closing of such sale or similar transaction, an amount agreed upon by the parties that equals a fair approximation of the property tax increment that will be lost by the Agency as a result of such sale. In the event of a lease or similar transaction, Developer shall pay to Agency, annually (on or before December 31st of each year) during the term of the lease or interest conveyed, an amount equal to the property tax increment that would have been received by the Agency if the lease or similar transaction had been undertaken with a non-Tax Exempt entity.

4.3 **<u>Nondiscrimination in Employment</u>**. Developer covenants and agrees for itself, its successors and assigns and any successor-in-interest to the Site or part thereof, that all persons employed by or applying for employment by it, its affiliates, subsidiaries, or holding companies, and all subcontractors, bidders and vendors, are and will be treated equally by it without regard to, or because of race, color, religion, ancestry, national origin, sex, age, pregnancy, childbirth, or related medical condition, medical condition (cancer related) or physical or mental disability, and in compliance with all valid and applicable provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200, et seq., the Federal Equal Pay Act of 1963, 29 U.S.C. § 206(d), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., the Immigration Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1324b, et seq.,. 42 U.S.C. § 1981, the California Fair Employment and Housing Act, California Government Code § 12900, et seq., the California Equal Pay Law, California Labor Code § 1197.5, California Government Code § 11135, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and all other valid and applicable anti-discrimination laws and regulations for the United States and the State of California as they now exist or may hereafter be amended.



4.4 **Nondiscrimination and Nonsegregation**. Developer covenants and agrees for itself, its successors and assigns and any successor-in-interest to the Site or part thereof, that it shall abide by the provisions to refrain from discrimination and to include such nondiscrimination and nonsegregation clauses as are set forth in the Declaration of Restrictive Covenants [Attachment 6].

4.5 **Taxes and Encumbrances**. Developer shall pay, when due: (i) all *ad valorem* property taxes imposed on the Site under Article XIII A of the California Constitution; (ii) all valid and applicable special taxes imposed on the Site; (iii) all valid and applicable special assessments imposed on the Site; (iii) all taxes payable under the California Bradley-Burns Uniform Local Sales & Use Tax Law, Revenue and Taxation Code § 7200, et seq.; and (iv) all other taxes, assessments, fees, exactions, or charges any portion of which are allocated to, or received by, the City or Agency and which are imposed due to the ownership, use, or possession of the Site or interest therein or due to the construction or operation of the Project. Upon failure to so pay, Developer shall remove any lien, levy or encumbrance made on the Site within ninety (90) business days of the attachment of such.

4.6 **Effect of Violation**. Agency and City are deemed the beneficiaries of the terms and provisions of this Agreement and for the purposes of protecting the interest of the community in Developer's performance of the covenants set forth in this Article 4.0. Only Agency and City shall have the right, if this Agreement or such covenants are breached, to exercise any rights and remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breaches to which it may be entitled.

4.7 **Declaration of Restrictive Covenants**. The Restrictive Covenants shall be recorded against each Acquisition Parcel that is to be conveyed by the Agency to Developer in fee at the Close of Escrow for said parcel, in accordance with Section 1.12, and against the balance of the Site at the time set forth in the Schedule of Performance. The Restrictive Covenants shall run with title to the legal parcels comprising the Site and shall be binding upon Developer and its successors and assigns for the period(s) of time and in accordance with the terms and conditions set forth therein.

## ARTICLE 5 .0 - INSURANCE

5.1 **Developer's Liability Insurance**. Within the time set forth in the Schedule of Performance, Developer shall, at its sole expense, obtain and thereafter keep in force until recordation of a Release of Construction Covenants for the portion of the Project situated on each legal parcel within the Site a policy of commercial general liability insurance in an occurrence form providing for broad form property damage coverage and personal injury and bodily injury, insuring Developer, and naming Agency and City as additional named insureds, against any liability arising out of or in connection with Developer's and its employees, agents and lessees' acts or omissions in owning, developing, and operating and using the portion of the Project on said parcel, Agency's activities in connection with the Project, or any other action arising out of, or

relating to, the Project or work on such portion of the Site.  Such insurance policy shall have (a) a combined single limit for both bodily injury or death in an amount not less than Two Million Dollars ($2,000,000.00), and (b) a limit for both bodily injury or death in one accident or occurrence or for property damage in an amount not less than One Million Dollars ($1,000,000.00), which amounts shall be increased from time to time as reasonably required by Agency.  Such insurance policy and each portion thereof shall be in the broadest and most comprehensive form available in the market at commercially reasonable rates at the time such policy is issued or amended.  The policy shall insure performance by Developer of the indemnity provisions of Section 6.1 [General Indemnity] of this Agreement.  The limits of said insurance shall not limit the liability of Developer hereunder.

     5.2   **Worker's Compensation Insurance**.  Until the recordation of a Release of Construction Covenants for the portion of the Project situated on each legal parcel within the Site, Developer shall, at its expense, obtain and keep in effect (or cause any contractor retained by Developer to procure and keep in effect), Worker's Compensation Insurance (including employer's liability in an amount satisfactory to the Agency and, if applicable, insurance covering claims of workers against employers arising under Federal law) covering all employees of Developer and any such contractor and, if required under applicable law, any subcontractor engaged in work on, or with respect to, such portion of the Site, in such amount as is required by law.

     5.3   **Insurance Policies**.  All of Developer's insurance policies referred to in this Article 5.0 shall be primary insurance written in a form satisfactory to Agency by companies licensed in California, acceptable to Agency (which must be Class IX A or better as rated by Best's Insurance Reports unless otherwise approved by Agency in writing) and shall specifically provide that such policies shall not be subject to cancellation or other change except after at least thirty (30) days prior written notice to Agency (ten (10) days in the event of cancellation for nonpayment) or contain a commercially reasonable clause of similar effect.  Copies of the terms of the policies consistent with this Agreement, together with satisfactory evidence of payment of premiums, shall be deposited with Agency on or prior to the date that Developer commences any grading or works of improvement on the Site (or portion thereof), and upon each renewal of such policies, which shall be effected not less than thirty (30) days prior to the expiration date of the prior term of such coverage.

     5.4   **Other Insurance Provisions**.  Said policy or policies, as applicable, shall combine aggregate limits for Bodily Injury, Property Damage, and Personal Injury, in the amounts specified above, that apply specifically to and can only be exhausted in connection with claims arising out of or relating to the Site.  If any claim, event, or loss occurs during the policy period which will or may decrease the aggregate amount of insurance coverage available under the policy, Developer shall immediately secure additional coverage sufficient to provide total aggregate limits at least equal to the amounts set forth above on a going forward basis.  Should any part of the coverage required above be provided by "excess" or "umbrella" policies, those policies shall specifically provide that the coverage under those policies shall "drop down" as to both defense and indemnity obligations in the event of insolvency of the primary or

underlying carrier. Such "excess" or "umbrella" policies shall also contain all the other provisions required by this Agreement.

## ARTICLE 6 .0 - INDEMNITY

6.1 **General Indemnity**. Except as to the sole negligence, active negligence or willful misconduct of Agency or City, Developer expressly agrees to and shall indemnify, defend, release, and hold Agency and City, their elected and appointed officers, officials, agents, servants, employees, attorneys and contractors harmless from and against, any Action, claim, liability, loss, damage, entry, costs, or expenses (including, but not limited to, attorney's fees, expert fees, and court costs) which arises out of or is in any way connected with Developer's performance under this Agreement, or any work performed by Developer or caused to be performed by Developer on said parcel during said period of time, or any services rendered to Developer in performance of this Agreement with respect to said parcel during said period of time by any of Developer's employees, agents, servants, or subcontractors, notwithstanding that Agency and/or City may have benefited from their services. This indemnification provision shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Developer's employees, agents, servants, and subcontractors. The Parties expressly agree that any payment, costs or Litigation Expenses Agency and/or City is required to incur or make to or on behalf of an injured employee under Agency's self administered workers' compensation as a result of Developer's acts or omissions relating to the Project is included as a loss, expense or cost for the purpose of this provision. Agency and City shall not be responsible for any acts, errors or omissions of any person or entity except Agency and the City and their respective officers, agents, servants, employees or contractors. The Parties expressly agree that the obligations of Developer under this Section shall survive the expiration or Termination of the Agreement.

6.2 **Hazardous Substances Indemnity**. Developer expressly agrees to indemnify, defend, release and hold Agency, City and their respective elected and appointed officials, officers, employees, agents, and contractors harmless from and against any Action, claim, liability, loss, injury, damage, judgment, encumbrance or cost and expense that foreseeably or unforeseeably, directly or indirectly, arises from or is in any way related to, the release, treatment, use, generation, transportation, storage, or disposal in, on, under, to, or from any legal parcel within the Site of any Hazardous Substances by Developer or its officers, directors, partners, employees, agents, and contractors during the period of Developer's ownership or possession of said parcel and up to the date development of the portion of the Project located on said parcel is completed (as evidenced by Agency's issuance of a Release of Construction Covenants therefor). For the purpose of this Section, costs and expenses include, but are not limited to, Litigation Expenses, the cost of any required or necessary remediation or removal of Hazardous Substances, any cost of repair of improvements on the Site or surrounding property necessitated by the remediation or removal of Hazardous Substances, and the costs of any testing, sampling, or other investigations or preparation of remediation or other required plans undertaken in connection with the remediation or removal of Hazardous Substances. Notwithstanding the foregoing,

Developer expressly agrees to, at its sole expense and with legal counsel of Agency's choice, defend Agency, City and their respective elected and appointed officials, officers, employees, agents, and contractors in any Action, in which Agency, City and their respective elected and appointed officials, officers, employees, agents, and contractors become involved as a result of the release, treatment, use, generation, transportation, storage, or disposal in, on, under, to, or from the Site of any Hazardous Substances by Developer or its officers, directors, partners, employees, agents, and contractors. Developer's obligations under this Section shall survive the termination of this Agreement (assuming termination occurs prior to completion).

## ARTICLE 7 .0 - ASSIGNMENTS, TRANSFERS AND RIGHTS OF HOLDERS

7.1 **Assignment**. There shall be no assignment, sale, lease, conveyance, devise, or other transfer ("Assignment") of the rights and/or obligations of Developer under this Agreement as to any legal parcel within the Site until completion of the portion of the Project on said parcel (as evidenced by Agency's issuance of a Release of Construction Covenants therefor) (the "Pre-Completion Assignment"), except and unless one or more of the conditions specified in Sections 7.1.1. through 7.1.4. are met ("Permitted Assignment"). Subject to Section 4.2.3 [Limit on Conveyance to Tax Exempt Entity], after completion of the portion of the Project located on any legal parcel within the Site, Developer may assign its rights and/or obligations under this Agreement with respect to said parcel, without first obtaining the permission of the Agency.

7.1.1 **Assignment to Holder**. Developer may make a Pre-Completion Assignment if such Assignment is required under Section 7.3 [Security Financing; Rights of Holders]. The Parties expressly agree that an Assignment of a security interest in the Site or any portion thereof to Developer's construction lender, as needed in order to enable Developer to acquire the Site and develop the Project thereon, is a Permitted Assignment.

7.1.2 **Assignment to Related Entity**. Developer may make a Pre-Completion Assignment to a Related Entity. Developer shall provide the Agency with advance written notice of the intent to make such an Assignment not less than thirty (30) days prior to the closing of such Assignment. The written notice shall identify the Related Entity, shall demonstrate that the entity meets the definition of a Related Entity under this Agreement. Developer's right to make such an Assignment shall be conditioned upon its delivery to the Agency of an assignment and assumption agreement in form reasonably satisfactory to the Agency's attorney pursuant to which the assignor assigns its rights and obligations hereunder (or with respect to one or more separate legal parcels within the Site) to the assignee and the assignee agrees to assume and perform the assigned obligations of the assignor from and after the effective date of the assignment. Upon the effective date of an assignment the assignor shall be released from all future performance of any obligations assumed by the assignee.

7.1.3 **Leasing of Commercial Buildings/Space**. The parties acknowledge that Developer's pre-leasing to private third parties of some or all of the

space to be constructed in the Commercial Phase of the Project, subject to the limitations stated in Section 4.2.3 [Limit of Conveyances to Tax Exempt Entities], is contemplated and encouraged under this Agreement. Therefore, Developer's pre-lease of any of the square footage in the Commercial Phase of the Project to one or more private third parties is deemed to be a Permitted Assignment.

7.1.4 **Other Assignments to Third Party**. Developer may make a Pre-Completion Assignment to a third party with the prior written consent from Agency. Agency agrees not to unreasonably withhold, condition, or delay its consent to such Assignment provided: (i) Developer is not then in Default of the Agreement; (ii) the assignee has experience, expertise, and financial resources commensurate with Developer such that the assignee is reasonably able (in the reasonable determination of the Agency) to carry out and complete Developer's obligations under the Agreement; and (iii) the requirements of Section 3.4. [Management of Project] are satisfied.

7.1.5 **Release of Authorized Assignor**.   Upon an assignment in conformance with this Section 7.1, upon submission of a fully executed assignment and assumption agreement to Agency (in a form approved by the General Counsel of Agency), the assignor shall be released from the obligations of this agreement,

7.1.6 **Certain Transfers Not to be Deemed an Assignment**. Notwithstanding any other provision set forth in this Agreement to the contrary, the following changes in ownership or transfers shall not be deemed to constitute a Pre-Completion Assignment hereunder and shall be permitted without the approval or consent of the Agency:  (i) transfers of stock or ownership interests in any publicly traded corporation or real estate investment trust; (ii) changes in ownership occurring as the result of the mental or physical incapacity or death of an individual; (iii) transfers in trust for the benefit of a family member or members of the transferor; or (iv) the conveyance or dedication of any portion of the Site to the City or Agency or other appropriate governmental agency or utility company for street, utility, or other public purposes consistent with the Project Approvals.

7.2 **Transfers to Tax-Exempt Entities**. In addition to the provisions set forth in Section 7.1, Developer shall be subject to the restrictions on assignment and transfer set forth in Section 4.2.1 [Limit on Conveyances to Tax Exempt Entities] for the period of time referred to therein.

7.3 **Security Financing; Rights of Holders**.

7.3.1 **Permitted Security Financing**. Mortgages, deeds of trusts and any other form of security interests required for any reasonable method of financing are permitted before completion solely for the purpose of securing a loan of funds to be used for financing acquisition of the Site and development of the Project or portion thereof. In any event, Developer shall promptly notify Agency of any mortgage, deed of trust or other security interest, encumbrance or lien that has been created or attached to the Site or portion thereof prior to completion of the Project (or applicable portion of the Project), whether by voluntary act of Developer or otherwise.  Agency shall cooperate

with Developer and the lender or lenders providing financing for development of the Project to reasonably facilitate such financing, provided the obligations of Developer and the rights of Agency hereunder are not materially affected.

7.3.2 **Holder Not Obligated to Develop Project.** Any Holder of any approved mortgage, deed of trust or other security interest shall in no way be obligated by the provisions of this Agreement to carry out and complete the Project or portion thereof or to guarantee same; nor shall any provision of the Restrictive Covenants be construed so as to obligate such Holder to carry out or complete the Project or portion thereof or to guarantee same. However, such Holder, its successors, grantees, and assigns shall be bound by the provisions of this Agreement and the Restrictive Covenants that regulate the use, maintenance, and transfer of the portion of the Site as to which such Holder's interest applies, and that prohibit discrimination, segregation, and speculation. No Holder shall be permitted to devote the Site or any portion thereof to any uses, or to construct any improvements thereon, other than those uses or improvements provided for or authorized by this Agreement, without prior written approval from Agency.

7.3.3 **Notice of Default; Right to Cure.** Whenever Agency shall deliver any Notice of Default or other demand to Developer with respect to any Default by Developer, Agency shall at the same time deliver to each Holder of record of an approved mortgage, deed of trust or other security interest, a copy of such notice or demand. Thereafter, each such Holder shall (insofar as the rights of Agency are concerned) have the right to, at its option, cure, correct, or remedy any such Default within ninety (90) days after the receipt of the notice and to add the cost thereof to the debt secured or cured by its lien on the Site or portion thereof. If such Default is a Default which can only be cured, corrected, or remedied by such Holder upon obtaining possession, then the Holder may seek to obtain possession through a receiver or otherwise, and may cure, correct, or remedy such Default within ninety (90) days after obtaining possession; provided that in the case of a Default which cannot with due diligence be cured, corrected, or remedied, or such cure, correction, or remedy cannot reasonably be commenced, within such ninety (90) day period, the Holder may have such additional time as reasonably necessary to cure, correct, or remedy such Default of Developer.

7.3.4 **Completion of the Project by Holder.** No Holder of any interest in any portion of the Site of whatever nature, or its successors, grantees or assigns, shall undertake or continue to carry out and complete the Project or portion thereof (beyond the extent necessary to conserve or protect the improvements already made) without first having expressly assumed Developer's obligations to Agency under this Agreement by written instrument reasonably satisfactory to Agency. Specifically, the Holder, or its successors, grantees or assigns, must agree to carry out, complete and operate the applicable portion of the Project in the manner provided in this Agreement.

7.3.5 **Right of Agency to Cure Mortgage.** In the event of a default or breach by Developer of a mortgage, deed of trust or other security interest with respect to the Site or any portion thereof prior to completion of construction, and the Holder



thereof has not exercised its option to carry out and complete the Project or applicable portion thereof, Agency may cure the default prior to completion of any foreclosure. In such event, Agency shall be entitled to reimbursement from Developer of all costs and expenses incurred by Agency in curing the default.  Agency shall also be entitled to a lien upon the Site (or applicable portion thereof) to the extent of such costs and disbursements, and may perfect such lien by filing notice thereof with the appropriate entities.  Any such lien shall be subordinate and subject to mortgages, deeds of trust, or other security instruments executed for the sole purpose of obtaining funds to complete the applicable portion of the Project on the Site as authorized herein or securing letters of credit which secure any such loans.

## ARTICLE 8 .0 - DEFAULTS AND REMEDIES

8.1     **Default**.  Either party's failure or unreasonable delay in performing any term, provision or covenant of this Agreement constitutes a Default of this Agreement. In the event of a Default, the injured party may give written "Notice of Default" to the defaulting party, specifying the Default.  Delay in giving or failure to give such notice shall not constitute a waiver of the Default.  If the defaulting party fails to cure the Default within thirty (30) days after receipt of a Notice of Default, or, if the Default is of a nature that cannot be cured within thirty (30) days, the defaulting party fails to commence to cure the Default within said thirty (30) days and thereafter diligently prosecute such cure to completion, then the defaulting party shall be liable to the injured party for any and all damages caused by such Default, unless otherwise provided for by this Agreement.

8.2     **No Waiver**.  Failure to insist on any one occasion upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any rights or powers hereunder at any one time or more times be deemed a waiver or relinquishment of such other right or power at any other time or times.

8.3     **Actions**.  In addition to any other rights and remedies any party may institute the appropriate Action to require the cure of any Default and to recover damages for any Default, or to obtain any other remedy consistent with the purpose of this Agreement.  The following provisions shall apply to any such legal action:

8.3.1 **Jurisdiction and Venue**.  Legal actions must be instituted and maintained in the Superior Court of the County of Orange, State of California, or in the United States District Court for the Central District of California.  Developer specifically waives any rights provided to it pursuant to California Code of Civil Procedure § 394 or federal or state statutes or judicial decisions of like effect.

8.3.2 **Applicable Law**.  The laws of the State of California shall govern the interpretation and enforcement of this Agreement.

8.3.3 **Litigation Expenses**.  In the event either party commences an Action against the other party which arises out of a Default of, breach of, failure to

perform this Agreement or otherwise related to this Agreement, then the Prevailing Party in the Action shall be entitled to recover its Litigation Expenses from the other party in addition to whatever relief to which the prevailing party may be entitled.

8.4   **Rights and Remedies are Cumulative**.  The rights and remedies of the Parties are cumulative, and the exercise by a party of one or more of its rights or remedies shall not preclude the exercise by it, at the same or different time, of any other rights or remedies for the same Default or any other Default by another Party.

8.5   **Termination by Agency**.  Agency may terminate this Agreement upon the occurrence of any of the following events:

8.5.1 **Bankruptcy / Insolvency**. Prior to Close of Escrow, Developer (or any successor in interest) becoming insolvent or Developer (or any successor in interest) voluntarily or involuntarily making an assignment or transfer for the benefit of creditors other than Agency and/or the City, and/or the voluntary or involuntary appointment of a receiver, custodian, liquidator or trustee of Developer's property and/or the Site.

If, after the occurrence of any of the above-entitled events, Agency elects, in its sole discretion, to terminate this Agreement, then all rights of Developer and any person or entity claiming by or through Developer arising under this Agreement or with regard to the Site as may arise under this Agreement shall immediately cease and be terminated, except that any obligations of Developer to indemnify or reimburse Agency or the City shall continue in full force and effect and Agency shall have all of the remedies to enforce a Default of this Agreement as may be provided hereunder and under the law including its right of revision and option to repurchase.

8.6   **Termination by Developer**.  Prior to the Close of Escrow, in the event that Developer is not in Default under this Agreement and Agency is in Default and any such Default is not timely cured as provided in Section 8.1 [Default] (failure of a party's Conditions of Closing shall not be considered to be a Default), then this Agreement may, at the option of Developer, be terminated by written notice thereof to Agency. From the date of the written notice of termination of this Agreement by Developer to Agency and thereafter, this Agreement shall be deemed terminated and there shall be no further rights or obligations between the parties, except that Developer may pursue any remedies it has hereunder.

8.7   **No Cross-Defaults**.  Notwithstanding any other provision set forth in this Agreement to the contrary, in no event shall a Default by Developer (or any permitted assignee or transferee) with respect to one or more separate legal parcel or parcels within the Site be deemed to constitute a Default hereunder by Developer (including any permitted assignee or transferee) relating to any other legal parcel or parcels within the Site, and in such event Agency's rights and remedies, including without limitation both legal and equitable remedies, shall be limited to the parcel(s) as to which such Default exists.  This Section 8.7 shall not be interpreted, however, to excuse Developer's obligation to construct or install any public improvements or utilities off of a particular

legal parcel that are required to be constructed or installed as a condition of or in conjunction with the development of that parcel.

8.8    **No Guarantee of Tax Revenues**.  With the exception of Developer's Performance of its covenants set forth in Sections 4.2, 4.6, and 9.5 of this Agreement, Developer does not covenant or guarantee to either the Agency or City that the Project or the Site will generate any amount of tax revenues for the benefit of the Agency or City, and in no event shall Developer be responsible for payment of any amount in lieu of such taxes, as damages or otherwise, in the event of any actual or alleged Default in the development, operation, or use of the Project.

8.9    **Security Deposit**.  Within the times set forth in the Schedule of Performance, Developer shall deliver to Agency one or more letters of credit, bonds, other security instruments, or, in Developer's sole and absolute discretion, cash, in a total amount not to exceed Three Million Dollars ($3,000,000) to secure Developer's performance of its obligations set forth in this Agreement (the "Security Deposit").  If the Security Deposit is other than cash, the identity of the surety or issuer and the form and content of each security instrument shall be subject to the reasonable approval of the Agency's Executive Director and Agency counsel.  If the Security Deposit is cash, in whole or in part, the Agency shall place the Security Deposit in an interest-bearing account in an institution reasonably acceptable to Developer, with the interest earnings to be added to and considered part of the Security Deposit and disbursed as provided herein.

The Agency shall release any unexpended portion of the Security Deposit (or reimburse the same to Developer in the event of a cash deposit) at the following times: (i) forty percent (40%) of said amount (including accrued interest thereon) shall be released or reimbursed two hundred ten (210) days after the Agency has issued a Release or Releases of Construction Covenants for all portions of the Project within Residential Phase 1; and (ii) twenty percent (20%) of said amount (including accrued interest thereon) shall be released or reimbursed two hundred ten (210) days after the Agency has issued a Release or Releases of Construction Covenants for all portions of the Project within each of the other phases of the Project (i.e., Residential Phase 2, Residential and Live/Work Phase 3, and the Commercial Phase), as applicable. Notwithstanding the foregoing, if at the time(s) the Agency would otherwise be required to release or reimburse such portions of the Security Deposit Developer is in Default under this Agreement or there is any pending or threatened Action by any third party against the Agency as to which Developer's indemnity obligations hereunder applies, the Agency shall have the right to withhold from said release or reimbursement such portion of the Security Deposit that in the Agency's reasonable discretion is necessary to adequately secure the Agency's potential damages or losses attributable thereto.

Prior to the Agency's draw or utilization of any portion of the Security Deposit hereunder to pay or reimburse the Agency for its costs or damages that are secured by the Security Deposit, the Agency shall deliver a written notice demanding payment by Developer, which notice shall state the amount of the demand and set forth in reasonable detail the Default by Developer that gives rise to the demand and an

itemization and explanation of the Agency's costs or damages upon which said demand is based (the "Demand Notice"). At Developer's request, the Agency shall meet and confer with Developer in good faith regarding all matters pertaining to the Demand Notice. If the parties have not reached a mutually satisfactory resolution of all matters pertaining to the Demand Notice and Developer has not paid the amount of the Agency's demand within thirty (30) days after Developer's receipt of the Demand Notice, the Agency shall have the full right of recourse to the Security Deposit (or the portion thereof that has not been previously released or reimbursed) in addition to whatever other rights and remedies it may have against Developer hereunder. In this regard, it is agreed that the Agency's resort to the Security Deposit is not intended to constitute an exclusive remedy for the Agency in the event of a Developer Default hereunder and, if the Agency's damages exceed the amount of the Security Deposit (or the portion thereof that has not been previously released or reimbursed at the time the Default exists), the Agency reserves any and all other remedies it may have against Developer with respect thereto.

Notwithstanding any other provision set forth herein, the Agency may also draw on any letter of credit or make a demand on any bond constituting all or a portion of the Security Deposit if, at any time before the Agency is required to release said deposit or portion thereof, as applicable, Developer fails to renew the letter of credit or extend the term of the bond or provide adequate substitute alternative security to the Agency within forty-five (45) days before said security instrument is scheduled to expire and such failure to renew, extend, or deliver substitute security continues for a period of fifteen (15) days after written demand by the Agency. In the event the Agency obtains funds from the surety or issuer in this situation, the Agency thereafter shall treat such funds in the same manner that it is required to treat a cash deposit, as set forth hereinabove.

## ARTICLE 9 .0 - GENERAL PROVISIONS

9.1 **No Excuse for Changes in Economic Conditions**. Developer agrees that foreseeable or unforeseeable future changes in economic or market conditions may make performance of its obligations and covenants under this Agreement impracticable, difficult or economically infeasible. However, Developer expressly assumes the risk of foreseeable and unforeseeable future changes in economic and general market conditions and expressly agrees that such changes shall not excuse or delay the strict performance of Developer's obligations and covenants hereunder. Without limiting the generality of the foregoing, Developer agrees that future foreseeable or unforeseeable changes in economic and market conditions shall not operate to relieve Developer of its (or its successors) obligation to abide by the terms, conditions, and Covenants of this Agreement.

9.2 **Forced Delays; Extension of Times**. Notwithstanding the times stated in this Agreement for the performance of obligations by parties, including but not limited to the Schedule of Performance, a party shall not be deemed to be in Default due to its inability to timely perform an obligation as required under this Agreement where the inability to perform, or the delay in performance is directly caused by any of the following: (i) actions challenging the validity of this transaction or any element thereof or

the right of either party to engage in the acts and transactions contemplated by this Agreement; (ii) inability to secure necessary labor materials or tools for the Project due to national, state, or local shortages, strikes, lockouts, or freight embargoes; (iii) delays of any contractor, sub-contractor or supplier beyond the reasonable control of Developer and not caused by any act or omission of Developer; (iv) withdrawal of financing for the Project that is beyond the reasonable control of Developer and not caused by any act or omission of Developer; (v) war or insurrection; (vi) civil disturbances, such as riots and looting; (vii) acts of terrorism and other acts of a public enemy; (viii) acts of God, including, but not limited to, floods, famine, earthquakes, fires, abnormally dangerous or damaging weather conditions; (ix) epidemics, quarantine restrictions, or other nation, state, or local mass medical emergencies; (x) any national, state, or local state of emergency declared by a duly authorized public official; (xi) casualties resulting from any of the foregoing; (xii) any delays resulting from the unreasonable delay or failure of a governmental agency or entity, including the City and/or Agency, to perform any act or to issue any permit or approval necessary for the Project where such delay or failure is beyond the reasonable control of the Developer and not caused by any act or omission of the Developer; and (xiii) any other causes beyond the reasonable control or arising without the fault of the party claiming an extension of time to perform. In the event of the occurrence of any such event that directly affects the performance of an obligation under this Agreement, the time to perform such obligation shall be extended by the period of the enforced delay. The period of forced delay shall commence to run from the time of the commencement of the cause, if notice by the party claiming such extension is sent to the other party within twenty (20) days of the commencement of the cause.

9.3     **Tax Consequences**.

9.3.1 Developer understands and acknowledges that it may experience adverse federal, state, and/or local tax consequences resulting from or related to the performance of this Agreement. Developer acknowledges and agrees that Agency and City are in no manner responsible or liable for any of Developer's federal, state, or local tax liabilities arising out of, or in any way related to, this Agreement.

9.3.2 Developer acknowledges that performance of this Agreement may create a taxable possessory interest in real or personal property and that Developer will be responsible for the payment of any and all tax upon such possessory interest. Developer expressly agrees that by inclusion of this Section in the Agreement, Agency has satisfied all of its obligations under Revenue and Taxation Code § 107.6. Developer hereby waives, releases and holds Agency and City harmless from any right to damages which may now or in the future accrue to Developer against Agency or City under Revenue and Taxation Code § 107.6 or such comparable section of the United States Internal Revenue Code in any way relating to this Agreement.

9.3.3 Developer acknowledges that neither Agency, the City, nor any elected official, officer, employee, agent, or consultant thereof has provided Developer with any tax, legal, accounting, or other advice or opinions, or made any representations

or warranties, concerning the tax consequences, legal effect, financial effect, or other effects that performance of the Agreement may have on Developer.

9.3.4 Developer acknowledges that it has been represented in this transaction by Developer's own independent advisors, including, but not limited to, attorneys, accountants, and/or financial consultants. Developer represents and warrants that it is entering into this Agreement based solely upon its own independent investigation, conducted with due diligence, of the facts and possible effects of this Agreement on Developer.

9.4 **Business Tax**. Developer understands that its performance of its obligations set forth in this Agreement will constitute the conduct of business in the City of Stanton, California, and it shall, therefore, register and pay a business license tax pursuant to the Stanton Municipal Code.

9.5 **Non-liability of Agency Officials and Employees**. No board member, official, consultant, attorney, or employee of Agency shall be personally liable to Developer, or any successor, or assign, or any person claiming under or through them, in the event of any default or breach by Agency or for any amount which may become due to Developer or to its successor, or on any obligations arising under this Agreement.

9.6 **Conflicts of Interest**. No board member, official, consultant, attorney, or employee of Agency shall have any personal interest, direct or indirect, in this Agreement nor shall any such member, official or employee participate in any decision relating to this Agreement which affects his or her personal interests or the interests of any corporation, partnership or association in which he or she is, directly or indirectly, interested.

9.7 **Warranty Against Payment of Consideration for Agreement**. Developer represents and warrants that it has not paid or given, and will not pay or give, any third party any money or other consideration for obtaining this Agreement, other than payments to consultants retained by Developer to assist it in the negotiation of this Agreement, excepting however, any contributions which this Agreement requires Developer to make to the Project.

9.8 **No Third Party Beneficiaries**. This Agreement and the Restrictive Covenants, are for the sole and exclusive benefit of the Agency, Developer, and to the extent expressly so stated the City. No other parties or entities are intended to be, or shall be considered, a beneficiary of the performance of any of the parties' obligations under this Agreement.

9.9 **Integration**. This Agreement consists of pages 1 through 46, excluding the cover page, and Attachments 1 through 6 attached hereto and incorporated herein by this reference, which constitute the entire understanding and agreement of the parties and supersedes all negotiations or previous agreements between the parties with respect to all or any part of the subject matter hereof.

9.10 **Recitals and Definitions**. The Recitals and Definitions set forth at the beginning of this Agreement are a substantive and integral part of this Agreement and are incorporated by reference in the Operative Provisions portion of this Agreement.

9.11 **Titles and Captions**. Titles and captions are for convenience of reference only and do not define, describe or limit the scope or the intent of this Agreement or any of its terms. References to section numbers are to Sections of this Agreement unless expressly stated otherwise.

9.12 **Interpretation**. Agency and Developer acknowledge that this Agreement is the product of mutual arms-length negotiation and drafting and each represents and warrants to the other that it has been represented by legal counsel in the negotiation and drafting of this Agreement. Accordingly, the rule of construction, which provides the ambiguities in a document, shall be construed against the drafter of that document shall have no application to the interpretation and enforcement of this Agreement. In any action or proceeding to interpret or enforce this Agreement, the finder of fact may refer to such extrinsic evidence not in direct conflict with any specific provision of this Agreement to determine and give effect to the intention of the parties hereto.

9.13 **Severability**. Each provision, term, condition, covenant, and/or restriction, in whole and in part, in this Agreement shall be considered severable. In the event any provision, term, condition, covenant, and/or restriction, in whole and/or in part, in this Agreement is declared invalid, unconstitutional, or void for any reason, such provision or part thereof shall be severed from this Agreement and shall not affect any other provision, term, condition, covenant, and/or restriction, of this Agreement and the remainder of the Agreement shall continue in full force and effect.

9.14 **Amendments to Agreement; Approvals**. Each Party agrees to consider reasonable requests for amendments to this Agreement which may be made by the other Party, lending institutions, bond counsel or financial consultants. Any amendments to this Agreement must be in writing and signed by the appropriate authorities of Agency and Developer. On behalf of Agency, the Executive Director shall have the authority to make minor amendments to this Agreement, including, but not limited to, the granting of extensions of time to Developer and modifications to provisions addressing the rights of Holders, so long as such actions do not materially change the Agreement or make a commitment of additional funds of Agency. All other changes, modifications, and amendments shall require the prior approval of Agency's governing board.

In addition to the foregoing, except when this Agreement specifically authorizes a party to withhold its approval or consent in its sole and absolute discretion, whenever either Agency or Developer shall require the approval or consent of the other party in fulfilling any agreement, covenant, provision, or condition contained in this Agreement, such approval or consent shall not be unreasonably withheld, conditioned, or delayed by the party from whom such approval or consent is sought.

9.15 **Administration**. This Agreement shall be administered and executed by Agency's Executive Director, or his or her designated representative, following approval of this Agreement by Agency's governing board. Agency shall administer this Agreement through the Executive Director (or his or her authorized representative). The Executive Director shall have the authority to issue interpretations and to make minor amendments to this Agreement on behalf of Agency as provided in Section 9.15 [Amendments to Agreement]. All other changes, modifications, and amendments shall require the prior approval of Agency's governing board.

9.16 **Notices, Demands and Communications Between the Parties**. Formal notices, demands and communications between the parties shall be given in writing and personally served or dispatched by courier or registered or certified mail, postage prepaid, return receipt requested, to the principal offices of the parties, as designated in this section, or telefaxed to the telefax number listed below followed by dispatch as above described. Such written notices, demands, and communications may be sent in the same manner to such other addresses as either party may from time to time designate by notice delivered as provided in this Section. Any such notice shall be deemed to have been received upon the date personal service is effected, if given by personal service, or upon the expiration of three (3) business days after mailing, if given by certified mail, return receipt requested, postage prepaid.

If notice is to be made to Agency:

Redevelopment Agency
ATTN: Executive Director
7800 Katella Avenue
Stanton, California  92860
Facsimile transmission may be made to: (714) 826-5744

with copy to:

City of Stanton
ATTN: Ralph D. Hanson, Agency Counsel
5 Park Plaza, Suite 1280
Irvine, CA  92614
Facsimile transmission may be made to: (949) 863-3350

If notice is to be made to Developer:

Stanton Plaza Group
16580 Aston
Irvine, CA  92606
ATTN:  James L. Barisic
Facsimile transmission may be made to: (949) 296-2420

Stanton Plaza Group II
16580 Aston
Irvine, CA  92606
ATTN:  James L. Barisic
Facsimile transmission may be made to: (949) 296-2420

with copy to:

Rutan & Tucker, LLP
611 Anton Boulevard, 14th Floor
Costa Mesa, CA  92626
ATTN:  Jeffrey M. Oderman, Esq.
Facsimile transmission may be made to: (714) 546-9035

9.17   **Ceremonies**.  To ensure proper protocol and recognition of Agency board members, Developer shall cooperate with Agency and City staff in the organization or any Project-related groundbreakings, grand openings or any such inaugural events/ceremonies sponsored by Developer celebrating the development, which is the subject of this Agreement.

9.18   **Estoppels**.  At the request of Developer or any existing or prospective Holder, the Agency shall timely execute and deliver to Developer or such existing or prospective Holder a written statement of Agency that no Default or breach exists (or would exist with the passage of time, the giving of notice, or both) by Developer under this Agreement, including any of the Attachments hereto, if such be the case, and certifying as to whether or not Developer has at the date of such certification complied with any obligation of Developer as to which Developer or such Holder may inquire.  If the Agency determines that any such Default or breach does exist, the Agency shall confer with Developer prior to delivery of any such estoppel certificate to identify the nature of the Default or breach and the action or actions the Agency believes must be taken in order to eliminate the same.  The final form of any estoppel certificate shall be prepared by Developer or such Holder and shall be at no cost to the Agency, excepting only the Agency's cost of inquiry and investigation in order to respond to the request and review and execute the estoppel certificate.

9.19   **Computation of Time**.  The time in which any act is to be done under this Agreement is computed by excluding the first day (such as the day escrow opens) and including the last day, unless the last day is a holiday or Saturday or Sunday, and then that day is also excluded.  The term "holiday" shall mean all holidays as specified in Government Code § 6700 and § 6701.  If any act is to be done by a particular time during a day, that time shall be Pacific Standard Zone time.

9.20   **Compliance with Local Regulations; Amendments to Local Regulations.**  The parties shall perform their respective obligations set forth in this Agreement in compliance with all valid and applicable Local Regulations that are in effect as of the Effective Date.  No amendment to the Redevelopment Plan and no other Agency ordinance, resolution, regulation, or rule adopted or approved after the Effective

Date shall apply to Developer, the Project, or the Site if the same would materially adversely impact or jeopardize Developer's rights hereunder or with respect to development of the Project or use of the Site. Developer acknowledges that the City is not a party to this Agreement and that this Agreement is not a statutory development agreement and does not restrict the City's exercise of its normal police power authority, but Developer does not by entering into this Agreement consent to comply with amendments or modifications to Local Regulations that are adopted by the City or other governmental agencies after the Effective Date and Developer reserves all of its rights and remedies with respect thereto that it would have in the absence of this Agreement.

     9.21  **Authority**.  The individuals executing this Agreement on behalf of Developer and the instruments referenced on behalf of Developer represent and warrant that they have the legal power, right and actual authority to bind Developer to the terms and conditions hereof and thereof.

     9.22  **Counterpart Originals**.  This Agreement may be executed in duplicate originals, each of which is deemed to be an original.

[Signatures on next page]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the date and year first above written.

STANTON PLAZA GROUP, LLC,
a California limited liability company

By: _____ , President

By: _____ V.P.


STANTON PLAZA GROUP, LLC II,
a California limited liability company

By: _____ , President

By: _____ V.P.

STANTON REDEVELOPMENT AGENCY

By: _____
    John F. Wager, Jr.
    Executive Director

**ATTESTATION**

_Brenda Green_
Brenda Green, Agency Secretary

**APPROVED AS TO FORM,**

_Ralph D. Hanson_
Ralph D. Hanson, General Counsel

## ATTACHMENT 1

### Legal Description of the Site

# ATTACHMENT 1

## LEGAL DESCRIPTION OF THE SITE

In the City of Stanton, County of Orange, State of California, described as follows:

Those portions of Lot 5 of Section 25, Township 4 South, Range 11 West, San Bernardino Meridian as shown on a map of resurvey of J.W. Bixby Co.'s subdivision of a portion of Rancho Los Alamitos, filed in Book 2, Page 43 of Record of Surveys, in the office of the County Recorder of said County, together with those portions of the Southwest Quarter of the Northwest Quarter of said Section 25, as per map recorded in Book 51, Page 11, of Miscellaneous Maps, in the office of said County Recorder, described as follows:

The southerly 590.00 feet of the westerly 470.00 feet of said Lot 5.

Together with Parcels 1 and 2 as shown on a map filed in Book 66, Page 10 of Parcel Maps, in the office of said County Recorder.

Also together with the northerly 158.01 feet of the southerly 1128.01 feet, as measured parallel with the southerly line of said Lot 5, of the westerly 715.00 feet, as measured parallel with the easterly line of said Lot 5.

Except that portion lying easterly of the westerly side of a block wall distant approximately 323.00 feet from the above mentioned easterly line of said westerly 715.00 feet.



# ATTACHMENT 1

### Sketch to Accompany Legal Description of the Site

HUNSAKER & ASSOCIATES
IRVINE, INC.
PLANNING ■ ENGINEERING ■ SURVEYING
Three Hughes ■ Irvine, CA 92618 ■ PH: (949) 583-1010 ■ FX: (949) 583-0759

| 02-01-05 | - - - | L. GASTON |
|----------|-------|-----------|

**STANTON PLAZA**
CITY OF STANTON, COUNTY OF ORANGE, STATE OF CALIFORNIA

| SCALE: 1"= 200' | W.O. 3015-1X |
|-----------------|--------------|
|                 | SHEET 1 OF 1 |

— 106 —

## ATTACHMENT 2

### Diagram of the Site



— 108 —

## ATTACHMENT 2A

## Project Phasing Plan

### [To be inserted]



STANTON PLAZA
TENTATIVE TRACT 16837
ATTACHMENT 2A PHASING PLAN

## ATTACHMENT 3

### Form of Grant Deed

FREE RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

Stanton Plaza Group II
c/o Brandywine Homes
16580 Aston
Irvine, CA  92606
Attn:  James L. Barisic

(Space Above Line for Recorder's Use Only)

### GRANT DEED

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, the STANTON REDEVELOPMENT AGENCY, a public body, corporate and politic, herein called "Grantor," acting under the Community Redevelopment Law of the State of California, hereby grants to Stanton Plaza Group II, a California limited liability corporation, herein called "Grantee," the real property, hereinafter referred to as the "Acquisition Parcel," in the City of Stanton, County of Orange, State of California, more particularly described in Exhibit No. 1 attached hereto and incorporated herein by this reference.

As conditions of this conveyance, the Grantee covenants by and for itself and any successors-in-interest for the benefit of Grantor and the City of Stanton, a municipal corporation, as follows:

1.      Non-Discrimination.

Grantee covenants that there shall be no discrimination against, or segregation of, any persons, or group of persons, on account of race, color, creed, religion, sex, marital status, age, physical or mental disability, ancestry, or national origin in the rental, sale, lease, sublease, transfer, use, occupancy, or enjoyment of the Acquisition Parcel, or any portion thereof, nor shall Grantee, or any person claiming under or through Grantee, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees, or vendees of the Acquisition Parcel or any portion thereof.  The nondiscrimination and nonsegregation covenants contained herein shall remain in effect in perpetuity.

112/018138-0001
574288.04 a02/02/05

3-1

— /// —

2.    Form of Nondiscrimination Clauses in Agreements.

Grantee shall refrain from restricting the rental, sale, or lease of any portion of the Acquisition Parcel on the basis of race, color, creed, religion, sex, marital status, age, physical or mental disability, ancestry, or national origin of any person. All such deeds, leases, or contracts shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

(a)    Deeds: In deeds the following language shall appear: "The grantee herein covenants by and for itself, its heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, age, physical or mental disability, ancestry, or national origin in the sale, lease, rental, sublease, transfer, use, occupancy, tenure, or enjoyment of the land herein conveyed, nor shall the grantee itself, or any persons claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the land herein conveyed. The foregoing covenants shall run with the land."

(b)    Leases: In leases the following language shall appear: "The lessee herein covenants by and for itself, its heirs, executors, administrators, successors, and assigns, and all persons claiming under or through them, and this lease is made and accepted upon and subject to the following conditions:

"There shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, age, physical or mental disability, ancestry, or national origin in the leasing, subleasing, renting, transferring, use, occupancy, tenure, or enjoyment of the land herein leased nor shall the lessee itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the land herein leased."

(c) Contracts: In contracts the following language shall appear: " There shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, age, physical or mental disability, ancestry, or national origin in the sale, lease, rental, sublease, transfer, use, occupancy, tenure, or enjoyment of the land, nor shall the transferee itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees, or vendees of the land."

The foregoing covenants shall remain in effect in perpetuity.

3.    <u>Covenants to Run With the Land</u>.

The covenants contained in this Deed shall be construed as covenants running with the land and not as conditions which might result in forfeiture of title, and shall be binding upon Grantee, its heirs, successors and assigns to the Acquisition Parcel, whether their interest shall be fee, easement, leasehold, beneficial or otherwise.

This Deed may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

[Signatures on next page]

IN WITNESS WHEREOF, Grantor and Grantee have caused this instrument to be executed on their behalf by their respective officers or agents hereunto as of the dates written hereinbelow.

GRANTOR:

STANTON REDEVELOPMENT AGENCY, a public body, corporate and politic

Dated: _____, 2005

By:_____
    John F. Wager, Jr., Executive Director

ATTEST:

By:_____
    Brenda Green, Agency Secretary

APPROVED AS TO FORM:

By:_____
    Ralph D. Hanson, Agency Counsel

By its acceptance of this Deed, Grantor hereby agrees as follows:

1.     Grantee expressly understands and agrees that the terms of this Deed shall be deemed to be covenants running with the land and shall apply to all of the Grantee's successors and assigns (except as specifically set forth in the Deed).

2.     The provisions of this Deed are hereby approved and accepted.

GRANTEE:

STANTON PLAZA GROUP II, a California limited liability company

Dated: _____, 2005

By: _____
    Its: _____

Dated: _____, 2005

By: _____
    Its:_____

112/016138-0001
574286.04 a02/02/05

3-4

— 114 —

STATE OF CALIFORNIA     )
                                ) ss.

COUNTY OF ORANGE     )

    On _____ before me, a notary public, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

                       WITNESS my hand and official seal.

                       By: _____

                           _____

STATE OF CALIFORNIA     )
                                ) ss.

COUNTY OF ORANGE     )

    On _____ before me, a notary public, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

                       WITNESS my hand and official seal.

                       By: _____

                           _____

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF ORANGE             )

    On _____ before me, a notary public, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

              WITNESS my hand and official seal.

              By: _____

                  _____

## EXHIBIT NO. 1 TO ATTACHMENT 3

### DESCRIPTION OF ACQUISITION PARCEL

**[To be inserted]**

### ATTACHMENT 4

### Schedule of Performance

| ITEM OF PERFORMANCE | TIME FOR PERFORMANCE |
|---|---|
| 1. Developer executes and delivers Agreement to Agency | February 5, 2005 |
| 2. Agency holds public hearing on Agreement | February 8, 2005 |
| 3. Agency exercises reasonable diligence in effort to secure right for Developer to enter onto Kwon Parcel to perform invasive testing and investigation, including by means of court order if required (Section 1.11.2) | As soon as possible after Effective Date of Agreement |
| 4. Developer approves (or disapproves) Physical Condition of the Site as to the Kwon Parcel (Section 1.11.2) | On or before Due Diligence Deadline |
| 5. Agency obtains written appraisals for Acquisition Parcels and presents written offers to owners/occupants (Section 1.3.1) | Completed as to Kwon Parcel; Agency to exercise reasonable diligence in effort to obtain appraisals for Ronnenberg Parcel, Auto Zone Lease, and Beauty Shop Lease within thirty (30) days after Effective Date; written offers to be presented to owners/ occupants within ten (10) business days thereafter |
| 6. Agency exercises its best efforts to cause City to take final action to approve (or disapprove) discretionary Project Approvals for the Project (i.e., tentative tract map and site plan, but excluding CUPs and other permits for specific proposed businesses or uses within Commercial Phase (Sections 3.1.1 and 3.1.4) | Within sixty (60) days after Developer's submission of complete applications |
| 7. Agency enters into binding written agreements to acquire Acquisition Parcels or holds hearing to consider adoption of a Resolution or Resolutions of Necessity to determine whether or not to initiate condemnation to acquire the same (Section 1.3.1) | Within sixty (60) days after Agency makes offers to acquire (Item No. 5) |
| 8. If Agency elects to pursue condemnation, Agency files action(s) to acquire Acquisition Parcel(s) (Section 1.3.1) | Within ten (10) business days after Agency adopts Resolution(s) of Necessity |
| 9. Agency and Developer open Escrow for conveyance of Acquisition Parcels to be conveyed by Agency to Developer in fee (i.e., | Within three (3) business days after Agency enters into binding written agreement with existing owner(s) to purchase applicable |

| | |
|---|---|
| Ronnenberg Parcel and Kwon Parcel) (Section 1.12.1) | parcel or within three (3) business days after Agency files eminent domain action to acquire that parcel, whichever is later |
| **10. Deposits by Developer** | |
| a) Developer delivers Administrative Deposit (Section 1.4.2) | Within five (5) days after Effective Date of Agreement |
| b) Developer delivers Acquisition Deposit (Sections 1.3.2, 1.4.1, and 1.4.3) | At the time(s) and subject to the terms and conditions set forth in Sections 1.4.1 and 1.4.3 |
| c) Developer delivers Security Deposit to Agency (Section 8.9) | Within ten (10) business days after Developer's receipt of Agency demand and satisfactory evidence that Agency has incurred or will incur a corresponding amount of costs per Section 1.3.4; but in no event shall any portion of the Security Deposit be required to be delivered until the conditions to Developer's obligation to deliver the first payment of the Acquisition Deposit are satisfied or waived by the Developer in its sole and absolute discretion |
| 11. Agency exercises reasonable efforts to obtain order(s) for prejudgment possession for Acquisition Parcel(s) and to relocate all tenants and occupants (Sections 1.3.1, 1.4, and 8.9) | Application(s) for order(s) to be made within five (5) business days after Agency's receipt of Developer's written request for same (and provided that Developer has delivered portion of Acquisition Deposit and Security Deposit to Agency that are due at that time; effective date(s) of order(s) to be either 30 or 90 days after date(s) order(s) is(are) served, depending on whether the property is unoccupied or occupied, or such later time as the court may order |
| 12. Developer and Agency record Restrictive Covenants against the Site (Sections 1.12.3, 1.12.5, and 4.7) | Recordation against portions of Site currently owned by Developer to occur within ten (10) business days after the later of (i) the date the Agency enters into binding written agreements with current owners/occupants of Acquisition Parcels or adopts Resolution or Resolutions of Necessity authorizing exercise of Agency's power of eminent domain to acquire said parcels, and (ii) the date the City approves the discretionary Project Approvals for the Project (i.e., tentative tract map and site plan, but excluding any CUP, signage plans, variance, or similar permits that may be |

| | |
|---|---|
| | required for specific proposed businesses or uses within Commercial Phase; recordation against Ronnenberg Parcel and Kwon Parcel to occur at Close of Escrow for each said parcel |
| 13. Escrow Agent gives notice of fees, charges, and costs to close escrow(s) (Sections 1.12.3 and 1.12.5) | One (1) week prior to scheduled Closing Date(s) |
| 14. Deposits into Escrow | |
| a) Agency and Developer deposit executed Grant Deed and Restrictive Covenant (Section 1.12.3) | Three (3) days prior to the Closing Date for Acquisition Parcels to be conveyed in fee by Agency to Developer |
| b) Agency and Developer pay their respective shares of Escrow fees and closing costs and deposit the Taxpayer ID Certificate, Certificate of Insurance, FIRPTA Certificate, executed Declaration, etc. (Sections 1.12.3 and 5.1) | One (1) business day prior to the Closing Date |
| 15. Close of Escrow for each Acquisition Parcel to be conveyed in fee by the Agency to Developer and recordation and delivery of documents; Closing for other Acquisition Parcels (Section 1.12.2) | As soon as possible, but not later than five (5) business days after satisfaction (or waiver by benefited party or parties) of applicable conditions to Closing |
| 16. Developer pays its fair share contribution toward cost of Stanton Plaza Entitlements (Section 3.1.7) | Within five (5) business days after City issues grading permit for Residential Phase 1 (or first portion thereof) |
| 17. Developer commences construction of Residential Phase 1 (Sections 3.2 and 3.3) | Within two (2) months after later of (i) approval by City, Caltrans, and any other governmental agency with jurisdiction of all Project Approvals and Project Plans for that phase, including building permits and (ii) delivery of title or possession to Developer, as applicable, and relocation of all tenants and occupants |
| 18. Developer completes construction of Residential Phase 1 (Section 3.2) | Within thirty (30) months after commencement of construction (Item No. 16) |
| 19. Developer completes construction of Residential Phase 2 and Commercial Phase of Project (Sections 3.2 and 3.3) | Subject to the timely Closing on the Kwon Parcel, within thirty (30) months after deadline for completing Residential Phase 1 (Item No. 17) |
| 20. Developer completes construction of | Within twenty-four (24) months after |

| | |
|---|---|
| Residential/Live-Work Phase 3 of Project (Sections 3.2 and 3.3) | deadline for completing Residential Phase 2 and Commercial Phase (Item No. 18) |
| 21. Agency issues Releases of Construction Covenants (Section 3.3.1) | Within fifteen (15) days of written request by Developer, and Developer's satisfactory completion of all improvements on the applicable parcel(s) or within the applicable Phase of the Project |
| 22. Agency releases or reimburses unexpended portions of Security Deposit (Section 8.9) | Within the times specified in Section 8.9 of Agreement |
| | |

It is understood that this Schedule of Performance is subject to all of the terms and conditions of the text of the Agreement, including without limitation Section 9.2. The summary of the items of performance in this Schedule of Performance is not intended to supersede or modify the more complete description in the text; in the event of any conflict or inconsistency between this Schedule of Performance and the text of the Agreement, the text shall govern.

The time periods set forth in this Schedule of Performance may be altered or amended only by written agreement signed by both the Developer and the Agency. The Executive Director of Agency shall have the authority to approve extensions of time without action of the Board of Directors of Agency not to exceed a cumulative total of 180 days.

**ATTACHMENT 5**

**Release of Construction Covenants**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

[Insert name of owner of applicable parcel(s)]
c/o Brandywine Homes
16580 Aston
Irvine, CA 92606
Attn: James L. Barisic

SPACE ABOVE THIS LINE FOR RECORDING USE

OFFICIAL BUSINESS. Document exempt from recording fees
pursuant to Cal. Gov. Code §§ 6103 and 27383.

## RELEASE OF CONSTRUCTION COVENANTS

This Release of Construction Covenants ("Release"), is dated for reference purposes as of _____, 200__.

### RECITALS

A.      On or about February 8, 2005, the **STANTON REDEVELOPMENT AGENCY** ("Agency") and **STANTON PLAZA GROUP, LLC**, and **STANTON PLAZA GROUP II, LLC** (collectively, "Developer"), entered into that certain Owner Participation and Disposition and Development Agreement (the "OP/DDA") pertaining to the redevelopment of approximately 11.25 acres of real property located within the Agency's Consolidated Redevelopment Project Area at the northeast corner of Beach Boulevard and Orangewood Avenue, which real property is more particularly described in the legal description attached hereto and incorporated herein by reference as Exhibit No. 1 (the "Site"). The OP/DDA is a public record and is on file in the offices of the City Clerk of the City of Stanton located at 7800 Katella Avenue, Stanton, California 92860. Unless otherwise specified herein, all terms in initial capitalization in this Release shall have the meanings ascribed to them in the DDA.

B.      Pursuant to Section 3.3.1 of the OP/DDA, upon Developer's completion of construction of the portion of the Project on any legal parcel or parcels within the Site, the Agency is required upon Developer's request to issue to Developer a Release of Construction Covenants with respect thereto, and upon Developer's completion of construction of the various phases of the Project the Agency is required to issue a final Release of Construction Covenants with respect to said phase of the Project.

C.      Developer has substantially completed the portion of the Project or the phase of the Project located on the legal parcels within the Site more particularly

described in Exhibit No. 2 to this Release in accordance with applicable provisions of the OP/DDA and, accordingly, Developer is entitled to the issuance of this Release of Construction Covenants with respect thereto.

## CERTIFICATION

Based upon the foregoing Recitals, which are incorporated herein by this reference:

1.    Agency does hereby certify that Developer has satisfactorily completed construction of the portion of the Project located on the legal parcel or parcels described in Attachment "2" hereto in accordance with the OP/DDA.

2.  .   This Release of Construction Covenants shall not constitute evidence of compliance with or satisfaction of any obligation of Developer to any holder of a mortgage or any insurer of a mortgage securing money loaned to finance construction work on the portion of the Site described in Attachment "2" or any part thereof.  This Release of Construction Covenants is not a notice of completion as referred to in California Civil Code Section 3093.

3.    As of the date this Release of Construction Covenants is being recorded, all of the terms and conditions of the OP/DDA applicable to the property described in Attachment "2" shall be of no further force or effect, excepting only that those covenants applicable to the property described in Attachment "2" that are set forth in that certain Declaration of Restrictive Covenants dated _____, 200_, and recorded in the Official Records of Orange County, California, on _____, 200_, as Instrument No. _____ that are intended to survive the recordation of the Release of Construction Covenants shall remain in effect in accordance therewith.

[Signatures on next page]

**IN WITNESS WHEREOF**, Agency has executed this Release which shall be effective as of the date of recording hereof in the Official Records of the County of Orange, State of California.

**STANTON REDEVELOPMENT AGENCY**

By:_____
     John F. Wager, Jr.
     Executive Director

ATTESTATION:

By:_____
   Brenda Green
   Agency Secretary

     The undersigned owner of the legal parcel(s) described in Attachment "2" hereby consents to the recordation of this Release against said parcel(s).

[INSERT NAME OF LEGAL OWNER]

By:_____

**EXHIBIT NO. 1 TO ATTACHMENT 5**

**Legal Description of Site**

## EXHIBIT NO.1 TO ATTACHMENT 5
## LEGAL DESCRIPTION OF THE SITE

In the City of Stanton, County of Orange, State of California, described as follows:

Those portions of Lot 5 of Section 25, Township 4 South, Range 11 West, San Bernardino Meridian as shown on a map of resurvey of J.W. Bixby Co.'s subdivision of a portion of Rancho Los Alamitos, filed in Book 2, Page 43 of Record of Surveys, in the office of the County Recorder of said County, together with those portions of the Southwest Quarter of the Northwest Quarter of said Section 25, as per map recorded in Book 51, Page 11, of Miscellaneous Maps, in the office of said County Recorder, described as follows:

The southerly 590.00 feet of the westerly 470.00 feet of said Lot 5.

Together with Parcels 1 and 2 as shown on a map filed in Book 66, Page 10 of Parcel Maps, in the office of said County Recorder.

Also together with the northerly 158.01 feet of the southerly 1128.01 feet, as measured parallel with the southerly line of said Lot 5, of the westerly 715.00 feet, as measured parallel with the easterly line of said Lot 5.

Except that portion lying easterly of the westerly side of a block wall distant approximately 323.00 feet from the above mentioned easterly line of said westerly 715.00 feet.



Sketch to Accompany Legal Description of the Site

STANTON PLAZA
CITY OF STANTON, COUNTY OF ORANGE, STATE OF CALIFORNIA

HUNSAKER & ASSOCIATES
IRVINE, INC.
PLANNING ■ ENGINEERING ■ SURVEYING
Three Hughes ■ Irvine, CA 92618 ■ PH: (949) 583-1010 ■ FX: (949) 583-0759

| 02-01-05 | - - - | L. GASTON | | SCALE: 1"= 200' | W.O. 3015-1X |
| | | | | | SHEET 1 OF 1 |

— 127 —

## EXHIBIT NO. 2 TO ATTACHMENT 5

### Legal Description of Portion of Site Covered by this Release of Construction Covenants

### [To be inserted]

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA

COUNTY OF ORANGE

On _____, ____ before me, _____, personally appeared _____,

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

(SIGNATURE OF NOTARY)

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA

COUNTY OF ORANGE

On _____, ____ before me, _____, personally appeared _____,

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

(SIGNATURE OF NOTARY)

## ATTACHMENT 6

### Restrictive Covenants

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

STANTON REDEVELOPMENT AGENCY
7800 Katella Avenue
Stanton, CA 92680
Attn: Executive Director

SPACE ABOVE THIS LINE FOR RECORDING USE

OFFICIAL BUSINESS. Document exempt from recording fees
pursuant to Cal. Gov. Code §§ 6103 and 27383.

## DECLARATION OF RESTRICTIVE COVENANTS

This Declaration of Restrictive Covenants (the "Declaration") is dated for reference purposes as of _____, 2005.

### RECITALS

A.    On or about February 8, 2005, the **STANTON REDEVELOPMENT AGENCY** ("Agency") and **STANTON PLAZA GROUP, LLC**, and **STANTON PLAZA GROUP II, LLC** (collectively, "Owner"), entered into that certain Owner Participation and Disposition and Development Agreement (the "Agreement") pertaining to the redevelopment of approximately 11.25 acres of real property located within the Agency's Consolidated Redevelopment Project Area at the northeast corner of Beach Boulevard and Orangewood Avenue, which real property is more particularly described in the legal description attached hereto and incorporated herein by reference as Exhibit No. 1 (the "Site"). The Agreement and related documents are public records on file in the offices of the City Clerk of the City of Stanton located at 7800 Katella Avenue, Stanton, CA 92860. Unless otherwise specified herein, all terms in initial capitalization shall have the meanings ascribed to them in the Agreement.

B.    Owner is the legal owner of that portion of the Site more particularly described in Exhibit No. 2 to this Declaration and consents to the recordation of this Declaration against said parcel(s) (the "Owner's Property").

C.    The Agreement was entered into in accordance with, and subject to, the Redevelopment Plan for the Stanton Consolidated Redevelopment Project, as enacted by Agency pursuant to the Community Redevelopment Law, Health and Safety Code § 33000, et seq. ("Redevelopment Plan"). The Redevelopment Plan is a public record that is on file in the offices of the City Clerk of the City of Stanton located at 7800 Katella

Avenue, Stanton, California 92680.  The Redevelopment Plan is incorporated herein by this reference.

D.     This Declaration of Restrictive Covenants ("Declaration") was expressly required by the Agreement and is in furtherance of the goals and objectives of both the Redevelopment Plan and the Agreement.

E.     It is the intent of Owner to bind itself, and its successors, assigns, lessees, tenants, contractors, agents, and all persons claiming an interest in the Owner's Property and any portion thereof to own, use, maintain and transfer such property and any interest therein subject to the restrictions ("Restrictions") set forth in this Declaration.  The term "Owner" as used in this Declaration, includes Owner and its successors, assigns, lessees, tenants, contractors, agents, and all persons claiming an interest in the Owner's Property and any portion thereof by and through any of the foregoing.

**RESTRICTIONS ON THE USE,
MAINTENANCE, AND TRANSFER OF SITE**

**NOW, THEREFORE,** Owner, in consideration of Agency's entering into the Agreement and performing its obligations set forth therein, hereby agrees, covenants, and declares that the Owner's Property shall be owned, used, and maintained, and any interest in the Owner's Property shall be transferred, subject to the Restrictions of this Declaration as follows:

**ARTICLE 1.0 - Restrictions Run With the Land.** The restrictions ("Restrictions") set forth herein are limitations on the ownership and use of the land as provided in Civil Code § 784.  The Restrictions are made for the direct benefit of the Owner's Property, are appurtenant to the estate conveyed to Owner herein, and shall run with the land and be binding upon Owner, as defined herein, as provided in Civil Code § 1460 through § 1468.  These Restrictions benefit, and may be enforced only by, the Agency, the City of Stanton ("City"), and their respective successors or assigns.  Owner shall not challenge the Restrictions as set forth in this Declaration or any right of Agency or City created under this Declaration.    Owner expressly acknowledges and agrees that the Restrictions are reasonable restraints on Owner's right to own, use, maintain, and transfer the Owner's Property and any estate or interest therein and are not and shall not be construed to be an unreasonable restraint on alienation or a forfeiture.

**ARTICLE 2 .0 - Applicability and Enforceability of the Agreement.**  Prior to the issuance and recordation of a Release of Construction Covenants against any separate legal parcel within the Owner's Property pursuant to Section 3.3.1 of the Agreement, the provisions of the Agreement shall apply to said parcel.  After the date a Release of Construction Covenants is so issued or recorded (or such earlier date that Owner is entitled to the issuance and recordation of such Release, as applicable), and notwithstanding any other provisions set forth in the Agreement or this Declaration to the contrary, the Agreement shall be of no further force or effect with respect to the

parcel(s) as to which said Release applies, and the only surviving covenants applicable to said parcel(s) shall be those covenants set forth herein.

**ARTICLE 3 .0 - Use Covenant**.  Owner covenants and agrees for itself, its successors and assigns, and any successor-in-interest to the Owner's Property or part thereof, that for a period of ten (10) years after the date this Declaration is recorded or upon such earlier date that the Agreement is terminated with respect to the Owner's Property or portion thereof, if such termination occurs prior to the Agency's issuance of its Release of Construction Covenants, whichever first occurs, Owner shall use the Owner's Property in accordance with the following provisions:

3.1 **Limit on Conveyances of Non-Residential Parcels to Tax Exempt Entities**.  Owner, its successors, and assigns shall not sell, convey, transfer, assign, lease, or sublet any non-residential parcel or lot within the Owner's Property or the buildings or any improvements thereon to any person or entity that is exempt, or that is seeking exemption, from payment of *ad valorem* taxes imposed under Article XIII A of the California Constitution ("Tax Exempt Entity"), unless one of the following conditions is met:

3.1.1 <u>Convey to Agency or City</u>.  Owner may sell, convey, transfer, assign, lease or sublet all or any portion of the Owner's Property and buildings and improvements thereon to the Agency, the City of Stanton, any division, department, or affiliated agency of either the Agency or City and any directly controlled and related entity of the Agency or City; or

3.1.2 <u>In Lieu Payments</u>.  Owner may sell, convey, transfer, assign, lease or sublet all or any portion of any non-residential parcel or lot within the Owner's Property and the buildings and improvements thereon to any Tax Exempt Entity, except for any publicly funded schools (or any directly controlled and related entity of publicly funded schools), provided that Owner pays to Agency an amount equal to the *ad valorem* taxes the entity would be required to pay in accordance with Article XIII A of the California Constitution and implementing laws and regulations, if it were not a Tax Exempt Entity.  In the event of the sale of any non-residential parcel, lot, or building or improvement thereon to a Tax Exempt Entity (excluding publicly funded schools as provided herein), Owner shall pay to Agency, prior to closing of such sale or similar transaction, an amount agreed upon by the parties that equals a fair approximation of the property tax increment revenues that will be lost by the Agency as a result of such sale.  In the event of a lease or similar transaction to a Tax Exempt Entity, Owner shall pay to Agency, annually (on or before December 31st of each year) during the term of the lease or interest conveyed, an amount equal to the property tax increment revenues that would have been received by the Agency if the lease or similar transaction had been undertaken with a non-Tax Exempt entity.

**ARTICLE 4 .0 - Maintenance of the Non-Residential Parcels Within the Site**.  Owner covenants and agrees for itself, its successors and assigns, and any successor-in-interest to any non-residential parcel or lot within the Owner's Property, or part thereof, that for a period of ten (10) years after the date this Declaration is recorded it will, at its

sole cost and expense: (i) maintain the appearance and safety of such non-residential parcel or lot (including all improvements, fixtures, and landscaping) in good order, condition, and repair, and free from the accumulation of trash, waste materials, and other debris; (ii) remove all graffiti placed upon such parcel (including all improvements, fixtures, and landscaping) within seventy-two (72) hours of its appearance; (iii) maintain in good order, condition and repair, properly functioning landscape irrigation systems on such parcel; and (iv) remove and promptly replace all dead or diseased landscaping material on such parcel.  In the event of a default of this Covenant and of a failure to cure the default within thirty (30) days after service of a written notice by Agency and/or the City, Agency and/or the City or their agents, employees and contractors shall have the right to enter upon such parcel without further notice and to take such actions as are necessary to cure the default.  Owner shall reimburse Agency and/or the City for all costs associated with cure of the default (including but not limited to, staff services, administrative costs, legal services, and third party costs), within thirty (30) days after service of a written notice by Agency and/or City.  If Owner fails to pay within the time provided, such costs shall be a lien upon such parcel, as provided by California Civil Code §2881.  Agency may enforce and foreclose such lien in any manner legally allowed.

**ARTICLE 5 .0 - <u>Nondiscrimination and Nonsegregation</u>.**   Owner covenants and agrees for itself, its successors and assigns and any successor-in-interest to the Owner's Property or part thereof, that it shall abide by the following provisions:

  5.1  **Obligation to Refrain from Discrimination**. They shall refrain from restricting the rental, sale, lease, sublease, transfer, use development, occupancy, tenure, or enjoyment of the Owner's Property on the basis of race, color, creed, religion, sex, marital status, ancestry, or national origin.  They shall not establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the land herein conveyed. This covenant and restriction shall remain in effect in perpetuity.

  5.2  **Nondiscrimination and Nonsegregation Clauses**. Any deeds, leases, or contracts which are proposed to be, or which are, entered into with respect to the rental, sale, lease, sublease, transfer, use, development, occupancy, tenure, or enjoyment of the Owner's Property (including improvements and fixtures) (or party thereof), shall be subject to, and shall expressly contain, nondiscrimination or nonsegregation clauses in substantially the following form:

    5.2.1  <u>In Deeds</u>. "The grantee herein covenants by and for itself, its successors and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group or persons on account of race, color, creed, religion, sex, marital status, ancestry, or national origin in the rental, sale, lease, sublease, transfer, use, occupancy, tenure of the land herein conveyed, nor shall the grantee itself or any person claiming under or through it, establish or permit any such practice or practices or discrimination or segregation with reference to the selection, location, number, use or occupancy or tenants, lessees,

subtenants, sublessees, or vendees in the land herein conveyed.  The foregoing covenants shall run with the land."

   5.2.2 In Leases.  "The lessee covenants by and for itself, its successors and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group or persons on account of race, color, creed, religion, sex, marital status, ancestry, or national origin in the rental, sale, lease, sublease, transfer, use, occupancy, tenure of the land herein conveyed, nor shall the grantee itself or any person claiming under or through it, establish or permit any such practice or practices or discrimination or segregation with reference to the selection, location, number, use or occupancy or tenants, lessees, subtenants, sublessees, or vendees in the premises herein leased."

   5.2.3 In Contacts.  "There shall be no discrimination against or segregation of, any person or group or persons on account of race, color, creed, religion, sex, marital status, ancestry, or national origin in the rental, sale, lease, sublease, transfer, use, occupancy, tenure of the land or premises affected by this instrument, nor shall the contracting or subcontracting party or parties, or other transferees under this instrument or any person claiming under or through it establish or permit any such practice or practices or discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees, or vendees of the land. This provision shall obligate the contracting and subcontracting party or parties, and other transferees under this instrument or any person claiming under or through it."

   The covenants and restrictions in this Section 5.2 shall remain in effect in perpetuity.

   5.3  **Taxes and Encumbrances**.  For a period of ten (10) years after the date of recordation of this Declaration or upon such earlier date that the Agreement is terminated with respect to the Owner's Property or portion thereof, if such termination occurs prior to the Agency's issuance of its Release of Construction Covenants, whichever first occurs, Owner shall pay, when due: (i) all *ad valorem* property taxes imposed on the Owner's Property under Article XIII A of the California Constitution; (ii) all special taxes imposed on the Owner's Property (or applicable portion thereof); (iii) all special assessments imposed on the Owner's Property (or applicable portion thereof); (iii) all taxes payable under the California Bradley-Burns Uniform Local Sales & Use Tax Law, Revenue and Taxation Code § 7200, et seq.; and (iv) all other taxes, assessments, fees, exactions, or charges any portion of which are allocated to, or received by, the City or Agency and which are imposed due to the ownership, use, or possession of the Owner's Property (or applicable portion thereof) or interest therein. Upon failure to so pay, Owner shall remove any lien, levy, or encumbrance made on the Owner's Property (or applicable portion thereof) within ninety (90) days of the attachment of such.  Notwithstanding the foregoing, nothing in this Declaration is intended or shall be construed as a waiver or release of Owner's right to object to or challenge the imposition of any such taxes, assessments, fees, exactions, or charges or

their validity or applicability to Owner or the Owner's Property (or applicable portion thereof).

5.4 **Compliance with Laws.**  Owner covenants and agrees for itself, its successors and assigns and any successor-in-interest to the Owner's Property or part thereof, that it shall operate and maintain the improvements existing from time to time on the Owner's Property or portion thereof in conformity with the Redevelopment Plan during the remaining term thereof.

**ARTICLE 6 .0 - Effect of Violation.**  Agency and City are deemed the beneficiaries of the terms and provisions of this Declaration.  Only Agency and City shall have the right, but not the obligation, if the Agreement, this Declaration or the covenants or restrictions set forth herein are breached, to exercise all rights and remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breaches to which it or any other beneficiaries of the Agreement or this Declaration may be entitled.

**ARTICLE 7 .0 - Rights of Holder.**  The Restrictions and provisions of this Declaration do not limit the right of any mortgagee, beneficiary under a deed of trust, or other lien holder which secures construction or permanent financing to foreclose or otherwise enforce any mortgage, deed of trust or other lien upon the Owner's Property or any portion thereof, or the right of any mortgagee, beneficiary under a deed of trust, or lien holder to exercise any of its remedies for the enforcement of any pledge or lien upon the Owner's Property or portion thereof; provided, however that in the event of any foreclosure under any such mortgage, deed of trust or other lien, or a sale pursuant to any power of sale included in any  such mortgage or deed of trust, the purchaser or purchasers and their successors and assigns and the Owner's Property shall be and shall continue to be subject to all of the Restrictions and provisions contained in this Declaration.

**ARTICLE 8 .0 - Remedies for Breach.**  Agency and its successor and assigns, may utilize any or all of the following provisions in the event of a default or breach of this Declaration:

8.1 **Specific Performance.**  The use and maintenance of the Owner's Property in accordance with this Declaration are of a special and unique kind and character and the rights granted to Agency, its successors, and its assigns, hereunder are of a similar special and unique kind and character so that if there is a breach by Owner of any material provision of this Declaration, Agency, its successors, and its assigns, would not have an adequate remedy at law.   Therefore, Agency's rights, and those of its successors, and its assigns hereunder may be enforced by an action for specific performance and such other equitable relief as is provided by the laws of the State of California.  In any action seeking enforcement or interpretation of any of the terms or provisions of this Declaration, the prevailing party shall be awarded, in addition to damages, injunctive relief, or other relief, its Litigation Expenses, as provided in Section 10.2.3. [Attorney Fees] of this Declaration.

8.2  **Legal Actions**.  In addition to any other rights and remedies any party may institute a legal action to require the cure of any breach or default and to recover damages for any breach or default, or to obtain any other remedy consistent with the purpose of this Declaration. The following provisions shall apply to any such legal action:

8.2.1  <u>Jurisdiction and Venue</u>.  Legal actions must be instituted and maintained in the Superior Court of the County of Orange, State of California, or in the United States District Court for the Central District of California. Owner specifically waives any rights provided to it pursuant to California Code of Civil Procedure § 394 or federal or state statutes or judicial decisions of like effect.

8.2.2  <u>Applicable Law</u>.  The laws of the State of California shall govern the interpretation and enforcement of this Declaration.

8.2.3  <u>Attorney's Fees</u>.  In the event either party commences an Action (as defined herein) against the other party which arises out of a default of, breach of, failure to perform this Declaration, or otherwise related to this Declaration, then the Prevailing Party (as defined herein) in the Action shall be entitled to recover its Litigation Expenses (as defined herein) from the other party in addition to whatever relief to which the Prevailing Party may be entitled. For the purposes of this Section, the term "Action" means any law suit, court or administrative proceeding (whether of a legal or equitable nature), arbitration or mediation (whether binding or non-binding), or any other alternative dispute resolution procedure, and the filing, recording, or service of any process,  notice, claim, lien, or other instrument which is a prerequisite to commencement of the Action.  For the purposes of this Section, the term "Litigation Expenses" means all costs and expenses, to the extent such are reasonable in amount, that are actually and necessarily incurred in good faith by the Prevailing Party directly related to the Action, including, but not limited to, court costs, filing, recording, and service fees, copying costs, exhibit production costs, special media rental costs, attorneys fees, consultant fees, fees for investigators, witness fees (both lay and expert), travel expenses, deposition and transcript costs, and any other cost or expense reasonably and necessarily incurred by the Prevailing Party in good faith and directly related to the Action. For the purposes of this Covenant, the term "Prevailing Party" shall have the meaning ascribed in Code of Civil Procedure § 1032(a)(4).

8.3  **No Liability for Non-Enforcement of Declaration**.  Agency, its successors, or its assigns has the right, but not the duty, to enforce the provisions of this Declaration.  However, Agency, its successors, or its assigns shall have no obligation to enforce this Declaration and shall have no liability for not enforcing the same.

8.4  **Rights and Remedies are Cumulative**.  The rights and remedies of Agency regarding enforcement of this Declaration are cumulative, and the exercise by Agency of one or more of its rights or remedies shall not preclude the exercise by it, at the same or different time, of any other rights or remedies for the same default or any other default by Owner.

8.5 **No Waiver.** Failure to insist on any one occasion upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any rights or powers hereunder at any one time or more times be deemed a waiver or relinquishment of such other right or power at any other time or times.

**ARTICLE 9 .0 -** Recitals**.** The Recitals set forth at the beginning of this Declaration are a substantive and integral part of this Declaration and are incorporated by reference.

**ARTICLE 10 .0 -** Interpretation**.**   Owner acknowledges that this Declaration is the product of mutual arms-length negotiation and drafting and each represents and warrants to the other that it has been represented by legal counsel in the negotiation and drafting of this Declaration. Accordingly, the rule of construction which provides the ambiguities in a document shall be construed against the drafter of that document shall have no application to the interpretation and enforcement of this Declaration. In any action or proceeding to interpret or enforce this Declaration, the finder of fact may refer to such extrinsic evidence not in direct conflict with any specific provision of this Declaration to determine and give effect to the intention of the parties hereto.

**ARTICLE 11 .0 -** Severability**.**   Each provision, term, condition, covenant, and/or restriction, in whole and in part, in this Declaration shall be considered severable.  In the event any provision, term, condition, covenant, and/or restriction, in whole and/or in part, in this Declaration is declared invalid, unconstitutional, or void for any reason, such provision or part thereof shall be severed from this Declaration and shall not affect any other provision, term, condition, covenant, and/or restriction, of this Declaration and the remainder of the Declaration shall continue in full force and effect.

**ARTICLE 12 .0 -** Amendments to Declaration**.**   Any modification, change, or amendment to this Declaration must be in writing and signed by the appropriate authorities of Agency and Owner and thereafter appropriately recorded in the Official Records of the County of Orange, State of California.

[Signatures on next page]

**IN WITNESS WHEREOF**, Owner has executed this Declaration which shall be effective as of the date of recording hereof in the Official Records of the County of Riverside, State of California.

**[INSERT NAME OF OWNER]**

[Acknowledgment Required]

By:_____

[Acknowledgment Required]

By:_____

Acknowledgment is hereby made to Owner's grants of this Declaration and its Restrictions in favor of Agency and City.

**STANTON REDEVELOPMENT AGENCY**

Date: _____

By:_____
    John F. Wager, Jr., Executive Director

ATTESTATION:

By:_____
    Brenda Green
    Agency Secretary

APPROVED AS TO FORM

By: _____
    Ralph D. Hanson
    Agency Counsel

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA

COUNTY OF ORANGE

On _____, ____ before me, _____, personally appeared _____,

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

(SIGNATURE OF NOTARY)

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA

COUNTY OF ORANGE

On _____, _____ before me, _____, personally appeared
_____,

☐ personally known to me - OR - ☐ proved to me on the basis of satisfactory
evidence to be the person(s) whose names(s)
is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(SIGNATURE OF NOTARY)

## EXHIBIT NO. 1 TO ATTACHMENT 6

**Legal Description of Site**

## EXHIBIT NO.1 TO ATTACHMENT 6

## LEGAL DESCRIPTION OF THE SITE

In the City of Stanton, County of Orange, State of California, described as follows:

Those portions of Lot 5 of Section 25, Township 4 South, Range 11 West, San Bernardino Meridian as shown on a map of resurvey of J.W. Bixby Co.'s subdivision of a portion of Rancho Los Alamitos, filed in Book 2, Page 43 of Record of Surveys, in the office of the County Recorder of said County, together with those portions of the Southwest Quarter of the Northwest Quarter of said Section 25, as per map recorded in Book 51, Page 11, of Miscellaneous Maps, in the office of said County Recorder, described as follows:

The southerly 590.00 feet of the westerly 470.00 feet of said Lot 5.

Together with Parcels 1 and 2 as shown on a map filed in Book 66, Page 10 of Parcel Maps, in the office of said County Recorder.

Also together with the northerly 158.01 feet of the southerly 1128.01 feet, as measured parallel with the southerly line of said Lot 5, of the westerly 715.00 feet, as measured parallel with the easterly line of said Lot 5.

Except that portion lying easterly of the westerly side of a block wall distant approximately 323.00 feet from the above mentioned easterly line of said westerly 715.00 feet.



# ATTACHMENT 1

Sketch to Accompany Legal Description of the Site

_— 144 —_

## EXHIBIT NO. 2 TO ATTACHMENT 6

### Legal Description of Owner's Property

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

ORIGINAL

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>AUTOZONE DEVELOPMENT CORPORATION | **DEFENDANTS**<br>STANTON PLAZA GROUP II, LLC<br>BRANDYWINE DEVELOPMENT CORPORATION |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Nevada and Tennessee | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Orange |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Michael J. Finnegan #137408, Nathan M. Spatz #204769<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>725 S. Figueroa St., Suite 2800<br>Los Angeles, CA 90017-5406 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No    ☒ MONEY DEMANDED IN COMPLAINT: $ In excess of $75,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Breach of Contract, Injunctive Relief

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty<br>☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment<br>☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☒ 890 Other Statutory Actions | ☒ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs<br>☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | | | FEDERAL TAX SUITS |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land | ☐ 240 Torts to Land<br>☐ 245 Tort Product Liability | | | |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 290 All Other Real Property | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed, remanded or dismissed or closed? ☒ No   ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:** Case Number: ~~CV05-6157 R(CWx)~~

| CV-71 (07/05) | **CIVIL COVER SHEET** | Page 1 of 2 |
|---|---|---|

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☐ No ☑ Yes

If yes, list case number(s): SACV05-690-JVS (RNBX)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
        ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
        ☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
        ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

    Nevada
    Tennessee

List the California County, or State if other than California, in which **EACH** named defendant resides.  (Use an additional sheet if necessary).
☐  Check here if the U.S. government, its agencies or employees is a named defendant.

    County of Orange, California

**List the California County**, or  State if other than California, in which **EACH** claim arose.  (Use an additional sheet if necessary)
**Note:** In land condemnation cases, use the location of the tract of land involved.

    County of Orange, California

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Matthew Lysak_    Date 8/22/05

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |